## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RYAN MUCAJ et al.                              :

v.                                             :        3:20-cv-66 (MPS)

UNIVERSITY OF CONNECTICUT et al.    :        JANUARY 15, 2020

### EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

In accordance with Federal Rule of Civil Procedure 65 and Local Rule 7(a)(6), the Plaintiffs move for emergency injunctive relief, as either a temporary restraining order or a preliminary injunction. Without such emergency relief, the plaintiffs on-campus housing is threatened, their First Amendment rights will continue to be infringed, and the defendants will continue to act in derogation of the consent decree, judgment and court order in *Nina Wu v. University of Connecticut*, CV H-89-649 (PCD) (January 25, 1990)[1] (hereinafter "the consent decree"). Good cause exists for an emergency hearing in light of the degree of irreparable harm and the compressed nature of the timeline here.

### SUMMARY OF ARGUMENT

This First Amendment case arises out of disciplinary proceedings against the plaintiffs, seniors at the University of Connecticut (school), based on their use of an offensive word, the racial slur "nigger" on October 11, 2019. A conduct officer of the school, Defendant Kytan, found that the plaintiffs violated the "Disruptive Behavior" policy. The officer also found that, among other things, the plaintiffs should be removed from student housing as punishment. The plaintiffs seek a temporary restraining order

_____

[1] It appears that the handwritten docket number is 16.

1

or preliminary injunction specifically enjoining the school from enforcing the Disruptive Behavior policy as-applied to the plaintiffs in administrative proceeding, and in particular a January 17, 2020 2:00pm hearing and from removing the students from their housing.

The plaintiffs are likely to succeed on the merits for several reasons. The school's conduct is plainly a content-based and viewpoint-based restriction on speech, prohibited by the First and Fourteenth Amendments.  Censorship of particular viewpoints, however offensive, is almost invariably unconstitutional.  In addition, the disciplinary proceedings violate a standing court order in the consent decree. See Exhibit 1 (copy of the consent decree); see also Exhibit 2 (Dec. 11, 1989 newspaper article concerning case). Finally, the "Disruptive Behavior" policy is vague, overbroad, and leaves too much discretion to decision-makers as concerns speech.

The other requirements for preliminary relief are met as well.  As concerns irreparable harm, in First Amendment cases, irreparable harm is presumed when the infringement is direct, like in this case. *Bronx Household of Faith v. Board of Education of City of New York*, 331 F.3d 342, 349–50 (2d Cir. 2003). Even if it were not presumed, damages cannot compensate the loss of access to the school learning environment or the loss of the comfort of a familiar home apartment.  In addition, the harm to the students absent an injunction is great, whereas the harm to the school with an injunction is essentially nonexistent. Removing the students from housing is in essence an immediate eviction, effected within 24 hours.  Such an upheaval at the start of a semester would have drastic implications on the plaintiffs' academic performance, not to mention their physical well-being.  In contrast, the school suffers no harm. The school would merely maintain the housing contract it already has with the plaintiffs, and having

2

already made its finding, there is no reason to believe delaying administrative proceedings could prejudice the school. Moreover, the public interest favors protecting the plaintiffs' freedom of speech.

Finally, good cause exists for the emergency nature of this motion. By the nature of the timing here, given the hearing two days hence, delay specifically jeopardizes the students' rights. The students received notice of the hearing on January 8, 2020.  In light of the degree of irreparable harm, the compressed timeline, the constitutional interest in prohibiting government action that chills the speech of non-parties to this action, and because the defendants flagrantly violate the order from this court in the consent decree, there is a particular exigency in the present case that merits a finding of good cause for an emergency motion.

