UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RYAN MUCAJ, *et al.* | : | Civil Case 3:20-CV-00066 (MPS) |
|    *Plaintiffs* | : | |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT, *et al.* | : | |
|    *Defendants* | : | JANUARY 24, 2020 |

**MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

The defendants The University of Connecticut ("UConn"), Thomas Katsouleas, Michael Gilbert, Eleanor Daugherty, Maureen Armstrong, Alexandra Kytan and Kim Colon (the "state defendants") respectfully submit this memorandum in opposition to plaintiffs' motion or request for preliminary injunctive relief.

**The Underlying Facts**

Many of the pertinent underlying facts are not in dispute. In the early morning hours of Friday October 11, 2019 the plaintiffs, Ryan Mucaj and Jarred Karal, both seniors at UConn, were heard, observed and recorded in a parking lot outside a student residential housing complex in which they lived engaging in what Jarred later confirmed was a verbal game they referred to as "penis." As reported, this game involved one of them stating that word, then the other repeating it louder, with the first repeating it again even louder, and so on, the loser being the first to stop the repetition. While still outside, adjacent to the residential complex, the word used in the game changed to "n\_\_\_\_\_," a word commonly considered a racial slur to persons of color. While there is some dispute as to how loud the game became with the use of the second word, there is no doubt that they were yelling the first word, "penis." This conduct was brought to the attention of the UConn Office of Community Standards ("CS") which, following usual protocols, conducted an investigation, which culminated in two "recommendations and findings" (one for

1

each student). The recommendation and findings concluded that the investigation results supported a finding that the two students had engaged in disruptive behavior and violated their student housing contracts, such that certain sanctions were warranted, including a warning, and removal from student housing. Per the Student Code, in the event the students disagreed with the student conduct investigator's findings and recommendations, the plaintiffs were entitled to a *de novo* hearing which would constitute a review and assessment of the matter in accordance with the standards of due process applicable in such proceedings. *Gorman v. University of Rhode Island*, 837 F.3d 7, 13-14 (1st Cir.1988) (The courts have not and should not require that student disciplinary hearings follow the traditional common law adversarial method or a common law criminal trial); *Matthews v. Eldridge*, 424 U.S. 319 (1976). Due process in this context only requires notice and an opportunity to be heard. See, *Doe v. Devonshire*, 181 F.Supp. 146 (D.Mass.2016) (Involving Bridgewater State University; adequate process does not require an elaborate hearing, but may be simply an informal give-and-take which gives the student an opportunity to explain his version of the facts). Had such a hearing been held, if either student had been deemed "responsible," the matter would have been bifurcated to address separately what sanctions, if any, were appropriate for each student(s) found responsible. Should there have been such findings, certain appeal rights would have attached. This Court's temporary restraining order of January 16, 2020 has halted this *de novo* adjudicatory process pursuant to plaintiffs' complaint. The complaint itself alleges only First Amendment claims.

**Plaintiffs' Conduct Was Not Speech Protected by the First Amendment**

While the First Amendment surely protects certain speech and expressive conduct, it is well settled that not all conduct, just because it may have an expressive aspect, is protected speech. In *U.S. v. O'Brien*, 391 U.S. 367, 376 (1968) the Court held that, *even where an idea was*

2

*intended to be expressed* it could not "accept the view that an apparently limitless variety of conduct can be labelled 'speech' whenever the person engaging in the conduct intends to express an idea." The *O'Brien* Court further noted that its precedents established that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* at 377. This principle was earlier elucidated by the Court in *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("It has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed."); see also, *Cox v. Louisiana*, 379 U.S. 536, 555-56 (1965) (Rejecting the claim that the First Amendment protects ideas by conduct as much as it protects ideas by pure speech). As noted by the Second Circuit in *East Hartford Ed. Assoc. v. Board of Ed. of Town of East Hartford*, 562 F.2d 838, 858 (2d Cir.1977), relying on what it called "the rule of *Cox,*" "[a]s conduct becomes less and less like 'pure speech' the showing of government interest required for its regulation is progressively lessened." (citing *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 505 (1969)). This important principle was followed by the Court in *Zalewska v. County of Sullivan, New York*, 316 F.3d 314, 3189-21 (2d Cir.2003). *Zalewska*, like *East Hartford*, held that clothing, despite its aspects of personal expression, can be regulated consistent with First Amendment guarantees. Quoting *O'Brien*, 391 U.S. at 376, the *Zalewska* Court observed that "the fact that something is in some way communicative does not automatically afford it constitutional protection," noting the Supreme Court has "repeatedly rejected" such a view. *Id.* at 319.

