UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RYAN MUCAJ, et al. | : | CIVIL ACTION NO. |
| *Plaintiffs* | : | 3:20-cv- 00066 (MPS) |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT, et al. | : | |
| *Defendants* | : | MARCH 2, 2020 |

## DEFENDANTS' PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW AND APPLICATION OF THE LAW TO THE FACTS

### Proposed Findings of Fact

The Incident and the Investigation

1. A University of Connecticut ("UConn") Assistant Director of Community Standards ("CS"), Alexandra Kytan, was assigned to conduct an investigation into possible violations of the UConn Student Code stemming from certain activities of plaintiffs herein, UConn students Ryan Mucaj and Jarred Karal, that occurred in the early morning hours of October 11, 2019 outside the on-campus Charter Oak Apartments ("dormitory"). Defendants' Exhibit 500 (hereinafter "500")

2. Ms. Kytan's investigatory findings and recommendations were contained in two reports, one for each student, dated November 12, 2019. 500; Plaintiffs' Exhibits 6 and 7 (hereinafter "6 and 7")

3. To protect student privacy these reports describe the students as "S1" for Mr. Mucaj, "S2" for Mr. Karal, "W1" for a student witness who observed the incident from his dormitory window and videotaped part of it on his cellphone, "W2" for a student who heard the incident through her dormitory window and then shut the window, and "W3" for a student who accompanied Messrs. Mucaj and Karal that night and encouraged them to stop the conduct. 500; 6 and 7 (JK4); Transcript dated January 29, 2020 at pages 56 and 69 (hereinafter "T. 56; T. 69")

4. As part of the investigation, Messrs. Mucaj and Karal, as well as several others were interviewed in person or over the phone. Ms. Kytan also reviewed a number of documents, including police affidavits. All the information she gleaned, including whom she spoke with and what she reviewed is set out in her two findings and recommendations. 500; 6, 7, 5

5. Ms. Kytan was asked by Mr. Mucaj at her first meeting with him what he was being investigated for, and she told him she was investigating what had allegedly happened in the parking lot outside the dormitory that night (the early morning hours of October 11, 2019). 500

6. Ms. Kytan discussed the matter with UConn's Director of CS, Megan Buda, and Ms. Buda reviewed the reports but made no edits. T. 41; T. 71; T. 78

7. Ms. Kytan's findings and recommendations reports reflect that the initial referral to CS came from the dormitory director Beth Helsinki, whose referral described that three individuals were walking through the adjacent parking lot loudly using hateful and derogatory language. 6 (RM2) and 7 (JK2)

8. Ms. Helsinki's referral provides detailed information about how the incident came to Ms. Helsinki's attention, including a video link that had been created by W1, and information that had been provided by W2, who reported the men in the parking lot were playing the "penis" game which involved yelling the word "penis" as loudly as possible, and that moments later the game changed to using the "n" word, again, loudly. 6 (RM6, RM7); 7 (JK6, JK7) W1 also described that the word "penis" was being yelled as loudly as possible. 6 (RM7); 7 (JK7); T. 66; T. 67; T.68

9. Ms. Kytan interviewed W1, tried without success to interview W2, and met with W3, who declined to provide her information. 6 (RM2); 7 (JK2)

10. As part of the investigation Mr. Mucaj and Mr. Karal, both of whom were accompanied by their attorney in this case, Mr. Cerame, were interviewed separately. 6 (RM2); 7 (JK2)

11. Ms. Kytan reviewed other relevant materials listed in her two reports. 6 (RM3); 7 (JK3) She determined the students were using the word "penis" "loudly," and then began using the "n" word. *Id.*

12. In the police affidavits, it is described that Mr. Karal admitted he and Mr. Mucaj were shouting the penis game, and then the word changed to the "n" word, although Mr. Karal is reported to have said he did not think they were shouting loud enough for others to hear. W3 confirmed to the police that the plaintiffs were playing the penis game, and then it changed to the "n" word. W3 reported that he told them they should stop. 6 (RM18-19); 7 (JK16-17); T. 70; T. 83

13. The UConn Police, having reviewed the video, and based on surveillance cameras and other data, were able to confirm that the two playing the verbal game in the early

morning hours in the parking lot adjacent to the dormitory were in fact Messrs. Mucaj and Karal. 6 (RM16); 7 (JK14)

14. Ms. Kytan also received a signed written statement from Mr. Mucaj, who was evasive about whether it was he in the video, indicating among other things that he "declined to respond." 6 (RM8-9) Ms. Kytan's associate Ms. Colon received a statement from Mr. Karal in which he admitted to the conduct. 6 (RM 10-11). Mr. Karal indicated their use of the word "penis" was significantly louder than their use of the "n" word.