## OPERATIVE FACTS

### Consent Decree[2]

In early 1989, Nina Wu was a junior at the University of Connecticut. Ms. Wu hung a handmade poster on her dormitory room door.  The poster listed the types of people who were "welcome," "tolerated." "unwelcome," and "shot on sight"—the last of which listed "bimbos," "preppies," "racists," and "homos." The school found that Ms. Wu violated the school harassment policy by way of the poster. Based on the use of the word "homos," the school expelled Ms. Wu from all residential and dining halls in April, 1989.  In response, Ms. Wu subsequently brought an action in federal District Court, District of Connecticut, pursuant to 42 U.S.C. § 1983, alleging deprivation of her First

---

[2]The facts outside of the consent decree itself are derived from conversations with counsel on the case as well as the December 11, 1989 New York Times news story, which counsel on the case confirmed to be accurate.  See Exhibit 2.  The plaintiffs do not possess a copy of the court file, pleadings, or discovery in *Wu*.

Amendment rights.  Although she denied writing the word "homos," she asked the court to assume that she did.

On January 25, 1990, the court, the Honorable Peter C. Dorsey, District Judge, entered judgment in accordance with the consent decree.  Pursuant to that consent decree, the school agreed to be permanently enjoined from enforcing the school harassment policy employed against Ms. Wu, as that policy existed at the time.  Specifically, the school agreed to excise the prohibition in the policy concerning "making personal slurs or epithets based on race . . . ." *See* Exhibit 1 (at consent decree's exhibit). In its place, the school adopted a policy prohibiting the "face-to-face" use of "fighting words," in accordance with that legal doctrine.  *See id.*

The school furthermore agreed to be permanently enjoined from "enforcing . . . any other policy that interferes with the exercise of First Amendment rights by the plaintiff or any other student, when the exercise of such rights is unaccompanied by violence or the imminent threat of violence." *See* Exhibit 1 (consent decree at ¶ 1).  The school also agreed to provide Ms. Wu with a dormitory room, to restore her dining privileges, and to pay Ms. Wu reasonable attorneys' fees. *See id.* (consent decree at ¶¶ 3, 5).

At some point after that, the school and its officials and employees began to systemically disregard their obligations under the consent decree.  They failed to take any reasonable precautions to ensure the order is followed or even that successive officials were made aware of its existence.

**January, 2015 Letter**

On January 26, 2015, the American Civil Liberties Union of Connecticut (ACLU-

CT) sent a letter to the Office of President of the school. *See* Exhibit 3. The letter expressed concerns over how the school's policies threatened First Amendment rights. Among other things, the letter reminds the school of its obligations pursuant to the consent decree.

**October 11, 2019 Incident and Arrest**

On October 11, 2019, Defendant Daugherty viewed an October 11, 2019 video that allegedly showed the plaintiffs' walking through a parking lot, late at night.  A student emailed to her an internet link to the video.[3]  Defendant Daugherty believed she heard the defendants utter the word "nigger" in the video.  That utterance is inaudible or indiscernible at normal volume—the utterance was only audible or discernible using a feature to highly amplify the recording. *See* Exhibit 5 (at warrant affidavit page 2).

Defendant Daugherty reported what she viewed to the University of Connecticut Police. *See* Exhibit 4. A police investigation ensued, which resulted in an arrest warrant. *See* Exhibit 5 (information and warrant affidavit).

According to the warrant, video, and witnesses, there were three students walking together.  Their conduct was identical except two of them—the plaintiffs— uttered a racial slur.  Only the students who uttered a racial slur faced criminal charges, even though all other conduct among the students was the same.

Both school officials and school police described what occurred as a "bias incident" in correspondence.  *See* Exhibit 6 at RM20, RM22–26; Exhibit 7 at JK21, JK23–27 (same documents).

---

[3] An unedited version of the video is available at
https://twitter.com/naacpuconn/status/1182821535670648833?s=21.

**UConn Disciplinary Hearings and Findings**

Starting in October, 2019, the school commenced disciplinary processes against the students.  The first hearings were general and informational in nature as to the administrative process.  On October 23, 2019, Conduct Officer Kytan had the first such hearing with Karal, and on October 25, 2019, she had the first such hearing with Mucaj.