Of course, the inverse can also be true -- conduct alone which is sufficiently expressive

3

can be protected speech. *Tinker,* 393 U.S. at 503, prominently illustrates this principle. In *Tinker* the armbands at issue obviously were not verbal, but they spoke volumes. Similarly, the act of wearing a jacket emblazoned with the words "f___ the draft" was held protected speech in *Cohen v. California,* 403 U.S. 15 (1971).

 Here, the conduct at issue, occurring in the very early hours of the morning on a non-weekend night, although involving words, expressed nothing. No idea, message, concept or point of view was expressed. The two words were not connected in any way, and were not even used in an articulable sentence or phrase. The words conveyed nothing, except that these two students were engaging in loud and disruptive behavior. If the plaintiffs had stood outside the dormitory and yelled nonsense words, or simply created loud noises, the same disciplinary investigation might well have ensued. The simple fact that a word is universally considered offensive does not cloak it with First Amendment protection. Words that convey nothing, or no idea of any value whatsoever, are simply not protected. See *Willett v. City University of New York*, 1998 U.S.Dist. LEXIS 8264 (E.D.N.Y.1998) (First Amendment challenge fails where discipline was based on trespass and insubordination, not speech); *Harrell v. Southern Oregon University*, 2009 WL 3562732 at *5 (D.Oregon) (Ad hominem attacks in on-line course not protected speech, not viewpoint discrimination, citing *O'Brien* and *Blackwell v. Issaquena County Board of Ed.*, 363 F.3d 749, 753-54 (5th Cir.1966) ("The First Amendment should not be construed to provide unrestricted and unbridled license giving immunity for every possible use of language and preventing punishment of those who abuse this freedom." (Internal quotation marks omitted)). As the *Harrell* Court noted, "[t]he state's interest in maintaining an educational interest can necessitate limitations giving rise to a balancing of First Amendment rights with the duty to

4

further and protect the public school system." *Id.* at 5. (Internal and quotations omitted).[1]

### Even if the Conduct Here Were Speech, Which It Was not, It Would Not be Entitled to First Amendment Protection

Even if the conduct here were truly speech, which it is not, it would not enjoy First Amendment protection. Colleges and universities need not tolerate speech that is inconsistent with their educational missions even if the government could not censor similar speech outside the university. *Esfeller v. O'Keefe*, 391 Fed.Appx. 337, 341 (5th Cir.2010) (*per curiam* decision denying legal challenge by disciplined student to Louisiana State University's Code of Conduct, that, among other things, prohibited "extreme, outrageous or persistent acts, or communications that are intended to or reasonably likely to harass, intimidate, harm or humiliate another."); see also, *Yeasin v. Durham*, 719 Fed.Appx. 844, 851 (10th Cir.2018) (holding University officials were entitled to qualified immunity when university student was disciplined for repeated offensive tweets; legal precedents cited by plaintiff did not concern university student conduct that interfered with the rights of other students or risked disrupting the campus); see also *Hunt v. Board of Regents of University of New Mexico*, 2019 WL 6003284 at*8 (D.New Mexico) (Law not clearly established regarding parameters of First Amendment protected speech in the university setting).

In *Widmar v. Vincent*, 454 U.S. 263, 267, n.5 (involving University of Missouri) the Court reiterated that

> our cases have recognized that First Amendment rights must be analyzed "in light of the special characteristics of the school environment." *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). We

---

[1] This case contrasts starkly with *Papish v. Board of Curators of University of Missouri*, 410 U.S. 667 (1973). In *Papish,* the student newspaper reprinted a political cartoon of a policeman raping the Statue of Liberty and Goddess of Justice, accompanied by the phrase "Motherf____ acquitted," a reference to a group known as "Up Against the Wall Motherf_____." The *Papish* Court found it significant that the student was expelled solely due to disapproved content, not the time, place or manner of dissemination. *Id.* at 670.  In this case, no message was conveyed, let alone one addressing a public policy issue like police brutality.