15. As the result of her investigation, Ms. Kytan determined, based on a preponderance of the evidence, that S1, S2 and W3 were together that night in the early morning hours outside the dormitory, that the "penis" game was played, and that this verbal game disrupted the living environment of students residing in the dormitory; she found no message in the word. 6 (RM5); 7 (JK4); 500; T. 71; T. 72; T. 73; T. 74

16. While Ms. Kytan determined the "n" word had been used during the incident, she expressly found that there was not a preponderance of the evidence that that word was directed at anyone. 6 (RM5); 7 (JK4); 500; T. 53

17. Ms. Kytan made an initial finding that Messrs. Mucaj and Karal had each engaged in disruptive behavior and violation of their on-campus housing contracts, in violation of the Student Code. 6 (RM5); 7 (JK4); 500

18. Having made these initial findings, Ms. Kytan recommended Messrs. Mucaj and Karal receive certain sanctions, including removal from campus housing, which, if the students had agreed with the findings at an optional administrative conference, would have resolved the matter. 500; T. 21; T. 26. However, students can, as these two did, elect instead to go to a hearing, in which case the hearing officer(s) do not receive the recommended sanctions. *Id*. If a respondent student elects to go to a hearing, the investigator (Ms. Kytan in this instance) attends the hearing, and if the student is found responsible under the Student Code and the hearing officer(s) appears to be moving towards a sanction(s) more onerous than initially recommended by the investigators, investigators can and often do speak up in favor of less serious sanction(s). T. 35

19. Having elected to go to a hearing, Messrs. Mucaj and Karal were scheduled to have their hearing January 17, 2020, but instead of attending the hearing they filed this lawsuit, with an accompanying motion for a temporary restraining order ("TRO") to halt the process, which motion this Court granted on January 16, 2020. (Docket No. 14)

20. While Ms. Kytan reviewed and considered many documents that described the incident as one of "bias," including correspondence from the police and the police affidavits that reflected pursuit of criminal charges based on an alleged crime of bias, among other materials, she pursued a wholly separate and independent investigation and concluded *only* that these students had engaged in disruptive behavior in violation of the Student Code, expressly finding that the words were not directed at anyone in particular. 500

## UConn's Practices in Responding to Challenging Student Conduct

21. The sole witness at the preliminary injunction hearing in this Court, Megan Buda, is the Director of CS at UConn, and has worked in the student conduct field since 2006. T.6; T.7

22. 501 is a six year analytic report based on electronically stored records, compiling all UConn CS matters during that period in which a student(s) was charged with "disruption" in violation of the Student Code. The columns in 501 reflect the case number, the charges, whether there was a finding of responsibility, and what sanctions they received (a warning, probation, suspension, expulsion, ban from the residence hall(s) and/or termination of their housing contract(s)). The yellow highlighting reflects where housing was lost. T. 7; T. 9

23. Using the universe of matters reflected in 501, Ms. Buda then eliminated those matters that had the complicating factors of alleged drug or alcohol violations or sexual assault, so as to be more analogous to Messrs. Mucaj's and Karal's matter. T. 11; T.12

24. Ms. Buda then looked at the actual files of this subset. 502 through 507 are certain relevant documents from this subset. T. 12

25. 502 reflects a student in campus housing on the Stamford campus who made a penis shape with Post-It notes in his dormitory window. He received a warning and removal from housing. T. 13; T. 14

26. 503 reflects a student who was knocking on women's doors in a dormitory in the middle of the night. He received a warning and removal from housing. T. 14

27. 504 reflects a student who was disruptive with staff, including during dormitory quiet hours. He received a removal from housing. T. 15

28. 505 reflects a student who was disruptive in a residential hallway in the middle of the night. The disruption and noise was reported as having an intrusive impact on students who were woken up or distracted from either endeavors. He received probation and was banned from the residence halls. T. 15; T.43

29. 506 reflects a student who urinated on a building at 5:45 pm, in the daytime. He was banned from the residence halls and removed from housing. T. 16

30. 507 reflects a student who started a fire in a residence hall. He received probation, was removed and banned from housing, and had an "educational component" sanction, meaning he had an assignment requiring him to reflect on his actions and their effect on others. T. 16; T. 32; T. 33

31. 508 is another analytic report reflecting 3.5 years of data covering those instances in which a matter was initially reported to CS as a "bias" incident, that is, directed at gender, sexual identity, race, ethnicity or religion. The columns in 508 reflect: case number, where the incident occurred, a summary of the incident, how it was resolved, what student Code violations (if any) were charged, the bias "tag," *i.e.*, how initially reported, and what sanctions (if any) resulted, "DP" meaning probation. T. 18; T. 20