Conduct Officer Kytan informed both students that they were being investigated because of "remarks directed towards race/ethnicity."  In the October 25, 2019 hearing, Mucaj asked Conduct Officer Kytan if Mucaj was being investigated "because of something I said," and Kytan responded, "Yes."

On November 1, 2019, Conduct Officer Kytan conducted a factfinding hearing of Mucaj, and on November 4, 2019, Conduct Officer Colon conducted a factfinding hearing of Karal.  Among other things, Conduct Officer Colon asked Karal as to the spelling of the word he uttered on October 11, 2019.  She asked whether the utterance was a word that is spelled "n-i-g-g-a'" or whether the utterance was a word that is spelled "n-i-g-g-e-r."

On November 13, 2019, Karal was subjected to an investigative hearing by the nursing school. During this meeting, Nursing School Officials made it explicitly clear to Karal that he was being investigated for the content of his speech on October 11, 2019. From start to finish of the investigation, Conduct Officer Kytan describes the investigation as concerning "remarks directed towards race/ethnicity." *See* Exhibit 8 (October 23, 2019 Letter); Exhibit 6 at RM1; Exhibit 7 at JK1.

On November 19, 2019, Conduct Officer Kytan detailed her findings to Mucaj, and on November 20, 2019, she detailed her findings to Karal.  She "found" that the

students violated a policy worded as follows:

> Disruptive behavior, which is defined as participating in or inciting others to participate in the disruption or obstruction of any University activity, including, but not limited to: teaching, research, events, administration, student conduct proceedings, the living/learning environment, or other University activities, on or off-campus; or of other non-University activities when the conduct occurs on University premises; or of the living environment, on or off-campus.

Conduct Officer Kytan found and explained, that among other things, the appropriate sanction was to terminate the students' housing agreement with the school. She explained that the students could acquiesce and accept her finding or challenge her finding by way of another hearing.

At no point in any of the proceedings was either student accused of acting with violence or the imminent threat of violence, or any misconduct even remotely approaching such.  The school has only ever accused the students of acting orally and verbally.

On January 8, 2020, the plaintiffs were each noticed that such a hearing would be conducted on January 17, 2020, with or without their presence.  That same day, General Counsel for the school clarified and affirmed that any discipline imposed at the January 17, 2020 hearing would go into effect **immediately**, without a stay even if review was sought.  Exhibit 9.  Further communications with that office verified that only a specific Court Order could stop proceedings.  This lawsuit followed.

### RELEVANT LEGAL STANDARDS

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414, 109 S. Ct.

2533 (1989).  It is well established that racial epithets, without more, fall within the aegis

of the First Amendment. *See Matal v. Tam*, 137 S. Ct. 1744, 198 L. Ed. 2d 366 (2017).

Prohibitions against racial epithets amount to not just impermissible content

discrimination, but viewpoint discrimination.  *See R.A.V. v. City of St. Paul*, 505 U.S.

377, 391–92, 112 S. Ct. 2538 (1992).

Under Rule 65 of the Federal Rules of Civil Procedure, courts weigh four factors

when deciding whether to grant a motion for preliminary injunction: (1) has the movant

shown a reasonable probability of success on the merits; (2) will the movant be

irreparably harmed by denial of the relief; (3) will granting preliminary relief result in

even greater harm to the non-moving party; and (4) is granting preliminary relief in the

public interest.

This is not a case where the required showing of success on the merits is

elevated.  In our circuit, "[w]here the movant seeks a mandatory injunction (one that will

alter the status quo) rather than a prohibitory injunction (one that maintains the status

quo), the likelihood-of-success standard is elevated: the movant must show a clear or

substantial likelihood of success."  *Hoblock v. Albany City Board of Elections*, 422 F.3d

77, 97 (2d Cir. 2005).  The injunction in this case is only prohibitory, however, so the

plaintiffs need only show a likelihood of success.