> continue to adhere to that view. A university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have *never* denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities.

(Emphasis added); see also, *McCauley v. University of the Virgin Islands*, 618 F.3d 232, 253 (3d Cir.2010) (University's code of conduct can constitutionally prohibit lewd, indecent and obscene speech). Yelling "penis" repeatedly, especially unconnected with any other expression, is nothing if not lewd and obscene. The same is true with respect to the "n" word.

In addition, "[f]ederal law requires educational institutions to maintain nondiscriminatory environments. Title VI [42 U.S.C. §2000d (2012)] was promulgated as part of the omnibus Civil Rights Act of 1964." Alexander Tsesis, *Campus Speech & Harassment*, Minn. Law Review 101:1863, 1897 (2017). "The [federal] Department of Education has for decades interpreted Title VI to include a prohibition against recipient institutions creating *or being responsible for maintaining* a hostile environment, which is defined as one where 'harassing conduct (e.g., physical, verbal, graphic, or written) … is sufficiently severe, pervasive or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the services, activities or privileges provided by a recipient.'" *Id.* at 1863, 1897-98 (Quoting *Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance*, 59 Fed. Reg. 11448, 11449 (March 10, 1994) (Emphasis added)). The ability to live on campus as part of a residential community is clearly such an activity and privilege. Further, in 2010, the Department, in a "Dear Colleague" letter to the higher education community noted that "[h]arassment does not have to include an intent to harm, be directed at a specific target, or involve repeated incidents." Thus "[h]arassment creates a hostile environment when the conduct is sufficiently severe, pervasive or persistent so as to limit or interfere with or limit a student's

ability to benefit from the services, activities or opportunities offer by the school." Office for Civil Rights, *Dear Colleague Letter from Assistant Secretary for Civil Rights*, U.S. Dep't Educ (Oct. 26, 2010), available at http://www2ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf. Again, living in a residential community of learners is surely one of UConn's services, activities or opportunities, as reflected in the Student Code provision alleged to have been violated.[2]

Moreover, infringement on First Amendment rights may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623, 628 (1984). (Jaycees' First Amendment associational rights trumped by State's interest in preventing gender discrimination; ("[E]ven if enforcement of the [Minnesota antidiscrimination] Act causes some incidental abridgement of the Jaycees' protected speech, that effect is no greater than is necessary to accomplish the State's legitimate purposes."). See also *Pi Lambda Phi Fraternity v. University of Pittsburgh*, 58 F.Supp.2d 619 (W.D.Pa.1999), *aff'd.* 229 F/3d 435 (3d Cir.2000) (First Amendment freedom of association claim rejected when need for behavioral punishment outweighed any First Amendment issue). Certainly in the workplace it is well accepted that expressive conduct that is openly discriminatory is not protected. *Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1535 (M.D.Fla.1991) (Offensive pictures and verbal harassment are not protected speech because they act as discriminatory conduct in the form of a hostile work environment). The *Robinson* Court quoted the *Roberts* opinion, wherein the *Roberts* Court opined that "[p]otentially expressive activities *that produce special harms distinct from their communicative impact* … are entitled to *no* constitutional protection." *Roberts*, 486 U.S. at 628 (Emphases added).

Here the conduct the plaintiffs engaged in was offensive, severe *and* persistent, although

---

[2] UConn has similar duties under Title IX, 20 U.S.C. § 1681, *et seq*.

7

it need only have been severe *or* persistent to create a hostile environment that cannot be condoned, notwithstanding First Amendment principles. Shouting the word "penis" repeatedly outside a residence hall complex at 12:26 am on a weekday morning was offensive, severe, and plaintiffs persisted in doing it. Adding loud repetition of the "n" word only compounded the hostility, giving it a now racially offensive aspect.