32. "Community conversation" in 508 refers to an informal meeting between any student affected by the conduct and a staff member, providing support and available resources, where the incident was deemed not to reflect a violation of the Student Code, or where a respondent cannot be identified. T. 20; T. 21

33. Reporters who check or select the "tag" (in 508 all tagged as "bias incident") often are residence hall directors, like Ms. Helsinki. T. 23; T. 24

34. 508 reflects that in a 3.5 year period approximately 170 matters were reported to CS as bias incidents. However, 508 also reflects that only about 12 to 14 of these moved forward as disciplinary matters under the Student Code, the remaining 156 or 158 only resulting in an educationally-based response with conversations involving those students impacted and involved. T. 25. The 156 or 158 did not go down the student disciplinary track. T. 27

35. Based on Ms. Buda's years of experience in the student conduct field 508 reflects that at UConn, when incidents are reported as bias incidents, an educational, not disciplinary, response or approach is used unless there is additional underlying misconduct. T. 27; T. 28

36. Ms. Buda looked into the 12 or so files where the student disciplinary track *was* pursued. 509 through 512 are excerpts from some of those files. T. 29

37. 509 reflects a student who barged into a meeting of a Chinese students associate, of which he was not a member, and yelled "f ___ China." T. 29

38. 510 reflects a student who yelled slurs directly to his roommate about his roommate's sexuality; he had also violated the guest policy. T. 30

39. 511 involved students who believed another student had stolen their bottle of vodka; they banged on that student's door and threatened him using biased language. T. 31

40. 512 involved a student who had made biased comments to his roommate about the roommate's sexuality. T. 31

41. This UConn pattern of taking a non-disciplinary approach to these incidents reported as bias incidents, where there is no other underlying misconduct, reflects the values of UConn as an educational institution that sees its job as educating students about expectations beyond the University, and beyond academics. T. 35; T. 38

42. There was a rally and march on campus as the result of the incident with Messrs. Mucaj and Karal, and while no one who attended the rally was the subject of any CS investigation, the rally and march proceeded from the student union to the center of the campus during the middle of the day, not a residential area. 14; T. 46

43. A rally against the policies of President Trump occurred on campus in 2017, but also occurred in front of the student union, a large open area in the center of the campus, during the middle of the day. The students had a clear message -- opposing Mr. Trump's policies. 18; T. 65; T. 66

44. Unlike the rallies that conveyed messages, or the clear, if inappropriate message Ms. Wu posted on her dormitory door informing certain groups of people they were not permitted into her room, the plaintiffs' yelling of "penis" in the middle of the night, having awaken or disturbed other students, even without the use of the "n" word, would have been enough to result in a disciplinary investigation and sanctions. The issue is the disturbance in the middle of the night, just as would be the case if the plaintiffs had cause a loud disturbance, by, for example, whacking car bumpers at that time and place. The factual circumstances of the when, where, and who was disturbed are the critical factors. T. 75; T. 64; T. 49; T. 50; T. 73; T. 74; T. 76

45. If someone had simply written derogatory or offensive words in a message like Ms. Wu did, it would not have resulted in discipline and sanctions at UConn. T. 76; 508

Mr. Mucaj's and Mr. Karal's Futures

46. If a UConn student receives a disciplinary sanction(s), it only appears on the student's transcript in instances of expulsion or suspension. Based on Ms. Kytan's recommendations, Messrs. Mucaj and Karal were not at risk of either of those sanctions. T. 35

47. Most institutions of higher education, as reflected in the Common Application (the most universal form) only asks whether the applicant has been the subject of student discipline resulting in probation, suspension, dismissal or expulsion. Based on Ms. Kytan's recommendations, Messrs. Mucaj and Karal were not a risk of either of any of those

sanctions. Even if they had received probation, they could have asked after six months for the probation to be lifted, which is generally granted. T. 36

48. Given these facts, the only way a school to which they may apply would learn of this incident would be through an Internet search that reveals the press reports based on this lawsuit. UConn did not release any information that would identify the plaintiffs. T. 37

**Proposed Conclusions of Law**

<u>General First Amendment Principles</u>

1. Not all conduct, just because it may have an expressive aspect, is protected speech.

   *U.S. v. O'Brien*, 391 U.S. 367, 376 (1968)

2. When speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.

   *U.S. v. O'Brien*, 391 U.S. at 377

3. It has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed.

   *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)
   *Cox v. Louisiana*, 379 U.S. 536, 555-56 (1965)

4. As conduct becomes less and less like pure speech the showing of government interest required for its regulation is progressively lessened.

   *East Hartford Ed. Assoc. v. Board of Ed. of Town of East Hartford*, 562 F.2d 838, 858 (2d Cir.1977)

5. The fact that something is in some way communicative does not automatically afford it constitutional protection; the Supreme Court has repeatedly rejected such a view.