"Where a plaintiff alleges injury from a rule or regulation that directly limits

speech, the irreparable nature of the harm may be presumed. . . .  [I]n instances where

a plaintiff alleges injury from a rule or regulation that may only potentially affect speech,

the plaintiff must establish a causal link between the injunction sought and the alleged

injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared

deprivation of free speech rights." *Bronx Household of Faith v. Board of Education of City of New York*, 331 F.3d 342, 349–50 (2d Cir. 2003).

"[S]ecuring First Amendment rights is in the public interest. . . .  [T]he Government does not have an interest in the enforcement of an unconstitutional law." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation omitted; internal quotation marks omitted).

## I. THE PLAINTIFFS HAVE A LIKELIHOOD OF SUCCESS ON THE MERITS

It is clear that the school is engaging in impermissible content and viewpoint discrimination.  It is equally plain that the school is violating the consent decree in *Wu.*

Consider the treatment of the plaintiffs vis-à-vis the third student.  The only difference in conduct was that the plaintiffs uttered a racial slur and the third student did not.  This is plain in the conduct officer's findings, arrest warrant affidavit, and the record.  *See* Exhibit 5 (warrant affidavit at 4–6); Exhibit 6 (RM4 at "witness 3"); Exhibit 7 (JK 18 "it was just me and [Mucaj] playing the game").  If there was a content-neutral rule at issue, then the third student would have been punished as well—but he wasn't.  *See* Exhibit 10 (Mucaj Affidavit); Exhibit 11 (Karal affidavit).

The focus of the investigation also evinces impermissible content and viewpoint discrimination. The conduct officer's findings and conclusions as to both plaintiffs focus on the racial epithet.  Exhibit 6 at RM 4; Exhibit 7 at JK4.  There is no focus on something content neutral, like time, place, manner, or volume.  As stated above, from start to finish Kytan describes the investigation as concerning "remarks directed towards race/ethnicity." *See* Exhibit 8 (October 23, 2019 Letter); Exhibit 6 at

9

RM1; Exhibit 7 at JK1.  Other officials describe what happened as a "bias" incident. *See* Exhibit 6 at RM20, RM22–26; Exhibit 7 at JK21, JK23–27 (same documents). No one describes the incident as "loud" or the like.

Statements by the Conduct Officers themselves also show that the proceedings are all about content and viewpoint discrimination.  Conduct Officer Colon was so concerned with content as to inquire as to the spelling of the utterance—which begs the question as to which is protected and which is not?  *See* Exhibit 11. Finally, Conduct Officer Kytan herself states affirmed to Mucaj that the issue was the content of his speech: something he said. *See* Exhibit 10.  Not how loud he was.  Not where he was.  Not the time of day.  Not his alcohol consumption. It was about the content and viewpoint of his speech.

The video evidence does not support a finding that the students' conduct was disruptive.  In her findings, Kytan principally uses video evidence for *identity*. See Exhibit 6 RM3–4.

Because the policy being enforced implicates First Amendment rights without violence or threat of violence, the consent decree is violated.  In addition, because the enforcement is based on impermissible content and viewpoint discrimination, the plaintiffs have a likelihood of success on the merits.

## II.  THE PLAINTIFFS ARE IRREPARABLY HARMED WITHOUT RELIEF

"Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed. . . .  [I]n instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between the injunction sought

and the alleged injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights." *Bronx Household of Faith v. Board of Education of City of New York*, 331 F.3d 342, 349–50 (2d Cir. 2003).

Here, the viewpoint and content discrimination from the school directly infringes on specific utterances. The speech restrictions, being direct, presumptively cause irreparable harm.

Even if there was no presumption, the plaintiffs readily show irreparable harm. Money cannot replace ready access to the school environment, with enormous social and academic resources.  Money cannot replace the burden on academics caused by a sudden move off campus as the students struggle to cope with extremely difficult logistics.  Money cannot fully compensate for the harm to the liberty of speech and the chilling effect the punishment effects on the plaintiffs.