It is also well settled that First Amendment rights may be legally subjected to reasonable time, place and manner restrictions. *Ward v. Rock Against Racism*, 491 U.S. 781, 797 (1989). In this regard, a regulation of speech is not invalid simply because there is some imaginable alternative that might be less burdensome on speech, and the requirement that the restriction be narrowly tailored is satisfied so long as it promotes a governmental interest that would be achieved less effectively without the regulation. *Id.* at 98-99. Courts must examine not only the content of any speech but also the context in which it was disseminated. *Rice v. Paladin Enterprises, Inc.*, 940 F.Supp. 836, 845 (.D.Md. 1996) *rev'd on other grounds* 123 F.3d 233 (4th Cir.1997) (citing *Young v. American Mini Theaters, Inc.*, 427 U.S. 50, 66 (1976)). Thus even if the plaintiffs' conduct had been protected speech, which it was not, UConn could legally restrict such speech to more reasonable places, and, more germane to this case, reasonable times. In *Frisby v. Schultz*, 487 U.S. 474 (1988), the Court emphasized the sanctity of one's home as a place where one cannot be forced to be an "unwilling listener," and while the plaintiffs' yelling of "penis" repeatedly at 12:26 am on a Friday morning was certainly disruptive conduct at an inappropriate time, it also occurred in the equivalent of their fellow students' yards. While it was not within the four walls of their "homes" as discussed in *Frisby*, *Frisby's* admonition about "unwilling listeners" surely applies here. Thus, even if this was protected speech, which it was not, UConn's efforts to enforce a reasonable time and place restriction on such conduct comports

with First Amendment principles.

### The Fact That Others Not Charged with Enforcing the Student Code Either Reported or Viewed the Conduct as a Racial Bias Incident, and That the University Assisted Such Persons, is Not Germane

Plaintiffs have and likely will assert that documentation reflects that certain people who reported the incident or who assisted students affected by the incident appeared to view or categorize it as one of racial bias. Some of the reporting paperwork and documents involving assistance to students affected by the incident reflect this. This is neither surprising nor germane to this Court's inquiry and analysis. What matters is what these students have been charged with by CS, and that is most clearly and comprehensively reflected in the November 12, 2019 "findings and recommendations" of the CS investigator, which would have served as the basis for the *de novo* disciplinary hearing at issue here. Each of those documents reflects that the plaintiff students were alleged to have violated the following Student Code provision:

> Disruptive behavior, which is defined as participating in or inciting others to participate in the *disruption* or obstruction of any University activity, including but not limited to: teaching, research, events, administration, student conduct proceedings, *the living and learning environment*, on or off campus ….

See Exhibits 6 and 7 to plaintiffs' TRO application. (Emphases added). In addition, violation of the respective students' housing contracts is alleged. Most tellingly, the factual basis for the Student Code violation is succinctly described as "___ engaged in a verbal game that disrupted the living environment of students residing in Charter Oak Apartments." See *Norton v. Discipline Committee of Eastern Tenn. University*, 419 F.2d 195 (6th Cir.1969) (Literature distributed on campus intended to cause disturbance not protected). Notably, Exhibits 6 and 7 to the TRO application candidly reflect that the student conduct investigator determined that there was at best uncertainty as to whether the words were directed at anyone, further underscoring

9

that, as reflected elsewhere in these two documents, the matter was being pursued as a violation of the disruption provision of the Student Code.

As discussed above, wholly separate from the student disciplinary process, UConn has a duty under Titles VI and IX to assist students who subjectively believe they have been subjected to racial, ethnic or gender discrimination, or a hostile environment created by such discrimination. UConn's legal and moral duty to address such student concerns means it must and does provide support and assistance to such students irrespective of whether the University or its staff share the students' conclusions that they have suffered or experienced a racial bias incident or have been subjected to a hostile environment based on categories of prohibited discrimination. See *Abbott v. Pastides*, 900 F.3d 160 (4th Cir.2018) *cert. denied* 139 S.Ct. 1292 (2019) (Looking into speech at the University of South Carolina that made students uncomfortable does not itself violate the First Amendment).