   *Zalewska v. County of Sullivan*, 316 F.3d 314, 318-21 (2d Cir.2003)

6. The First Amendment should not be construed to provide unrestricted and unbridled license giving immunity for every possible use of language and preventing punishment of those who abuse this freedom.

   *Blackwell v. Issaquena County Board of Ed.*, 363 F.3d 749, 753-54 (5th Cir.1966)

7. Colleges and universities need not tolerate speech that is inconsistent with their educational missions even if the government could not censor similar speech outside the university.

    *Esfeller v. O'Keefe*, 391 Fed.Appx. 337, 341 (5th Cir.2010)

8. First Amendment rights must be analyzed in light of the special characteristics of the school environment; a university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of the Supreme Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities.

    *Widmar v. Vincent*, 454 U.S. 263, 267, n.3 (1981)

9. A university's code of conduct can constitutionally prohibit lewd, indecent and obscene speech.

    *McCauley v. University of the Virgin Islands*, 618 F.3d 232, 253 (3d Cir.2010)

10. Infringement on First Amendment rights may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas.

    *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623, 628 (1984)

11. Federal law requires educational institutions that receive federal monies to maintain nondiscriminatory, non-hostile environments.

    42 U.S.C. § 2000d *et seq.;* 20 U.S.C. § 1681 *et seq.*

12. Some incidental abridgement of protected speech that is no greater than is necessary to accomplish the State's legitimate purposes is permissible.

    *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623, 628 (1984)

13. Expressive conduct or speech that materially disrupts or invades the rights of others is not protected.

    *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503,513 (1969)

14. First Amendment rights may be legally subjected to reasonable time, place and manner restrictions; a regulation of speech is not invalid simply because there is some imaginable alternative that might be less burdensome on speech, and the requirement that the restriction be narrowly tailored is satisfied so long as it promotes a governmental interest that would be achieved less effectively without the regulation.

*Ward v. Rock Against Racism*, 491 U.S. 781, 797 (1989)

15. In assessing restrictions on speech, courts must examine not only the content of any speech but also the context in which it was disseminated.

*Rice v. Paladin Enterprises, Inc.*, 940 F.Supp. 836, 845 (D.Md. 1996) *rev'd on other grounds* 123 F.3d 233 (4th Cir.1997)

16. In a person's home, the First Amendment does not require that residents become unwilling listeners.

*Frisby v. Schultz*, 487 U.S. 474 (1988)

17. Simply looking into an event where students were made uncomfortable by expressive activities does not itself violate First Amendment principles.

*Abbott v. Pastides*, 900 F.3d 160 (4th Cir.2018) *cert. denied* 139 S.Ct. 1292 (2019)


Burdens of Proof in First Amendment Cases

1. In a First Amendment retaliation case, the plaintiff has the initial burden of showing that his conduct was constitutionally protected, and that this conduct was a substantial factor in the alleged retaliation complained of. If these burdens are met, the defendant can defeat the claim by establishing by a preponderance of the evidence that the defendant's decision or response would have been the same even in the absence of the allegedly protected First Amendment conduct.

*Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)

2. In analyzing the evidence in light of *Mt. Healthy's* burden shifting paradigm, if the defendant establishes dual motivation, *i.e.*, that even without any improper motivation the allegedly retaliatory action would have occurred, the defendant prevails.

*Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir.2003)

3. When a plaintiff claims he was arrested in retaliation for First Amendment protected activity, the claim fails if there was otherwise probable cause for the arrest (or in this case the school disciplinary investigation).

*Nieves v. Bartlett*, 139 S.Ct 1715, 1726 (2019)

4. Those who claim retaliatory prosecution in violation of the First Amendment must prove as a threshold matter that the decision to press charges was objectively unreasonable.

*Hartman v. Moore*, 547 U.S. 250, 263 (2006)

Ripeness

1. A claim is not ripe if it involves contingent future events that may not occur as indicated, or indeed may not occur at all.

   *Peloe v. University of Cincinnati*, 2015 WL 828309 at *5 (S.D. Ohio 2/19/15);
   *Thomas v. Union Carbide*, 473 U.S. 568, 580-81 (1985));
   *Doe v. The Ohio State University*, 136 F.Supp. 3d 854, 864-65 (S.D.Ohio 2016)

Preliminary Injunction Standards

1. Only the standards of likelihood of success on the merits and irreparable injury apply when the injunction seeks to prevent government action taken pursuant to statutory authority, which is presumed to be in the public interest.