It is of no import that some of the harm is only threatened—that there *could* be a different outcome from the hearing.  In the First Amendment context, the threat of harm is sufficient. *See Elrod* v. *Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673 (1976), (preliminary injunction appropriate where party was only threatened with discharge from employment in derogation of First Amendment).  Furthermore, the disciplinary *process* alone, distinct from any possible sanctions, alone violates the consent decree and burdens the plaintiffs' speech, as "enforcing . . . [a] policy that interferes with the exercise of First Amendment rights by . . . [a] student, when the exercise of such rights is unaccompanied by violence or the imminent threat of violence."

## III. GRANTING RELIEF CAUSES ESSENTIALLY NO HARM TO THE SCHOOL

The school suffers no practical harm in granting the injunctive relief. The

school would merely maintain the housing contract it already has with the plaintiffs. In addition, having already made its finding, there is no reason to believe delaying administrative proceedings could prejudice the school.

## IV. PROTECTING THE FREEDOM OF SPEECH SERVES THE PUBLIC INTEREST

The public interest favors protecting the plaintiffs' freedom of speech. "[S]ecuring First Amendment rights is in the public interest. . . .  [T]he Government does not have an interest in the enforcement of an unconstitutional law." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation omitted; internal quotation marks omitted).  However offensive the speech may be, "[t]he public interest lies with the enforcement of the Constitution." *Ligon v. City of New York*, 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013).

## V. GOOD CAUSE EXISTS FOR THE EMERGENCY RELIEF

Finally, good cause exists for the emergency nature of this motion. The plaintiffs received notice of the January 17, 2020 hearing on January 8, 2020. The timing by the school created this exigency, and the school will not reschedule to accommodate these proceedings. In light of the degree of irreparable harm, the compressed timeline, the constitutional interest in prohibiting government action that chills the speech of non-parties to this action, and because the defendants flagrantly violate the order from this court in the consent decree, there is a particular exigency in the present case that merits a finding of good cause for an emergency motion.

## VI. CONCLUSION

For the foregoing reasons, the Court should grant the motion for temporary restraining order or for a preliminary injunction or both.

THE PLAINTIFFS

BY:     */s/ Mario Cerame ct30125*
        Mario Cerame
        Brignole, Bush & Lewis LLC
        73 Wadsworth Street
        Hartford, Connecticut 06106
        T: 860.527.9973
        F: 860.527.5929
        E: mario@brignole.com
           attorneys@brignole.com

**CERTIFICATION**

A hardcopy of the foregoing, including attached letter to chambers, shall be hand delivered before 10:00AM on January 16, 2020 to:

    Henry Salton, Esq.
    (or an individual authorized to receive on his hehalf)
    Assistant Attorney General
    Office of the Attorney General
    Health and Education Unit Head
    165 Capitol Avenue
    Hartford, Connecticut 06106

    Mark Kohler, Esq.
    Assistant Attorney General
    Office of the Attorney General
    Health and Education Unit Head
    165 Capitol Avenue
    Hartford, Connecticut 06106

An electronic copy of the foregoing has been or shall immediately be sent by way of electronic mail as follows:

| | |
|---|---|
| Henry Salton, Esq. | Mary Lenehan, Esq. |
| Assistant Attorney General | Assistant Attorney General |
| Henry.Salton@ct.gov | Mary.Lenehan@ct.gov |
| | |
| Mark Kohler, Esq. | Ralph Urban II, Esq. |
| Assistant Attorney General | Assistant Attorney General |
| Mark.Kohler@ct.gov | Ralph.Urban@ct.gov |

    Office of the Attorney General
    165 Capitol Avenue
    Hartford, Connecticut 06106


    Nicole Fournier Gelston, Esq.
    General Counsel to the University of Connecticut
    nicole.gelston@uconn.edu

    Office of the General Counsel
    343 Mansfield Road, Unit 1177
    Storrs, CT 06269-1177

                             */s/ Mario Cerame ct30125*
                             Mario Cerame