This Court should not be misled by reference to such information regarding the University's non-CS response to this incident. What matters for purposes of plaintiffs' First Amendment claims is what provisions of the Student Code plaintiffs have been alleged to have violated, and what would control the *de novo* review.[3]

[3] The Court has pointed to the notices of the hearing dated January 8, 2020 that went out which include reference to the incident as being "described" as "[r]emarks directed towards race/ethnicity." That reflects how the incident was initially reported to CS. More importantly, these notices establish that the hearing will be about the charges of disruptive behavior and violation of housing contracts. There are no due process claims here, and even if there were, a relaxed standard applies. *Gorman*, 837 F.2d at 13-14 . Similarly, the fact that police and prosecutors charged these men with a bias crime should not redound to the legal detriment of UConn. The criminal process was wholly distinct from the CS process, although the latter reasonably relied on affidavits and statements gleaned in the former, as would any reasonable investigation.

### The *Wu* Consent Decree Applies Only to First Amendment Protected Speech

In *Wu v. University of Connecticut*, CV H-89-649 (PCD), the student had posted on her dormitory door that "bimbos," "preppies," "racists," and "homos" would be shot on sight, and she was expelled for a period from the residence and dining halls. It was not a class action, and is now thirty (30) years old. As discussed above, there have been important changes and advances in First Amendment jurisprudence since that time. See, e.g., *Willett*, 1998 U.S.Dist. LEXIS 8264 (E.D.N.Y.1998)

More significantly, plaintiffs, because they did not engage in and did not intend to engage in First Amendment protected speech, but rather only yelled random words during a game, do not fall within the ambit of *Wu*. There is no question that Ms. Wu had written a full, clear message, the content and meaning of which was wholly unambiguous. Her written message conveyed genuine ideas, if distasteful ones. That is simply *not* what happened here, the thus the *Wu* decree is inapplicable and inapposite.

### Plaintiffs Cannot Demonstrate Genuine Irreparable Harm, and their Claims Are Not Ripe

As this Court noted in its TRO decision in this case, *Trump v. Deutsche Bank*, 943 F.3d 627 (2d Cir.2019), *cert. granted* No. 19-760 (U.S. Dec. 13, 2019) reiterates the standards for preliminary injunctive relief. Irreparable harm is the first prerequisite. This Court, at least temporarily, concluded there was irreparable harm because of a perceived chilling effect on protected speech. However, that determination was before the defendants were able to fully articulate, with supporting legal precedent, why this is not a speech case at all, or even if it is in part, why plaintiffs' likelihood of success on their First Amendment claims should not be accepted as a logical proposition. The defendants respectfully urge the Court to revisit such

preliminary conclusions.[4]

There is also the important issue of whether plaintiffs' claims are ripe. A claim is not ripe if it involves contingent future events that may not occur as indicated, or indeed may not occur at all. *Peloe v. University of Cincinnati*, 2015 WL 828309 at *5 (S.D. Ohio 2/19/15) (quoting *Thomas v. Union Carbide*, 473 U.S. 568, 580-81 (1985)); see also *Doe v. The Ohio State University*, 136 F.Supp. 3d 854, 864-65 (S.D.Ohio 2016) (Student's due process claims not ripe while disciplinary investigation still pending). Given that the plaintiffs have rejected the recommendations of the student conduct investigator, as they are entitled to do, and exercised their right to a hearing under the Student Code, there is no final determination of any Student Code violations, much less the imposition of any sanctions(s).

**Conclusion**

Plaintiffs' conduct was not speech, and even if it had been, it would not have been protected speech, or UConn can reasonably restrict the time, place and manner of its dissemination. In addition, plaintiffs' claims are not ripe. Based on these principles, this Court should vacate its TRO and deny any preliminary relief.

---

[4] As noted in the argument on the TRO application, both students are seniors who live within driving distance of the campus, and off campus housing in Storrs may well be available at this the beginning of the second semester.

                DEFENDANTS,
                UNIVERSITY OF CONNECTICUT, et al.
                WILLIAM TONG
                ATTORNEY GENERAL

BY: /s/ Ralph E. Urban
     Ralph E. Urban
     Assistant Attorney General
     Federal Bar No. ct00349
     ralph.urban@ct.gov
     Office of the Attorney General
     165 Capitol Avenue
     Hartford, CT  06106
     Tel: (860) 808-5210
     Fax: (860) 808-5385

## CERTIFICATION

I hereby certify that on January 24, 2020 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

                /s/ Ralph E. Urban
                Ralph E. Urban