   *Molloy v. Metropolitan Transportation Authority*, 94 F.3d 808, 811 (2d Cir.1996);
   *New York Urban League, Inc. v. State of New York*, 71 F.3d 1031, 1036, n.7 (2d Cir.1995);
   *Statharos v. New York City Taxi and Limosine Comm'n.*, 198 F.3d 317, 321 (2d Cir.1999);
   *Ulloa v. United States*, 2006 WL 1763676 at *1 (N.D.N.Y.);
   *Able v. United States*, 44 F.3d 128, 130-31 (2d Cir.1995)

2. Conn. Gen. Stat. § 10a-104 provides that the Board of Trustees of the University of Connecticut shall establish the rules and general policies of the University and its institutions and campuses, which includes policies governing behavioral expectations for the University's students.

3. Interim injunctive relief is an extraordinary and drastic remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.

   *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam);
   *Caiola v. Saddlemire*, 2014 WL 1310002 at *1 (D.Conn.)

4. To satisfy the irreparable harm requirement, a plaintiff must demonstrate that absent the injunction he will suffer an injury that is neither remote nor speculative, but actual and imminent.

   *Freedom Holdings, Inc. v. Spitzer,* 408 F.3d 112, 114 (2d Cir.2005);
   *Caiola v. Saddlemire*, 2014 WL 1310002 at *2 (D.Conn.)

Eleventh Amendment Immunity

1.  The Eleventh Amendment bars suit against a State and its agencies regardless of the nature of the relief sought. This includes suits for money damages, injunctive relief and declaratory relief.

    *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 100 (1984);
    *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985);
    *Edelman v. Jordan*, 415 U.S. 651, 667-69 (1974);
    *Cory v. White*, 457 U.S. 85, 90-91 (1982);
    *Atlantic Health Care Benefits Trust v. Googins*, 2 F.3d 1, 4 (2d Cir.1993);
    *Manners v. New York*, 1999 U.S. App. Lexis 2645 at *2-3 (2d Cir.1999)

2.  The Eleventh Amendment provides immunity to suit, not just liability, and deprives the federal courts of any jurisdiction to entertain certain claims against the State, and thus it may be raised at any time, even if urged for the first time in appellate proceedings.

    *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 99 n. 8 (1984) (quoting *Ford Motor Co. v. Dept. of Treasury of Indiana*, 323 U.S. 459, 467 (1945));

3.  Connecticut's state universities are entitled to Eleventh Amendment immunity, and the Court cannot exercise jurisdiction over them.

    *Doe v. University of Connecticut*, 2020 WL 406356  at *3 n.3 (January 23, 2020);
    *Brown v. Western Connecticut State Univ.*, 204 F.Supp.2d 355, 361 (D.Conn.2002)

4.  The Eleventh Amendment also bars suit when state officials are sued for damages in their official capacity, because such a suit is against the official's office, which is no different than a suit against the State itself.

    *Kentucky v. Graham*, 473 U.S. 159, 169 (1985);
    *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989)

**Proposed Application of the Law to the Facts**

Plaintiffs have brought a five count complaint. All five counts allege deprivation of plaintiffs' First Amendment rights. Now pending before the Court is plaintiffs' motion for preliminary injunction seeking to further enjoin a UConn disciplinary hearing on allegations that plaintiffs violated certain limited provisions of UConn's Student Code.

Preliminary Injunction Standards

Given that the defendants are government officials and employees acting pursuant to statutory authority, to obtain a preliminary injunction plaintiffs must establish both likelihood of success on the merits and irreparable injury. *Molloy v. Metropolitan Transportation Authority*, 94 F.3d 808, 811 (2d Cir.1996); *New York Urban League, Inc. v. State of New York*, 71 F.3d 1031, 1036, n.7 (2d Cir.1995); *Statharos v. New York City Taxi and Limosine Comm'n.*, 198 F.3d 317, 321 (2d Cir.1999); *Ulloa v. United States*, 2006 WL 1763676 at *1 (N.D.N.Y.); *Able v. United States*, 44 F.3d 128, 130-31 (2d Cir.1995); Conn. Gen. Stat. § 10a-104. Such interim injunctive relief is an extraordinary and drastic remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); *Caiola v. Saddlemire*, 2014 WL 1310002 at *1 (D.Conn.) To satisfy the irreparable harm requirement, a plaintiff must demonstrate that absent the injunction he will suffer an injury that is neither remote nor speculative, but actual and imminent. *Freedom Holdings, Inc. v. Spitzer,* 408 F.3d 112, 114 (2d Cir.2005); *Caiola v. Saddlemire*, 2014 WL 1310002 at *2 (D.Conn.) Plaintiffs have decidedly not met this burden.


Plaintiffs' First Amendment Claims

Plaintiffs claim the UConn investigation and proposed disciplinary proceeding amount to retaliation for their exercise of their First Amendment rights. As plainly described in the Complaint, "[t]he gist of the claim is that based on uttering an offensive *word* [singular], a racial slur," the defendants seek to punish the plaintiffs. Docket No. 1, paras. 3, 4 (Emphasis added). In a First Amendment retaliation case, the plaintiff has the initial burden of showing that his conduct was constitutionally protected, and that this conduct was a substantial factor in the

alleged retaliation complained of. If these burdens are met, the defendant can defeat the claim by establishing by a preponderance of the evidence that the defendant's decision or response would have been the same even in the absence of the allegedly protected First Amendment conduct. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)  Moreover, in analyzing the evidence in light of *Mt. Healthy's* burden shifting paradigm, if the evidence supports a finding of dual motivation, *i.e.*, that even without the improper motivation the allegedly retaliatory action would have occurred, the defendant prevails. *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir.2003)

While plaintiffs here are not facing criminal charges but rather University disciplinary charges, it is notable that those who claim retaliatory prosecution in violation of the First Amendment must prove as a threshold matter that the decision to press charges was objectively unreasonable, and when a plaintiff claims he was arrested in retaliation for First Amendment protected activity, the claim fails if there was otherwise probable cause for the arrest. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019); *Hartman v. Moore*, 547 U.S. 250, 263 (2006)

In this case the evidence establishes that the plaintiffs did not engage in First Amendment protected activity, but even if they had, the defendants' investigation and scheduling of the disciplinary hearing was wholly objectively reasonable because defendants reasonably sought to regulate the time, place and manner of the expression.  In addition, while there is no credible evidence of improper motivation on the part of the defendants, even if there were such evidence, the defendants had reasonable cause to investigate and seek limited disciplinary sanctions, to simply enforce reasonable time, place and manner restrictions.

The evidence is incontrovertible that on October 11, 2019, a Friday morning: i) plaintiffs were yelling the word "penis" at approximately 12:30 am outside a dormitory complex on the

13

UConn campus as part of a "game," the acknowledged goal of which was to see who had the temerity to shout it the loudest; ii) this noise was heard by and disturbed at least two other students in the dormitory and caused the plaintiffs' companion, another student, to urge plaintiffs to stop; and iii) while the plaintiffs were still in the parking lot below the dormitory windows, the word used in the game changed to the "n" word, although how loud the use of the "n" word was is somewhat unclear. The three witnesses (W1, W2 and W3), plus defendant Karal's statement, establish these facts. Plaintiffs claim the defendants' investigation and proposed disciplinary hearing were in retaliation for their use of the "n" word that night, which they claim was First Amendment protected speech. 6; 7; Docket No. 1, para. 3; Defendants' Proposed Findings of Fact Nos. 1-5; 7-17 (hereinafter "DFF 1-5; 7-17")

Not all conduct, just because it may have an expressive aspect, is protected speech, and when speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. *U.S. v. O'Brien*, 391 U.S. 367, 377 (1968). Thus, the fact that something is in some way communicative does not automatically afford it constitutional protection -- the Supreme Court has repeatedly rejected such a view. *Zalewska v. County of Sullivan*, 316 F.3d 314, 318-21 (2d Cir.2003).  Indeed, it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed. G*iboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949); *Cox v. Louisiana*, 379 U.S. 536, 555-56 (1965).  As conduct becomes less and less like pure speech the showing of government interest required for its regulation is progressively lessened. *East Hartford Ed. Assoc. v. Board of Ed. of Town of East Hartford*, 562 F.2d 838, 858 (2d Cir.1977).

Here, plaintiffs seek to cloak their conduct with First Amendment protections, but their yelling of the word "penis"(and in fact the "n" word also) expressed nothing. The word was not used in connection with any other word, or as part of any sentence, phrase, or even slogan. There was no meaning and no message, and plaintiffs presented no evidence of such. Neither word was directed at anyone. It reflected no viewpoint and no opinion. It was literally disturbing noise that only plaintiffs' revisionist history now seeks to posit as a protected message.  The contrast with the facts underpinning the *Wu* consent decree thus could not be starker; again, unlike political rallies at UConn, no message was conveyed.  As such, plaintiffs have utterly failed to establish their preliminary burden under *Mt. Healthy*, 429 U.S. at 274. 6; 7; DFF 7; 8; 11; 12; 14; 15; 42; 44; 45

Even if speech had been present, however, the First Amendment does not ensure unrestricted and unbridled license giving immunity for every possible use of language, or prevent punishment of those who abuse this freedom. *Blackwell v. Issaquena County Board of Ed.*, 363 F.3d 749, 753-54 (5th Cir.1966). Colleges and universities need not tolerate speech that is inconsistent with their educational missions even if the government could not censor similar speech outside the university. *Esfeller v. O'Keefe*, 391 Fed.Appx. 337, 341 (5th Cir.2010)  First Amendment rights must be analyzed in light of the special characteristics of the school environment because a university differs in significant respects from public forums such as streets or parks or even municipal theaters. *Widmar v. Vincent*, 454 U.S. 263, 267 n.3 (1981)  A university's code of conduct can constitutionally prohibit lewd, indecent and obscene speech. *McCauley v. University of the Virgin Islands*, 618 F.3d 232, 253 (3d Cir.2010)  A university's mission is education, and decisions of the Supreme Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its

campus and facilities. *Widmar,* 454 U.S. at 267, n.3 In addition, infringement of First Amendment rights may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623, 628 (1984) Some incidental abridgement of protected speech that is no greater than is necessary to accomplish the State's legitimate purposes is permissible. *Id.* In particular, expressive conduct or speech that materially disrupts or invades the rights of others is not protected. *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503,513 (1969)

As part of such reasonable restrictions, First Amendment rights may be legally subjected to reasonable time, place and manner restrictions, and such a regulation of speech is not invalid simply because there is some imaginable alternative that might be less burdensome on speech. The requirement that any restriction be narrowly tailored is satisfied so long as the restriction promotes a governmental interest that would be achieved less effectively without the regulation. *Ward v. Rock Against Racism*, 491 U.S. 781, 797 (1989) Thus in assessing restrictions on speech, courts must examine not only the content of any speech but also the context in which it was disseminated. *Rice v. Paladin Enterprises*, 940 F.Supp. 836, 845 (D.Md. 1996) *rev'd on other grounds.* In a person's home, the First Amendment does not require that residents become unwilling listeners. *Frisby v. Schultz*, 487 U.S. 474 (1988)

Applying these First Amendment principles here, even if the Court were to find the plaintiffs' shouting that night was somehow protected speech -- which it was not -- UConn could lawfully regulate such speech so as to ameliorate its undesirable effects, namely, waking up or disturbing students in a residential area in the early morning hours of a non-weekend night. DFF 2; 3; 7; 8; 11; 12; 14 UConn could impose reasonable time, place and manner restrictions on any such speech, ensuring that the rights of others were not abridged by any such expressive activity.

16

UConn has met any applicable burden under the *Mt. Healthy* paradigm, establishing that its response, reasonable and measured as it was, was predicated on ensuring the activity that disturbed the campus at night was not countenanced. The thorough testimony of Ms. Buda, UConn's Director of CS, established by more than a preponderance, through detailed documentary and statistical evidence, that UConn's response to this disturbance in the early morning hours of a Friday would have been the same even in the absence of any supposed First Amendment protected expression. DFF 21-41 The recommended sanction including removal from housing was no different than sanctions received by students for other similar instances of disruptive on-campus conduct in a residential area. Any incidental infringement of plaintiffs' allegedly expressive activity was more than warranted by the need to protect plaintiffs' fellow students from disturbing conduct in the middle of the night. In short, there was more than probable or reasonable cause to investigate the incident and charge the plaintiffs with limited violations of the Student Code. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019)*; Hartman v. Moore*, 547 U.S. 250, 263 (2006)

The uncontested evidence also established the reasonableness of UConn's response to plaintiffs' disturbing conduct, even if the conduct was couched in words. Ms. Kytan's recommended sanction of removal from campus housing was in line with other incidents of disturbance in residential areas at inappropriate times, and such sanctions would not have appeared on the plaintiffs' transcripts (which are limited to instances of suspension or expulsion), nor would they have be required to be reported on applications to other higher education institutions (which are limited to instances of probation, suspension, dismissal or expulsion). Unfortunately, such other institutions may now learn of these matters by searching the Internet, which accesses the court filings in this lawsuit, which was not brought using pseudonyms.

UConn has not revealed personally identifiable information regarding the plaintiffs' disciplinary matters.  If the hearing officers had appeared poised to issue more stringent sanctions, Ms. Kytan would have advocated for her more limited recommended sanctions. DFF 18; 22-30; 46-48

Finally, plaintiffs have not even come close to proving any improper motive on the part of the investigator, Ms. Kytan, but even if they had, where the defendant establishes dual motivation, that is, that even without any improper motivation the allegedly retaliatory actions (the investigation and charging) would have occurred, the First Amendment claim fails. *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir.2003) Ms. Kytan's report itself attests to these facts. If UConn or Ms. Kytan were retaliating against protected expression, why would Ms. Kytan so candidly note that the evidence did not support that the use of the "n" word -- the very expression plaintiffs claim precipitated the alleged retaliation -- was not even directed at anyone, and may not have been heard by the witnesses? DFF 2; 16 Even if the Court were to find some improper motive on this limited record, the overwhelming weight of the evidence establishes that the behavior, particularly the shouting of "penis" loudly and repeatedly in the middle of the night, both justified the investigation and the charges, and conformed with past practice at UConn, whereas reports to CS of alleged "incidents of bias" do *not* move forward as student disciplinary matters absent other apparently sanctionable misconduct. DFF 1-17; 22-30; 30-41 As Ms. Buda's testimony made abundantly clear, where matters are reported to CS as "incidents of bias," if the investigation reveals the allegedly biased words or conduct are not accompanied by other conduct that violates the Student Code, then discipline does not ensue, and the matter is treated as an opportunity for educational growth, reflecting UConn's values as an educational institution seeking to educate its students as whole persons, not just academic achievers. *Id*. The act of

looking into such alleged incidents of bias of course does not itself violate First Amendment

principles. *Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018) *cert. denied* 139 S. Ct. 1292 (2019)

Applying controlling law to this evidentiary record establishes that plaintiffs have not met

their burden of establishing likelihood of success on the merits, let alone irreparable harm, and

any further injunctive relief should be denied.


Jurisdictional Issues

The Eleventh Amendment to the U.S. Constitution bars, as a matter of law, all of

plaintiffs' claims against UConn itself, and all of plaintiffs' claims for damages alleged against

UConn officials and employees sued in their official capacities.  The defendants respectfully

submit that the Court's lack of jurisdiction over such claims, apparent from the pleadings

themselves, mandates that such claims be dismissed.  *Pennhurst State School and Hospital v.*

*Halderman*, 465 U.S. 89, 99 n. 8, 100 (1984); *Kentucky v. Graham*, 473 U.S. 159, 167 n.14

(1985); *Edelman v. Jordan*, 415 U.S. 651, 667-69 (1974); *Cory v. White*, 457 U.S. 85, 90-91

(1982); *Atlantic Health Care Benefits Trust v. Googins*, 2 F.3d 1, 4 (2d Cir.1993); *Manners v.*

*New York*, 1999 U.S. App. Lexis 2645 at *2-3 (2d Cir.1999); *Doe v. University of Connecticut*,

2020 WL 406356  at *3 n.3 (January 23, 2020); *Brown v. Western Connecticut State Univ.*, 204

F.Supp.2d 355, 361 (D.Conn.2002); *Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Will v.*

*Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).

In addition, a claim is not ripe if it involves contingent future events that may not occur

as indicated, or indeed may not occur at all. *Peloe v. University of Cincinnati*, 2015 WL 828309

at *5 (S.D. Ohio 2/19/15); *Thomas v. Union Carbide*, 473 U.S. 568, 580-81 (1985); *Doe v. The*

*Ohio State University*, 136 F.Supp. 3d 854, 864-65 (S.D.Ohio 2016) Here, plaintiffs claim they

have been retaliated against by UConn for protected speech, and they seek to further enjoin a hearing on allegations that they violated the Student Code. However, all that has occurred so far is UConn's investigation; the investigation to date has not resulted in any sanctions, and indeed it might never if allowed to go forward, because the hearing officers could either find the plaintiffs "not responsible" under the Student Code, or determine no disciplinary sanctions are warranted. DFF 18, 19  Conducting the investigation itself does not violate the First Amendment. *Abbott*, 900 F.3d at 160. This raises a serious question as to whether plaintiffs have or would suffer irreparable injury -- save any self-inflicted injury that may have been caused by the lawsuit itself -- a question on which plaintiffs have not carried their burden of proof. DFF 46-48

## <u>CONCLUSION</u>

The Court's TRO expires by its own terms upon the Court's ruling on Plaintiffs' motion for a preliminary injunction. Docket No. 14, page 3.  Plaintiffs' claims are not ripe, and plaintiffs have not carried their burden of proof that they are entitled to further relief. As such, their claims for any such further relief should be denied. In addition, their claims against UConn, and any claims for damages against UConn officials and employees in their official capacities should be dismissed because this Court lacks jurisdiction over such claims.

DEFENDANTS
UNIVERSITY OF CONNECTICUT, et al.

WILLIAM TONG
ATTORNEY GENERAL


BY:  /s/ Ralph E. Urban
     Ralph E. Urban
     Assistant Attorney General
     165 Capitol Avenue
     Hartford, CT  06106
     Tel:  (860) 808-5210
     Fax: (860) 808-5385
     Email:  ralph.urban@ct.gov




**<u>CERTIFICATION</u>**

I hereby certify that on March 2, 2020, a copy of the foregoing Defendants' *Proposed Findings of Fact, Conclusions of Law and Application of the Law to the Facts* was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


/s/ Ralph E. Urban
Ralph E. Urban
Assistant Attorney General