# ATTACHMENT TO

# DEFENDANTS' PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW AND APPLICATION OF THE LAW TO THE FACTS

```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF CONNECTICUT
 2
     - - - - - - - - - - - - - - - x
 3                                     No. 3:20-CV-00066 (MPS)
     RYAN MUCAJ and JARRED KARAL
 4                                     JANUARY 29, 2020
     vs.
 5                                     9:03 a.m.
     UNIVERSITY OF CONNECTICUT,
 6   THOMAS KATSOULEAS, MICHAEL        PRELIMINARY INJUNCTION HEARING
     GILBERT, ELEANOR DAUGHERTY,
 7   MAUREEN ARMSTRONG, ALEXANDRA
     KYTAN, and KIM COLON
 8   - - - - - - - - - - - - - - - x

 9
                            450 Main Street
10                        Hartford, Connecticut

11        BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

12

13   APPEARANCES:

14   FOR THE PLAINTIFFS:
             BRIGNOLE, BUSH & LEWIS
15               73 Wadsworth Street
                 Hartford, Connecticut 06106
16        BY:  MARIO K. CERAME, ESQUIRE

17   FOR THE DEFENDANTS:
             OFFICE OF THE ATTORNEY GENERAL
18               165 Capitol Avenue
                 Hartford, Connecticut 06106
19        BY:  RALPH E. URBAN, AAG

20   ALSO PRESENT:
             UCONN OFFICE OF THE GENERAL COUNSEL
21               343 Mansfield Road, Unit 1177
                 Storrs, Connecticut 06269
22        BY:  NICOLE FOURNIER GELSTON, ESQUIRE

23
     COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
24                     (860) 212-6937

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

1          THE COURT:  All right.  We have a hearing today in

2     Ryan Mucaj versus University of Connecticut, et al.  The case

3     is 20-CV-66.

4          Let's begin by having counsel state appearances for

5     the record.

6          MR. CERAME:  This is Mario Cerame for the plaintiffs,

7     Ryan Mucaj and Jarred Karal.

8          THE COURT:  Sorry.

9          MR. CERAME:  No, it's fine.

10          MR. URBAN:  Ralph Urban from the Attorney General's

11     Office for the defendants.  With me today is Nicole Gelston,

12     general counsel for the university.

13          THE COURT:  Morning.  Ms. Gelston, good morning.

14          Okay, so we're here for a hearing on the plaintiff's

15     motion for a preliminary injunction.  Before the hearing, the

16     parties submitted exhibits to the Court, as well as a list of

17     witnesses.

18          And so, Mr. Cerame, it's your motion.  How do you wish

19     to proceed, sir?

20          MR. CERAME:  Your Honor, a housekeeping matter first:

21     I made a mistake, and I just want to apprise the Court of it.

22     I talked with His Honor's clerk today in court about it, or

23     deputy.

24          I did not have the exhibits marked by the courtroom

25     deputy, and so if I may submit them to the Court at this time

1   for marking.  And I apologize for the mistake.

2          THE COURT:  Okay.  Well, let me ask this question

3   before we get into the exhibits:  Is it your intention to call

4   any witnesses today?

5          MR. CERAME:  No witnesses beyond Attorney Urban's

6   going to call.  I would ask for some leniency in asking her

7   questions.  I may want to ask her questions outside the scope

8   of direct, because in order to establish my case.  I could call

9   her in a principal case-in-chief, but I thought it would be

10  just for expediency.

11         THE COURT:  Except that you didn't list her as a

12  witness.

13         MR. CERAME:  I spoke with Attorney Urban about this,

14  and he felt that there would be accommodations being that it

15  was cross and that there would be some leniency in that way.

16  It's not an extensive set, Your Honor, and they all do relate

17  to what I believe is going to be the scope of direct.

18         THE COURT:  Attorney Urban, is there some agreement in

19  this regard?

20         MR. URBAN:  I just represented that I thought the

21  Court, as is the usual procedure, that on initial

22  cross-examination, scope objections are, you know, looked upon

23  a little bit more -- with a little bit more disfavor and that

24  there would be probably a little more liberality since, you

25  know, on initial cross-examination credibility and other

1    factors are always in play.

2            THE COURT:  All right.  Well, we'll see how it goes.

3            So -- and then is there -- the witness list -- excuse

4    me.  I misspoke.  The exhibit list indicates that the listed

5    witnesses -- and I have Plaintiff's 1 through 18 and

6    Defendant's 500 through 512 are agreed to.  Does that mean

7    there's no objection to the Court considering each of these

8    exhibits?

9            MR. CERAME:  Yes, Your Honor.

10           MR. URBAN:  That's correct.

11           THE COURT:  All right.  So then why don't we have Mr.

12   Cerame -- so you're saying your exhibits have not been

13   stickered at all.  Is that what you're saying?

14           MR. CERAME:  Yes, Your Honor.  They're tabulated.

15   They're labeled.  But they're not properly stickered.

16           THE COURT:  Why don't you do that at a recess.  Unless

17   they're different from what was submitted to chambers, then I

18   think I have them here.  So why don't we do that at a recess.

19   We'll probably take a break at 10:30 or so, and then you can

20   arrange with Ms. Johnson to sticker the exhibits.

21           MR. CERAME:  Sure, Your Honor.

22           THE COURT:  Mr. Urban, how about you?  Do you need an

23   accommodation?

24           MR. URBAN:  I don't believe so.

25           THE COURT:  You're all set?  Then in that case, I will

```
 1  admit as full Plaintiff's Exhibits 1 through 18 and Defendant's
 2  Exhibits 500 through 512.  Those exhibits are admitted as full,
 3  and the Court will consider them in its decision in this case.
 4       (Plaintiff's Exhibits 1 - 18, received in evidence.)
 5       (Defendant's Exhibits 500 - 512, received in evidence.)
 6            So I take it, Mr. Cerame, do you rest at this time?
 7  Is there any other evidence you propose to present today?
 8            MR. CERAME:  No.  Just argument, which would happen
 9  post hearing.
10            THE COURT:  Well, that will be up to me.
11            MR. CERAME:  Oh, certainly.
12            THE COURT:  So we'll talk about that at the time.  So
13  you rest at this time?
14            MR. CERAME:  Yes, Your Honor.
15                           PLAINTIFFS REST
16            THE COURT:  All right.  Very well.  Mr. Urban.
17            MR. URBAN:  May I make one inquiry?
18            THE COURT:  Yes, you may.
19            MR. URBAN:  Has Your Honor received the January 24
20  memorandum of law?
21            THE COURT:  Yes, I have, and I read it.  We'll be
22  talking more about the law at the end of the hearing.
23            Do you have a witness to call?
24            MR. URBAN:  I do.  The defendants called Megan Buda.
25            THE COURT:  Ma'am, no, this side.  Here you are.
```

```
 1   Welcome, ma'am.  If you would raise your right hand and face
 2   our courtroom deputy.
 3
 4                     M E G A N   B U D A,
 5            having been duly sworn by the Clerk, testified
 6                       under oath as follows:
 7
 8           THE CLERK:  Please be seated.  State your name, city,
 9   and state you work.  Spell your last name.
10           THE WITNESS:  City and state that I work?  My name is
11   Megan Buda.  I work in Storrs, Connecticut.
12           THE COURT:  And your last name is spelled B-u-d-a;
13   correct?
14           THE WITNESS:  Correct.
15           THE COURT:  Mr. Urban.
16           MR. URBAN:  Thank you, Your Honor.
17                      DIRECT EXAMINATION
18   BY MR. URBAN:
19   Q   Good morning, Ms. Buda.
20   A   Good morning.
21   Q   Could you tell the Court by whom you are employed?
22   A   The University of Connecticut.
23   Q   And what is your job title?
24   A   I'm the director of Community Standards.
25   Q   And could you briefly describe what Community Standards is
```

1   and what your duties entail?

2   A   Our duties entail oversight of the Student Code of Conduct

3   and overview of all of the behavioral issues and concerns on

4   our campuses.

5   Q   Related to students?

6   A   Correct.

7   Q   And how long have you worked in the student conduct field?

8   A   Nearly my entire career.

9   Q   And how long has that been?

10  A   Since graduate school in 2006.

11  Q   Thank you.

12        Does the Office of Community Standards keep records of

13  investigations into possible violations of the Student Code and

14  the outcomes of such matters?

15  A   I do.

16  Q   And are these records stored in an electronic format?

17  A   They are.

18        MR. URBAN:  Your Honor, I'd like to have the witness

19  look at Exhibit 501.

20        THE COURT:  She doesn't have the exhibits.  You have a

21  set of exhibits there that have been stickered.

22        MR. URBAN:  May I approach?

23        THE COURT:  You may.  You asked her to look at 501; is

24  that right?

25        MR. URBAN:  That is correct.

1   Q   (By Mr. Urban) So looking at what has been admitted as

2   Exhibit 501, could you tell the Court what that is?

3   A   This is an analytic report that I ran over the past,

4   approximately, six academic years any time one of the potential

5   violations was disruptive behavior.  And I included the

6   findings that the student was found responsible and then the

7   possible sanctions that were included.

8   Q   Okay.  And just so the Court can understand, could you run

9   through the column headings from left to right and tell the

10  Court what those reflect?

11  A   Sure.  So the first column is the case number, and that's

12  the case identifier that we utilize.  The first four digits are

13  typically the beginning of the academic year.  For example, an

14  academic year would be 2013/'14; so all of those cases were

15  from that year.

16          THE COURT:  Sorry.  Let me stop you there for a

17  minute.

18          THE WITNESS:  Sure.

19          THE COURT:  So if the first four digits are 2013, that

20  would refer to the entire academic year 2013/2014?

21          THE WITNESS:  Correct.

22          THE COURT:  Got it.  Thank you.

23          THE WITNESS:  The second column are the charges; so

24  those are the alleged violations of the Student Code of

25  Conduct.  And you can see that a number of them have other

1    violations as well.

2           And then the findings, these were all in terms of

3    findings and responsibility to identify that there was a

4    sanction that went along with each case.

5           And then the following columns would describe whether

6    the student received a warning, a probationary status, a

7    suspension status, an expulsion.

8           And then the next two refer directly to housing.  So

9    it would be a ban from the residence halls or a termination of

10   the housing contract.

11   Q   Thank you.  Now, I note that there are some yellow

12   highlights on this document.  Could you describe for His Honor

13   what the yellow highlighting represents?

14   A   Sure.  So the yellow highlighting would have meant that it

15   was inferred that the student would have lost their housing.

16   So the student is suspended or expelled.  They're banned from

17   campus anyway, and this was just an easier way to look through

18   the number of cases to identify a removal from housing.

19          THE COURT:  I'm sorry.  So yellow highlights indicates

20   a case where the student lost his or her housing?

21          THE WITNESS:  Correct.

22          THE COURT:  Got it.

23   Q   (By Mr. Urban) Now, does this particular data compilation

24   include instances where there was a charge involving sexual

25   misconduct or drugs or alcohol?

1  A   It did.

2          THE COURT:  I'm sorry.  Can I -- I'm sorry.  You'll

3  probably get to this.

4          MR. URBAN:  Absolutely, Your Honor.

5          THE COURT:  Just a couple of questions on these

6  columns.  Can you explain the difference between a residence

7  hall ban and termination of a housing contract?

8          THE WITNESS:  Sure.  So, for example, if a student

9  were a commuter and they were causing a disruption in a

10  residence hall, the university could take action to ban them

11  from the residence halls versus a termination of the contract.

12          THE COURT:  Got it.  And I note, for example, if you

13  look on the first page, one, two, three, four, five, six,

14  seven, eighth down, that one is not highlighted, and yet it

15  does say "Termination of housing contract."  Can you explain

16  that?

17          THE WITNESS:  That was just an error.

18          THE COURT:  So that should be highlighted?

19          THE WITNESS:  Yes.  If it says "yes," um-hmm.

20  Q   (By Mr. Urban) So once you had this data compilation, what,

21  if anything, did you do with it?

22  A   I then narrowed it down to remove the sexual misconduct

23  cases and cases involving alcohol and other drugs.

24  Q   So just to clarify that, whenever a case involved an

25  allegation of sexual assault or a drug or alcohol violation,

1   you took that out.

2   A   Correct.

3   Q   From the subset you were looking at.

4   A   Correct.

5           THE COURT:  Okay, I'm going to interrupt again.

6   Sorry.  So I'm looking at the first page again.  If you look

7   about three quarters of the way down the page, one of the

8   charges there is AOD Policy, illegal consumption, possession,

9   proximity, then AOD Policy, public consumption.  I assumed that

10  had something to do with alcohol or drugs.  Am I wrong?

11          THE WITNESS:  No, you are correct.

12          THE COURT:  But I thought you removed the alcohol or

13  drugs.

14          MR. URBAN:  I'm talking about a process after she had

15  this static compilation.

16          THE COURT:  Ah, so we're talking about some other

17  document.

18          MR. URBAN:  An additional narrowing.

19          THE COURT:  I got it.

20  Q   (By Mr. Urban) So with respect to this additional narrowing

21  we just described, again, you took this universe reflected in

22  501, and then you, in your personal narrowing of it, took out

23  cases where there was sexual assault allegations or drug or

24  alcohol alleged violations?

25  A   That's correct.

1  Q   And why did you choose those particular parameters to

2  narrow down what you would glean from 501?

3  A   Um, in comparison to the current case that we're dealing

4  with, those are additional violations that wouldn't be

5  referenced in this case.

6  Q   So they were analogous or more similar to what Mr. Karal

7  and Mr. Mucaj --

8          MR. CERAME:  Objection, Your Honor.  Calls for a legal

9  conclusion.

10  Q   (By Mr. Urban) Again, why did you pick those parameters?

11  A   I selected those parameters to further narrow down to a

12  more simplified disruption charge.

13  Q   Okay.  And once you had segregated those matters out, what

14  did you do?

15  A   I then looked at similar cases where a student could have

16  been removed from the residence hall for a disruption

17  violation.

18  Q   And could you take a quick look at Exhibits 502 through 507

19  and just take a peek at each one of those and then tell the

20  Court what those represent.

21  A   The majority of these represent a case resolution form,

22  which would be the form that a student receives at the

23  conclusion of their conduct matter.

24  Q   Okay.  And these particular disciplinary matters that are

25  reflected in 502 to 507, were they part of the group that you

1    looked at?

2    A    They were.

3    Q    And I'd ask you to look at Exhibit 502.

4         And can you tell the Court -- I'm going to ask you with

5    respect to each of these -- well, let me back up.

6         502 through 507 all reflect individual disciplinary

7    files with the student's personal identifiable information

8    redacted?

9    A    I believe so.

10   Q    Okay.  So I'm going to ask you, going through 502 through

11   507, to have you help the Court by explaining what the

12   underlying conduct was and what happened in the case.

13   A    Sure.

14   Q    So let's look at 502, if we could.  Could you tell the

15   Court what that case involved.

16   A    Um --

17   Q    Or that matter.

18   A    Sure.  So a student in the Stamford residence halls used

19   sticky notes to create a shape of a penis on their window.

20         THE COURT:  Can I -- just to be clear, you're

21   testifying from the document or from your own personal

22   knowledge of the case?

23         THE WITNESS:  From the document.

24         THE COURT:  Okay.  Got it.  Thank you.

25   Q    (By Mr. Urban) Okay.  And where -- this was at a Stamford

1    residence hall?

2    A    Yes.

3    Q    And what was the result of that matter?

4    A    The student received a university warning and a removal

5    from the university housing.

6    Q    Let's look at Exhibit 503, if we could, please.  Again,

7    based on the records, what was the underlying conduct at issue

8    in that matter?

9    A    The student had been knocking on women's doors in the

10   residence hall throughout one night.

11   Q    And do you have an understanding of what time of day or

12   night the knocking took place?

13   A    I believe it was 4:00 in the morning.

14   Q    And does it reflect what the result of that matter was?

15   A    It does.

16   Q    And what was that?

17   A    A university warning, a ban from the university residence

18   halls, and a removal from university housing.

19   Q    So let's look now at 503.  And again I'm going to ask you

20   the same two questions.  Does the record reflect what the

21   underlying conduct --

22              THE COURT:  Sorry.  Did you just say 503?  I thought

23   that was the one we just looked at.

24              MR. URBAN:  I'm sorry.

25              THE COURT:  Are we on 504 now?

1              MR. URBAN:  Yeah, 504.  I apologize.  503 was the

2      knocking on the doors.

3              THE COURT:  Right.

4              THE WITNESS:  Yes.

5      Q   (By Mr. Urban) 504 --

6              MR. URBAN:  I'm sorry, Your Honor.  I gave up my set.

7      Q   (By Mr. Urban) 504, what happened in that particular

8      matter?  What was the underlying conduct?

9      A   The student was being disruptive with the RA staff.

10     Q   Okay.

11     A   Um, yeah.

12     Q   And does it give a description of when that disruption

13     occurred?

14     A   Over the course of several days.

15     Q   Was some of that in the evening hours during quiet hours?

16     A   It was.

17     Q   And what was the sanction that's reflected in that matter?

18     A   Removal from housing.

19     Q   Okay.  Let's look at Exhibit 505, if you would, please.

20     And what was the underlying conduct at issue in that matter?

21     A   Over the course of time, typically late at night, a student

22     was causing a disruption in their hall.

23     Q   And what was the sanction in that case?

24     A   University probation with an eligible to review six months

25     after the fact, and they were also banned from the residence

1   halls and a removal from housing.

2   Q   Let's look at Exhibit 506, if you would, please.

3           Can you tell me what the underlying conduct at issue

4   is reflected in that file?

5   A   The student was found to be urinating on a building.

6   Q   And can you tell me what was the sanction, if any, in that

7   matter?

8   A   The student received university probation, a ban from the

9   residence halls, and a removal from university housing.

10  Q   And, again, what time of day did the urination on the

11  building take place?

12  A   5:45 p.m.

13  Q   So that was outside, presumably during the daytime.

14  A   Correct.

15  Q   Are we up to -- did we finish 507?

16          THE COURT:  No.  We just finished 506.

17  Q   (By Mr. Urban) Okay.  So let's look at 507.

18          MR. URBAN:  Thank you, Your Honor.

19  Q   (By Mr. Urban) Again, the question:  What was the

20  underlying conduct at issue in the 507 matter?

21  A   Fire in the residence hall.

22  Q   And what was the outcome in that matter?

23  A   University probation, a removal from housing, and a ban

24  from the residence halls and an educational component as

25  well.

1   Q   And that fire -- he started a fire where, in the bathroom?

2   A   Correct.

3           THE COURT:  Can you give me one second, Mr. Urban,

4   please?

5           MR. URBAN:  Sure.

6       (Pause.)

7           THE COURT:  So if I can ask you to turn to 505, you

8   said this was a student causing disruption in the hall late at

9   night.  Where do you see that in 505?  I'm sure it's here.  I

10  just can't find it.

11          THE WITNESS:  May I?

12          THE COURT:  Yeah.  Oh, sure.

13          THE WITNESS:  Sorry.

14          THE COURT:  Oh, there's stuff behind the first two

15  pages.

16          THE WITNESS:  It says the incident time right there.

17          THE COURT:  And how do you know that the student was

18  causing disruption in the hall late at night?  Because of

19  what's attached?

20          THE WITNESS:  Yes.

21          THE COURT:  Okay, I didn't see the attachment.  Thank

22  you.  I'm good.

23          THE WITNESS:  You're welcome.

24          THE COURT:  Sorry, Mr. Urban.  Go ahead.

25          MR. URBAN:  No problem, Your Honor.

1  Q    (By Mr. Urban) So did you run any other data compilations

2  or analytic reports?

3  A    I did.

4  Q    And I'm going to ask you to look at Exhibit 508.

5         THE WITNESS:  I apologize for the size, Your Honor.

6         THE COURT:  That's all right.

7  Q    (By Mr. Urban) Can you tell the Court what 508 is?

8  A    508 is a three-and-a-half-year report on incidents that

9  were reported through our online database that reflected some

10  incident of bias.

11  Q    So that means the reporter thought that the incident

12  qualified as an incident of bias?

13  A    Correct.

14  Q    What kind of bias would be included in that?

15  A    The third column under "Incident Summary" identifies that

16  it could be remarks or actions directed at a gender or sexual

17  identity, vandalism directed at gender or sexual identity,

18  vandalism or remarks directed at racial or ethnic identity.

19         THE COURT:  There's also religious.

20         THE WITNESS:  Yes, yes.

21  Q    (By Mr. Urban) So, again, just so the record is clear,

22  could you tell the Court what the columns in 508 correspond to?

23  A    Sure.

24  Q    Going from left to right.

25  A    The first column is the case number, so identifying the

1    academic year in which it began.

2            THE COURT:  Is there any significance to the four

3    digits following the year?

4            THE WITNESS:  Yes.  That's the number of incident on

5    the docket that year.

6            THE COURT:  So the first incident of the year would be

7    triple zero one.

8            THE WITNESS:  Correct.  Then if there are individuals

9    in that case, it would go zero one; if there were two people,

10   zero two.

11           THE COURT:  Got it.  Thank you.

12   Q   (By Mr. Urban) So I'm sorry.  Did you finish going through

13   the columns left to right?

14   A   I did not.  The second column is the incident location

15   where the alleged incident took place.  The next is the

16   incident summary; so it -- you can identify where it's

17   targeted.  The next column is a hearing type, and that's just a

18   blanket column title.

19           Within that you can see there's variance as to what

20   type of hearing it is.  It's not to imply that there actually

21   was a hearing.  So there's community conversations, Student

22   Affairs outreach, administrative conference, um, things of that

23   nature.

24   Q   Okay.

25   A   The next column is charges.  So if a case actually was

1   adjudicated through conduct, it would have the violations

2   there.  The next column is the tag of bias; so that's manually

3   done on the back end of this system once a case is put in to

4   identify to be able to run a report such as this.

5   Q   So let me interrupt for a minute.  That's how you know it

6   was reported as a bias case initially.

7   A   Correct.

8   Q   Okay.

9   A   And then the following columns are the same as the previous

10  report explaining that it was a probation, expulsion,

11  suspension, warning, a ban, ban from the residence hall, or a

12  termination.

13          THE COURT:  "DP" is probation.

14          THE WITNESS:  Yes.  Disciplinary probation it's short

15  for.

16  Q   (By Mr. Urban) Now, there's some -- there's a column there

17  that sometimes reflects some narrative like "Community

18  Conversation" or "Not a Student Code issue."  Could you tell

19  the Court what that phrase "Not a Student Code issue" means?

20  A   Sure.

21  Q   And what "Community Conversation" means.

22  A   So a "Community Conversation" would be an informal meeting

23  that any staff member could have with a student who was

24  impacted by the situation, even if they didn't know who the

25  alleged respondent was offering support to that student and

1    explaining the resources that are available.

2           Similarly, if it was an incident that didn't rise to

3    the level of a policy violation but the university deemed it

4    would be appropriate to still have an educational conversation

5    with the student, it would be coded as a "Community

6    Conversation."

7    Q   Okay.  And what does "Administrative Conference" mean so

8    the Judge can understand that?

9    A   An administrative conference is a conduct proceeding.  It's

10   a one-on-one meeting, again informal, not a formal hearing, um,

11   where the administrator would go through the narrative that

12   they've received, have a conversation with the student.  If the

13   student agrees to the proposed sanctions in that meeting, the

14   meeting can close and the similar documents that were presented

15   earlier in the case resolution form is what would be the

16   conclusion of that.

17   Q   So those case resolution forms that we saw in some of 502

18   through 507 would be the outcome of such an administrative

19   conference.

20   A   That's correct.

21          THE COURT:  Can I ask --

22          MR. URBAN:  Sure.

23          THE COURT:  -- a couple questions on this document?

24          So I'm looking at the right-hand column and seeing a

25   string of nos all the way down on both pages.  Does that mean

1  that -- should I infer from that that for three and a half

2  years no bias incident resulted in any discipline whatever?

3          THE WITNESS:  I would say not all of them.  If you

4  look at towards the bottom, third from the bottom of the first

5  page, disruptive behavior, the student received a warning.

6          THE COURT:  Oh, yes, I see a "yes" there, okay.  Oh,

7  yes, and there is a "yes" a little bit higher up, yup.

8          THE WITNESS:  Yes.

9          THE COURT:  Good catch.

10         MR. URBAN:  I'll be inquiring about that, Your Honor.

11         THE COURT:  Okay.  Fine.  I'll let you do that.

12         If -- and I'll let you -- I don't mean to interrupt

13  you, Mr. Urban.  I'll let you do some more inquiring.  I had

14  other questions about whether the community conversation is

15  with the person who needs support, that is to say, perhaps a

16  victim or somebody's regarded as the perpetrator or both.  So

17  that was one question I had that you might want to address.

18         I also had a question about who prepares the document

19  in, particularly, incident summary and when those notations are

20  made.  So I'm happy to let you do the questioning.

21  Q   (By Mr. Urban) Sure.  Can you answer the first question His

22  Honor asked?

23  A   Which one?

24  Q   Whether the community conversation reflects a conversation

25  amongst whom?

1    A    Sure.  It could absolutely be with both parties if a person

2    was identified.

3         THE COURT:  Got it.  Thank you.

4    Q    (By Mr. Urban) And the second question I believe His Honor

5    asked was --

6         THE COURT:  Let's see.  I know there was a question

7    about who prepares the incident summary and when is it

8    prepared.

9         THE WITNESS:  Sure.  So you'll notice that the

10   majority of these incidents take place in a residence hall.  So

11   there's an administrator in Residential Life who receives the

12   reports as they come in.  Those reports can come from

13   traditionally the resident assistants.  They would review that

14   narrative and then type in the incident summary.  When it's

15   created into a case, that's when they can also add the tag of

16   bias.

17        THE COURT:  Who?  Who is "they" here?

18        THE WITNESS:  An administrator in Residential Life if

19   it takes place in the residential areas.

20        THE COURT:  Okay.  And so, for example, in this case I

21   believe there's a woman named -- I saw her name in the report.

22   I'm forgetting her name, but she was the Residential Life

23   person at Charter Oak.

24        MR. URBAN:  Ms. Helsinki (sic)?

25        THE COURT:  Helsinki (sic), yes.  Is that the person?

```
1              THE WITNESS:  No.  That's the residence hall director
2   for that area.  It would be an assistant director in that area
3   who receives that form.  My office also can receive reports --
4              THE COURT:  I see.
5              THE WITNESS:  -- where the same process would take
6   place.
7              THE COURT:  Okay.
8              THE WITNESS:  We're all able to receive them.
9              THE COURT:  Thank you.  Thank you.
10  Q   (By Mr. Urban) Sure.  So when a reporter makes an initial
11  report to Community Standards, they get to select certain tags;
12  is that right?
13  A   Correct.
14  Q   And this 508 reflects where that tag initially happened to
15  be checked off as a racial -- or, sorry, a bias incident.
16  A   Correct.
17  Q   So did you happen to tabulate in this three-and-a-half-year
18  period how many of these matters were initially reported as
19  bias incidents?
20  A   I did.
21  Q   And what was that figure?
22  A   About 170.
23  Q   And of those 170, how many actually moved forward to an
24  administrative conference or a hearing as a matter of
25  discipline?
```

1    A    About a dozen.

2    Q    Okay.  And so what does that mean happened to the remaining

3    156, 158, whatever that is?

4    A    It was educational in nature to have a conversation with

5    the students impacted and involved.

6              THE COURT:  Sorry.  Let me follow up on that.

7              So the 170, that is the sum of the rows on these two

8    pages.

9              THE WITNESS:  I believe so.

10             THE COURT:  And you're saying that of those -- of

11   these entries, we should be able to find a dozen, or

12   thereabouts, that resulted in -- I'm sorry -- that moved to

13   some kind of a hearing.

14             THE WITNESS:  Yes.  And that's reflected in the

15   charges column.

16             THE COURT:  Got it.  Thank you.

17             THE WITNESS:  You're welcome.

18   Q    (By Mr. Urban) Now, when the Judge uses the word "hearing,"

19   maybe we should clarify.  I know in -- well, let me back up.

20             Are these all literally hearings like you have in

21   court?

22   A    No.

23   Q    Okay.  Maybe we could enlighten the Court about what kind

24   of proceedings can occur in a disciplinary matter.

25   A    Sure.  So if you look at the fourth column of the hearing

1   type and you see the corresponding column with the charges, you

2   can identify that some are noted as "Administrative

3   Conference," and so that would be the one-on-one meeting that

4   the administrator has with the student to rectify their conduct

5   matter.  And that would be where the student agrees to the

6   terms of the sanctions and the matter would be closed.  There's

7   no appeal.

8           Should a student have an administrative conference

9   meeting where they're reviewing the findings and the student

10  disagrees with that, they're permitted to request a hearing.

11  Q   And when such a hearing goes forward, are different hearing

12  officers appointed?

13  A   That's correct.

14  Q   And what do the hearing officers receive?

15  A   They receive a full findings report, which would include

16  any of the documents that the investigating student conduct

17  officers used to write the report.

18  Q   And do those hearing officers receive the recommended

19  sanction portion of that report?

20  A   It's the internal practice that they do not.

21          THE COURT:  So that's redacted, the sanction?

22          THE WITNESS:  Correct.

23  Q   (By Mr. Urban) So based on your years of experience in this

24  field, these 156 or 158 out of 170 matters, does that reflect a

25  pattern to you in terms of what happens at UConn when something

1   is reported as a bias incident?

2           MR. CERAME:  I'm going to object as the lack of

3   foundation.  It's calling for an expert testimony.  I don't

4   know what she's an expert on.

5           THE COURT:  Well, I'm going to overrule it.  I'm

6   interested in what she has to say.  I'm not sure I quite

7   understand the question, but perhaps the witness does.

8   Q   (By Mr. Urban) Well, let me ask it another way.  156 or 158

9   of these matters never proceeded down the disciplinary track;

10  correct?

11  A   Correct.

12  Q   So what does that tell you as someone who's experienced in

13  the field about how matters that are reported as bias incidents

14  are treated at the university?

15          MR. CERAME:  Same objection.

16          THE COURT:  That's overruled.  You can answer.

17          THE WITNESS:  It's an educational approach.  The whole

18  foundation of student conduct is to be educational with

19  students.

20  Q   (By Mr. Urban) And if we look at 508 and we look at those

21  incidents where, in fact, the 12 or so did move forward on a

22  disciplinary track, is there something about those matters that

23  are different from the other 156?

24  A   There's an underlying conduct issue.

25  Q   Do you want to explain that a little bit more?

1          THE COURT:  Yeah.  What does that mean?

2          THE WITNESS:  Can we get into --

3          MR. URBAN:  You want to look at the exhibit?

4          THE WITNESS:  Please.

5    Q   (By Mr. Urban) So looking at 508, can you point to His

6    Honor some of the 12 where the matter went forward as a

7    disciplinary matter and, in your view, it went forward because

8    there were other or additional conduct issues other than just a

9    racial or ethnic or sexual orientation biased event?

10   A   Yes.  The third from the bottom.

11         THE COURT:  So that says disruptive behavior; right?

12         THE WITNESS:  Yes.

13         THE COURT:  We're on the first page; right?

14         THE WITNESS:  Yes.

15         THE COURT:  Okay.  Go ahead.

16         THE WITNESS:  So you can see the remarks were

17   disruptive nature were made.  And then if you move over to the

18   fourth column from the right, you can see that the student

19   received a warning.  So while the incident may have been

20   reported as bias, that may not have been the reason why it was

21   held to conduct.

22         THE COURT:  Fair to say you don't have personal

23   knowledge of these episodes?

24         THE WITNESS:  No.

25   Q   (By Mr. Urban) Did you happen to take a peek at some of the

1    files, some of those 12 or 14 files?

2    A    I did.

3    Q    And showing you Exhibits -- looking at Exhibits 509 through

4    512, can you tell the Court what those are?

5    A    So 509 is a student who, in the Student Union, invited

6    themself into a student meeting and yelled at the students.

7    That was disruptive.

8    Q    And do you have an understanding of the nature of the

9    meeting?  Was there a particular group that was meeting?

10   A    It was a Chinese student organization.

11   Q    And do you have an understanding of what he interrupted or

12   she interrupted and did?

13   A    Yes.  He entered the meeting and yelled, "F China."

14   Q    So he was not a member of that group.

15   A    He was not.

16   Q    He was not an invitee to the meeting.

17   A    He was not.

18   Q    Looking at Exhibit 510.

19         THE COURT:  I'm sorry.  Before you go on, 509, I just

20   want to make sure I see where you're getting this information

21   from.  I have one page in Exhibit 509.  Another student

22   organization meaning to exclaim a phrase that disrupted their

23   activities.

24         So you've looked beyond this one page.

25         THE WITNESS:  Yes.

1          THE COURT:  I understand.  Okay, thank you.

2     Q    (By Mr. Urban) Let's look at 510, if you would, Ms. Buda.

3     Again, these were all initially reported as bias incidents;

4     correct?

5     A    Correct.

6     Q    And what was the underlying conduct in 510?

7     A    510 was disruption.

8     Q    Does it reflect what kind of disruption?

9     A    He was yelling, um, slurs and making comments to his

10    roommate about their sexuality.

11    Q    So those comments were made directly to the roommate.

12    A    Yes.

13    Q    Let's look at 511.  Well, let me back up.

14         510 he was not only making a comment about the

15    roommate's characteristics, but he was also yelling.

16    A    Yes.

17         THE COURT:  He also allowed -- he violated the guest

18    policy by allowing two people into the room that he did not

19    know; right?

20         THE WITNESS:  Correct.

21         THE COURT:  Okay.

22    Q    (By Mr. Urban) I'm sorry.  So I think we're up to 5 --

23         THE COURT:  11.

24    Q    (By Mr. Urban) -- 11.  Again, this was reported as a bias

25    incident, but what was the underlying conduct?

1  A   Students were angry that they believed another student

2  stole their bottle of vodka and went banging on his door to try

3  to retrieve it.  And the language that they used was biased in

4  nature.

5  Q   And was there a particular time at night do you know?  If

6  you know.  It may not be in your papers there.

7  A   I don't know.

8  Q   Okay.

9          THE COURT:  Now, this, as far as I can see, doesn't

10  say that the language was biased in behavior, but you know that

11  from looking at the file?

12          THE WITNESS:  That's correct.

13          THE COURT:  This also indicates he threatened the

14  individual.

15          THE WITNESS:  Yes.

16          THE COURT:  Okay.

17  Q   (By Mr. Urban) So now we're up to 512, I believe?

18  A   Yes.

19  Q   And, again, the same set of questions, if you would.  What

20  was the underlying -- again, it was reported as a bias

21  incident, but what was the underlying conduct?

22  A   The student was making comments about his roommate's

23  sexuality.

24  Q   And, again, that was presumably to the roommate's face.

25  A   Yes.

1   Q   I note that in 509 through 512 there's reference to

2   educational project.  Could you enlighten the Court about what

3   it means when there's a reference to educational project?

4           MR. CERAME:  Objection, Your Honor.  I don't

5   understand the relevance.

6           THE COURT:  Well, actually, if you could point it out

7   on the document to me first, that would be helpful.

8           MR. URBAN:  If I may approach.

9           THE COURT:  Yes, you may.

10          THE COURT:  Which exhibit are we looking at?

11          THE WITNESS:  509.

12          THE COURT:  509?  Can you point it out?  Just tell me

13  where on the page.

14          THE WITNESS:  Section IV.

15          MR. URBAN:  Roman numeral.

16          THE COURT:  I see.  "Educational project.  You must

17  complete the following by December 1, 2017."  I'll allow the

18  question.  Go ahead.

19  Q   (By Mr. Urban) And the same question 510 reflects the same

20  thing in subsection Roman numeral III; correct?

21  A   Correct.

22  Q   So what does that mean when there's a reference to

23  educational project in those exhibits?

24  A   So the educational project is agreed upon between the

25  administrator and the student as an opportunity for the student

1   to reflect on their behavior that led them to that meeting.

2           THE COURT:  It's like a homework assignment basically.

3           THE WITNESS:  Yes.

4   Q   (By Mr. Urban) Based on your years of experience in this

5   field, do you have an understanding of the theory and purpose

6   behind such community conversations or educational projects?

7           MR. CERAME:  Same objection as earlier.

8           THE COURT:  It's overruled.

9           THE WITNESS:  Yes.

10  Q   (By Mr. Urban) And could you tell the Court your

11  understanding of what the purpose or theory behind such

12  approaches is?

13  A   Oftentimes the students need to understand where the

14  university is coming from when they're addressing behavior on

15  campus, and this allows for a nonconfrontational conversation

16  to explain that matter to the student and to help them reflect

17  on the situation.

18  Q   Do you, in your experience, see that as a benefit to the

19  student who has been the subject of the inquiry or the matter?

20  A   Yes.

21  Q   And why does it help that student, in your experience?

22  A   Oftentimes students don't realize the impact of their

23  behavior on the entire community.

24  Q   Does that approach reflect, in your experience, the values

25  of a university setting?

1    A    Yes.

2    Q    How so?

3    A    We're educational in nature.  It's our job to educate the

4    students about our expectations beyond just the university.

5    Q    And beyond academics?

6    A    Yes.

7    Q    I want to switch gears for a moment, Ms. Buda, and ask you

8    about this:  If a University of Connecticut student does

9    receive some sort of a disciplinary sanction from the

10   university, does that appear on his or her transcript?

11   A    Only in two instances.

12   Q    Only what?

13   A    In two instances.

14   Q    And what are those two instances?

15   A    A suspension or an expulsion.

16   Q    And were either Mr. Karal or Mr. Mucaj, based on the

17   recommendations of Community Standards, ever at risk of

18   expulsion or suspension?

19   A    No.

20            THE COURT:  Can I ask about that?

21            MR. URBAN:  Sure.

22            THE COURT:  So is it the case -- so my understanding,

23   from what you just testified to, is that the sanction

24   recommended by the investigator is redacted, and the only thing

25   that the hearing officers see is the report plus the supporting

1  documents that the investigator obtained but without seeing the

2  recommended action; correct?

3           THE WITNESS:  Correct.

4           THE COURT:  So is there anything that would prevent

5  the hearing officers from taking whatever disciplinary steps

6  they saw fit in any particular case?

7           THE WITNESS:  No.

8           THE COURT:  Okay.

9  Q   (By Mr. Urban) Well, is the investigator present at the

10  hearing?

11  A   Yes.

12  Q   And can the investigator indicate what they think is

13  appropriate or not appropriate in the hearing?

14  A   Yes.

15  Q   So if a student conduct investigator is at a hearing and

16  the hearing officer moves to or decides to impose a sanction

17  more stringent than the investigator believes is appropriate,

18  the investigator can certainly speak up; correct?

19  A   Correct.

20  Q   And do they in your experience?

21  A   They can.

22  Q   If you know, could you tell the Court what other higher

23  educational institutions typically ask applicants about their

24  past discipline?

25  A   So on the common application form, which is the most

1  universal form, the standard question is:  Have you been

2  subject to discipline resulting in your student status as

3  probation, dismissal, or suspension or expulsion?

4  Q   And, again, were either Mr. Mucaj or Mr. Karal, based on

5  the recommendations at least of the Community Standards

6  investigator, ever at risk of probation, suspension, dismissal,

7  or expulsion?

8  A   No.

9          THE COURT:  What is probation?  What does it mean?

10         THE WITNESS:  Probation means that there's been a

11  violation of the code.  And it's UConn's policy that it's

12  indefinite, but six months after the probation is initiated,

13  students may apply for a probation review in which they would

14  sit before peers and identify how they've changed their

15  behavior.  And the majority of the time students are then

16  released from their probation status.

17         THE COURT:  Is there anything that they're prevented

18  from doing while they're on probationary status?  Are there any

19  privileges that they lose, anything like that?

20         THE WITNESS:  There could be, but it's unlikely.

21  Q   (By Mr. Urban) So given your last answer to my last

22  question, how would any school that these two young men were

23  applying to ever learn about these matters involving these two

24  students?

25  A   An internet search.

1  Q   And did the university administration or Community

2  Standards, to your knowledge, ever release any personally

3  identifiable information regarding these two students being the

4  subject of any disciplinary proceeding?

5  A   No.

6          MR. URBAN:  If I may have a moment, Your Honor.

7          THE COURT:  You may.

8  Q   (By Mr. Urban) Ms. Buda, with respect to the 156 matters

9  reflected on 508 that did not move forward as discipline

10  matters, do you have an understanding, based on your

11  experience, why those didn't move forward as discipline

12  matters?

13         MR. CERAME:  Objection, Your Honor.  I think the

14  witness testified she doesn't have personal knowledge of what

15  happened in each of these instances.

16         THE COURT:  I agree and certainly understand that to

17  be the case.  I'll allow her to testify as to her experience if

18  it's relevant.  Certainly she has more information on that than

19  the Court does; so I'll overrule the objection.

20         MR. CERAME:  Very well, Your Honor.

21         THE WITNESS:  In my experience, oftentimes the

22  respondent is unknown, and so the university would be unable to

23  proceed.

24  Q   (By Mr. Urban) Is there any other reason why these matters

25  don't go forward?

```
 1   A    Yes.  Absolutely.  I mean not everything is targeted

 2   towards a specific person.

 3   Q    So if a -- in your experience, if a student makes a biased

 4   remark that's not accompanied by any other misconduct, in your

 5   experience, what happens with that?

 6   A    A community conversation.

 7   Q    But no discipline; correct?

 8   A    Correct.

 9            MR. URBAN:  I have nothing further right now.

10            THE COURT:  All right.  Thank you, Mr. Urban.

11            Mr. Cerame.

12            MR. CERAME:  Yes, Your Honor.  Actually, I would ask

13   for a brief recess.  I didn't want to say this about Attorney

14   Urban, but the exhibits he sent to me were not labeled

15   particular numbers.  And I would just want to converse with him

16   to make sure I understand exactly what numbers he was speaking

17   with.  I got a bunch of PDFs.  I received all of the exhibits.

18   But I just want to make sure --

19            THE COURT:  Take ten minutes.  That's fine.  Take ten

20   minutes.

21            MR. URBAN:  Your Honor, I did indicate which numbers.

22            THE COURT:  Okay.  I'm not getting involved in that.

23   I'll give you ten minutes, and then we're going to come up and

24   finish the hearing.

25        (Recess from 9:48 a.m. to 9:58 a.m.)
```

```
 1              MR. CERAME:  I'm ready to proceed.

 2              THE COURT:  You are, very well.  You may take the

 3    stand.

 4                         CROSS-EXAMINATION

 5    BY MR. CERAME:

 6    Q   Morning, ma'am.

 7    A   Good morning.

 8    Q   So one of the things I'm going to talk about today -- I

 9    just want to set this out -- is a word that's not often

10    discussed in polite company.  So today when I discuss a certain

11    racial epithet that begins with "N," I'm going call it the "bad

12    word" or the "naughty word" or the "N-word."  You understand

13    what racial epithet I'm referring to?

14    A   I do.

15    Q   What is your relationship with Alexandra -- well, who is

16    Alexandra Kytan?

17    A   She's an assistant director of Community Standards.

18    Q   And what is your relationship with her?

19    A   I'm her indirect supervisor.

20    Q   Indirect supervisor.  What does that mean?

21    A   She reports to the associate director for Community

22    Standards, and then he reports to me.

23    Q   So in the incident that is the genesis of this case here,

24    the incident that brings us here today, did she consult with

25    you about this case?
```

1    A    Yes.

2    Q    You're familiar with this case?

3    A    I am.

4    Q    You reviewed the reports.

5    A    I did.

6    Q    All right.  So I'd like to first go through some of the

7    exhibits that Attorney Urban discussed with you, and then I

8    want to talk about some other exhibits.  Okay?

9          So if we could turn to, first off, Exhibit 502.  This

10   is the incident -- correct me if I'm wrong -- but this is the

11   incident where a gentleman had put Post-It Notes of a penis, a

12   caricature of a penis in his window.

13   A    Yes.

14   Q    He also put the world "help."

15   A    Yes.

16   Q    You would agree the word "help" suggests a safety concern.

17   A    Yes.

18   Q    In this case here, was there any safety concern in what

19   Alexandra Kytan investigated?

20   A    No.

21   Q    All right.  In 503, if we turn to 503, this is the incident

22   where a gentleman was knocking on women's doors; is that right?

23   A    Yes.

24   Q    And the women were afraid; is that right?

25   A    Yes.

1   Q    It says they were afraid for their safety.

2   A    Yes.

3   Q    Do we know the content of what the gentleman said, the

4   content of his language from that report?

5   A    No.

6   Q    Okay.  So it seems his conduct caused these women to fear

7   for their safety; is that right?

8   A    Yes.

9   Q    All right.  Was there any -- did anyone -- was anyone

10  caused to fear for their safety as a result of the incident

11  that brings us here today?

12  A    I don't know.

13  Q    To your knowledge, to the best of your knowledge, yes or

14  no?

15  A    No.

16  Q    Was anyone -- okay.  Thank you, ma'am.

17        And could you look at 504, and particularly if I could

18  direct your attention to about five lines down on 504, the

19  first page.

20        Now, this was an incident I think you described it on

21  direct as a disruption or disruptive behavior; is that correct,

22  ma'am?

23  A    Yes.

24  Q    I think about five lines down it describes the behavior

25  specifically as aggressive; is that correct, ma'am?

1    A    Yes.

2    Q    And you would agree that there was no violence or threat of

3    violence in the present case.

4    A    Correct.

5              THE COURT:  I'm sorry.  I have a question.  So this

6    document says -- where Mr. Cerame has directed you -- says,

7    "violating quiet hours and aggressive behavior to staff."  Do

8    you see that?

9              THE WITNESS:  Yes.

10             THE COURT:  What are quiet hours?

11             THE WITNESS:  Quiet hours are hours during the day

12   where it should be quieter in the residential areas.

13             THE COURT:  Is that something that's set?  Is it a set

14   of hours across campus, or does it vary by residence hall?

15             THE WITNESS:  I believe it's universal within the

16   residential areas.

17             THE COURT:  And do you happen to know what they are?

18             THE WITNESS:  If you look at the bottom of that first

19   page that he was referring to --

20             THE COURT:  10:00 p.m. to 7:00 a.m. Sunday to Thursday

21   and 12:00 a.m. to 7:00 a.m. Friday and Saturday.

22             THE WITNESS:  Correct.

23   Q    (By Mr. Cerame) If we could look at 505, please.  Again, I

24   think you described this on direct -- and correct me if I'm

25   wrong -- as disruptive behavior.

1   A    Yes.

2   Q    Do we know anything more specific about what the gentleman

3   or what the student said or did beyond that it was disruptive?

4   A    In the incident it was described as pervasive disruption.

5   Q    Do we know anything beyond that that -- was he threatening

6   anyone?  Was he banging on doors?  Do we know based on what's

7   written?

8   A    No.

9   Q    Okay.  I want to look at 506.  This incident I think was

10  described as urinating on a building.

11  A    Yes.

12  Q    You would agree that you're -- public urination is a

13  sanitary concern?

14  A    Yes.

15  Q    It's a concern of public health?

16  A    Yes.

17  Q    Was there any concern to public health in the present case

18  that brings us here today?

19  A    No.

20  Q    Okay.  507, I believe this was described as a fire in the

21  residence hall.

22  A    Yes.

23  Q    You would agree a fire in a residence hall poses a risk of

24  danger to people?

25  A    Yes.

1  Q   Was -- and, again, there was no threat of violence or

2  imminent threat of violence in the present case that brings us

3  here today.

4  A   No.

5  Q   I want to talk about 508 a bit, and I may want to talk

6  about a few things with that one.

7          We talked about what's in there, but I want to talk

8  about what's not in there, and also in 501.  So if we could

9  just keep both of those exhibits in mind.

10         You would agree that sometimes, on occasion, college

11  students might shout "Go Huskies" outside of a residence hall?

12  A   Yes.

13  Q   Do we know how often anyone who shouted "Go Huskies" at

14  11:00 p.m. at night or during quiet hours was punished based on

15  either Exhibit 501 or Exhibit 508?

16  A   No.

17  Q   Okay.  Does your exhibits show or do these exhibits show

18  how often students who shout "Go Huskies," or a similar kind of

19  cheer, were tracked down through video and based on Wi-Fi usage

20  to identify them for how loud they were?

21  A   No.

22  Q   Does your data show when an RA has to go down and quiet a

23  party and there's no further action taken?

24  A   No.

25  Q   Do you imagine that that does happen with some occasion and

1    some frequency, that RAs come down, tell some people to be

2    quiet, maybe they have to go down twice, and there's no further

3    action taken?

4    A    Yes.

5    Q    That does happen with some frequency, okay.

6            Were you aware of a protest, a rally, that was held on

7    October 21, 2019, at UConn campus?

8    A    Yes.

9    Q    Okay.  And is it fair to say that protest concerned these

10   events here?

11   A    Yes.

12   Q    Okay.

13           THE COURT:  Meaning the events that bring us to this

14   courtroom; right?

15           MR. CERAME:  Yeah, the events that are the genesis of

16   this lawsuit.

17   Q    (By Mr. Cerame) Do you know whether the students who held

18   the rally used megaphones?

19   A    Yes.

20   Q    Did they use megaphones?

21   A    There's a picture that I saw, but I wasn't there.

22   Q    Okay.  So but you saw -- let me make sure I understand.

23   You saw a news article or something that suggested that

24   students used megaphones at the rally.

25   A    Yes.

```
 1   Q    Would it surprise you if they used megaphones at the rally?

 2   A    No.

 3   Q    And classes were going on that day.  Yes?

 4   A    Yes.

 5   Q    And it's reasonable to infer that people in classes could

 6   hear the rally; right?

 7   A    Perhaps.  I wasn't there.

 8   Q    Okay.  Were any of those students punished?

 9   A    No.

10   Q    Do you know how many students were at the rally?

11   A    No.

12   Q    If I said that the news reported 200 people, would that

13   surprise you?

14            MR. URBAN:  Object.  She doesn't have a basis.

15            THE COURT:  Sustained.

16            MR. CERAME:  Sure.

17            THE COURT:  I mean unless you know how many people

18   were there.

19            THE WITNESS:  No, sir.

20            MR. CERAME:  No, Your Honor, no, that's fine.

21   Q    (By Mr. Cerame) Do you know whether there was a rally

22   against President Trump a few years ago or a couple years ago?

23   A    No.

24   Q    If I could direct your attention to Exhibit 18.  Perhaps a

25   news article about it, might that refresh your recollection if
```

1   there was a rally?

2   A    No.

3   Q    News article about it wouldn't refresh your recollection?

4   A    About Trump?

5   Q    About a rally on campus -- I'm sorry.  Let me start over.

6        You said you don't remember if there was a rally a few

7   years ago against President Trump.

8   A    No.

9   Q    If I showed you a news article about an event like that,

10  might that help you remember whether there was?

11  A    Perhaps.

12       MR. CERAME:  Okay.  I'm going to show the witness

13  Exhibit 18.  May I approach, Your Honor?

14       THE COURT:  You may.

15  Q    (By Mr. Cerame) Does that refresh your recollection,

16  ma'am?

17  A    No.

18  Q    You don't know whether there was a rally there that day?

19  A    This article suggests there was.

20  Q    But you don't know -- you don't remember whether there was?

21  A    No.

22  Q    Do you remember whether any students were punished for

23  going to a rally a few years ago?

24       MR. URBAN:  I'm sorry.  I didn't hear that.  Could

25  you --

1   Q    (By Mr. Cerame)  Sorry.  Do you remember whether any

2   students were punished for attending a rally such as this a few

3   years ago?

4   A    No.

5   Q    You don't remember?

6   A    I wouldn't have that knowledge.

7   Q    Why not?

8   A    I was not employed at the university.

9   Q    Ah, okay.  All right.  Very well.

10          THE COURT:  I'm glad you raised that.  When did you

11   start at UConn?

12          THE WITNESS:  July.

13          THE COURT:  Of?

14          THE WITNESS:  2019.

15          THE COURT:  I see.

16          MR. CERAME:  All right.

17          THE COURT:  And where were you before?

18          THE WITNESS:  I was the director of Student Conduct at

19   Quinnipiac University.

20          THE COURT:  And you had never worked at UConn before

21   July 2019?

22          THE WITNESS:  Correct.

23          THE COURT:  Got it.

24          MR. CERAME:  Thank you, Your Honor.  May I approach

25   the witness to collect the exhibit?

1           THE COURT:  You may.

2           MR. CERAME:  Thank you, ma'am.

3           THE WITNESS:  You're welcome.

4    Q    (By Mr. Cerame) Based on your experience, you said you had

5    30 years of experience in this field?

6    A    No.

7    Q    How many years?

8           THE COURT:  Fourteen.  She's not that old.

9           MR. CERAME:  Sorry.

10          THE WITNESS:  Thank you, Your Honor.

11   Q    (By Mr. Cerame) It was a large number.

12          Based on your years of experience, if the students

13   shouted, instead of the naughty word that we're discussing

14   today, instead they shouted "Go Huskies," would they receive

15   the same punishment?

16          MR. URBAN:  I'm going to object to asking a fact

17   witness a hypothetical question.

18          THE COURT:  I'll allow it.  I gave you some leeway.

19   If she knows, she can answer.

20          THE WITNESS:  It would require someone to submit a

21   referral to our office.

22   Q    (By Mr. Cerame) So do you believe that if someone did

23   submit such a referral, the students, for someone shouting "Go

24   Huskies," is it your testimony here today you believe someone

25   shouting "Go Huskies" would have received the same punishment

1   as someone who used the N-word in this case?

2          MR. URBAN:  Same objection, Your Honor.

3          THE COURT:  I'll allow it.

4          THE WITNESS:  Our office would review to identify if

5   there were any potential code violations along with the

6   shouting of "Go Huskies."

7   Q   (By Mr. Cerame) So I couldn't tell if you, in your

8   experience, you believe that would be the case or wouldn't be

9   the case.

10  A   It would depend on the situation and what was reported to

11  our office.

12  Q   Everything is the same.  Everything is the same.  The only

13  thing that's different is the words used.  And if the words

14  used were "Go Huskies," is it your testimony here today that

15  you believe, in your heart of hearts, that the students would

16  have received exactly the same punishment?

17         MR. URBAN:  Same objection for the record.

18         THE COURT:  Okay.  It's overruled.

19         THE WITNESS:  It would be a case-by-case basis.

20  Q   (By Mr. Cerame) I still don't understand, ma'am, but I'm

21  going to move on, Your Honor.

22         THE COURT:  Before you move on, you mentioned, ma'am,

23  a moment ago that something about "if we got a referral."  What

24  were you referring to when you said that?

25         THE WITNESS:  Sure.  So similarly to how you looked at

1    both spreadsheets --

2              THE COURT:  Yes.

3              THE WITNESS:  -- all of those incidents came in via a

4    referral from our online reporting firm, either from a resident

5    assistant, community member, police department, etc.

6              THE COURT:  And that basically --

7              THE WITNESS:  It generates the process to review an

8    incident.

9              THE COURT:  Got it.  Thank you.

10             THE WITNESS:  You're welcome.

11             MR. CERAME:  So, Your Honor, I'm not going to harangue

12   the witness any more.  But I would just note it was a simple

13   yes or no, and the witness declined to answer with a yes or no.

14             THE COURT:  She said it was a case-by-case process.

15             MR. CERAME:  Correct.

16   Q   (By Mr. Cerame) I'll come back to that.

17             Let's turn back to some of the exhibits that we did

18   discuss in this case.  In fact, perhaps -- do you have the

19   exhibits?  I think you do.  You do have the exhibits; right?

20   A   Yes.

21             THE COURT:  Does she have your exhibits?

22             MR. CERAME:  I'm going to talk about Attorney Urban's,

23   the defense exhibits.  I'm returning to the defense exhibits.

24             THE COURT:  Got it.

25   Q   (By Mr. Cerame) And we were talking about 508.  Do we know

1   how many of these incidents occurred near student housing based

2   on what's in front of you?

3   A   If you look at the incident location, it would refer to all

4   of the locations where the incident was reported.

5   Q   Okay.  So a lot of them, as I recall, were not near student

6   housing; is that correct, ma'am?

7            THE COURT:  Are you asking her to count them up and

8   try to make -- I mean I've got the list.

9            MR. CERAME:  Yeah.  Can I ask her about some of the

10  headers?

11           THE COURT:  You can ask her what you like.

12  Q   (By Mr. Cerame) Yeah.  So let's go through some of the

13  headers.  I actually didn't personally understand some of those

14  headers, particularly the last two columns.

15  A   The "Ban RH"?

16  Q   Yeah.  Ban from residence halls?

17  A   Yes.

18  Q   And then what was the one before that?

19  A   "A ban."

20  Q   And what does that mean?

21  A   It would be from a specific building.

22  Q   Okay.

23  A   Not necessarily a residence hall.

24  Q   So a ban from any building.

25  A   Correct.

1   Q   Okay.  Okay.  Let's talk about 509.  You noted here in

2   particular the student was not invited to the meeting on

3   direct.

4   A   Correct.

5   Q   You would agree that my clients had a right to use the

6   parking lot that evening; correct?

7   A   Yes.

8   Q   510, these were remarks that were used -- that were

9   directed to a roommate.  Again, there was -- there was a

10  suggestion of violence or a threat in that case; right?

11  A   Yes.

12  Q   And there was none of that in this case.

13  A   Correct.

14  Q   And in particular too, the roommate couldn't shut the

15  window, for example.  He had nowhere else to go in this

16  incident; right?  He was in his home on campus?

17  A   Yes.

18  Q   He couldn't shut a window and shut his roommate out.

19  A   Correct.

20          THE COURT:  This is 510 we're referring to; is that

21  right, Mr. Cerame?

22          MR. CERAME:  Yes, Your Honor.

23  Q   (By Mr. Cerame) In this case, the findings were that none

24  of the comments were directed into anyone's room.  Isn't that

25  correct?

1   A   It was between people.

2   Q   Sorry.  In my case with my clients here, with Ryan Mucaj

3   and Jarred Karal's case, there was a specific finding by

4   Alexandra Kytan that there was not enough evidence to suggest

5   that the remarks were directed into someone's room.

6   A   Correct.

7   Q   Okay.  Whereas, here it's in someone's room.

8   A   Yes.

9   Q   511, this was banging on people's doors.  This was conduct

10  that occurred inside the residence hall.  Isn't that right?

11  A   Yes.

12  Q   And again it was directed into someone's room, someone's

13  home on campus; right?

14  A   Yes.

15  Q   There's no evidence that the remarks here or the utterances

16  here were directed into anyone's room.

17  A   Correct.

18  Q   512, similar situation, it was directed inside.  And

19  there's no evidence that remarks in this case were directed

20  inside.  Isn't that correct?

21  A   Yes.

22  Q   Would you agree -- there was discussion about values.

23  Would you agree that part of the values of an educational

24  setting are to be exposed to viewpoints you might not agree

25  with?

1    A    Yes.

2    Q    To have your views challenged by views that you may not

3    find match your own?

4    A    Yes.

5    Q    Okay.  I want to turn to some exhibits I have brought.

6         MR. CERAME:  I first want to direct the witness's

7    attention to what's marked as Exhibit 6.  May I approach the

8    witness, Your Honor?

9         THE COURT:  You may.  You may approach the witness.

10   Q    (By Mr. Cerame) If you could just take a moment to review

11   it.  It is a little hefty.

12        You know what this is?

13   A    Yes.

14   Q    What is it?

15   A    This is the notification for the hearing.

16   Q    It also contains Ms. Kytan's findings.

17   A    Yes.

18   Q    I want to specifically talk about some of those, starting

19   at what's labeled in the corner RM 2.  In the lower right-hand

20   corner, there's additional pagination, and one of them is RM 2.

21        And this is where she has her findings; correct?

22   A    Yes.

23   Q    And I want to talk about her conclusions, each of them sort

24   of in turn.  So if we could turn to RM 4 where she starts

25   making conclusions.

1          In the middle of RM 4, it says someone closed a

2  window.  Isn't that right?

3  A    Yes.

4  Q    But her first conclusion in the middle of RM 4, you would

5  agree, if you take a moment to read it, you would agree

6  principally what's going on there is to identify Ryan Mucaj as

7  the person who was in the video.

8  A    Are you referring to the first conclusion on that page?

9  Q    Yes, ma'am, the one that's the first conclusion on that

10  page.

11  A    Yes.

12  Q    Okay.  It's not a conclusion about how loud my client was,

13  Ryan Mucaj.

14  A    Correct.

15  Q    Okay.  The second conclusion, you would agree that that is

16  a conclusion about words Ryan Mucaj used.

17  A    Yes.

18  Q    It's about the naughty word, the nasty word, the word we're

19  talking about today.

20  A    Yes.

21  Q    It's not a conclusion about how loud he was.

22  A    Correct.

23  Q    The third conclusion, this was a conclusion about whether

24  his --

25          THE COURT:  Do you want us to move to the next page;

1    right?

2           MR. CERAME:  I'm sorry, Your Honor.  Yes, it goes on

3    to the next page.

4    Q   (By Mr. Cerame) Third conclusion, you would agree this is a

5    conclusion about where the word was directed.

6    A   Yes.

7    Q   It was a conclusion that the word was not directed at a

8    particular person.

9    A   Correct.

10   Q   Again, this is not a conclusion about how loud Ryan Mucaj

11   was that evening.

12   A   Correct.

13   Q   Okay.  And the findings -- there's a little subsection

14   there that says "Findings."  You would agree that there's

15   nothing in the findings that state anything about how loud Ryan

16   Mucaj was that evening.

17   A   It explains that he was engaged in a game.

18   Q   Did it use -- does it describe how loud he was anywhere in

19   the findings?

20   A   No.

21   Q   The volume he used?

22   A   No.

23   Q   Okay.  So looking at the findings and all the conclusions,

24   there's nothing that discusses how loud my client was that

25   evening, looking at the findings and the conclusions?

1  A    No.

2  Q    You would agree with that statement; right?  That there is

3  nothing that says volume -- your "no" means -- I'm sorry.

4          THE COURT:  I think I understood.

5          MR. CERAME:  I think you did too, Your Honor.

6  Q    (By Mr. Cerame) The two -- there are two conclusions, and

7  they both concern --

8          THE COURT:  Actually, there are three conclusions.

9          MR. CERAME:  I'm sorry.  I want to talk about two of

10 them in particular though.

11         THE COURT:  Okay.

12 Q    (By Mr. Cerame) Two of the conclusions concern whether my

13 client used the naughty word; correct?

14 A    Yes.

15 Q    Thank you.

16         And, again, there's no evidence of violence or a

17 threat of violence here.

18 A    No.

19 Q    All right.

20         MR. CERAME:  May I approach the witness?

21         THE COURT:  You may.

22         MR. CERAME:  I would like to submit to the witness

23 Exhibit 7.

24 Q    (By Mr. Cerame) I want to go through this one too.  You

25 know what this is similarly.  Yes?

1    A    Yes.

2    Q    What is it, just for the Court?

3    A    This is the administrative hearing notification for

4    Jarred.

5    Q    Okay.  I want to talk about if we go to, again, I think

6    it's JK 4.  There's a one line about how someone had to close a

7    window; right?

8    A    Yes.

9    Q    I want to talk about the conclusion there though.  There's

10   really -- there's one big conclusion about Jarred Karal here on

11   4.  It's not contested whether Jarred Karal used the nasty

12   word, but there is -- but you would agree that there's nothing

13   in there that suggests that there was violence or a threat of

14   violence in the finding.

15   A    There is not.

16   Q    And that conclusion does concern -- does not indicate how

17   loud Jarred was that evening.

18   A    Correct.

19   Q    Okay.  It does indicate whether he used the naughty word.

20   A    Yes.

21   Q    All right.

22        MR. CERAME:  If I may collect that exhibit, Your

23   Honor?

24        THE COURT:  You may.

25        MR. CERAME:  And give the witness what I've marked as

```
 1    Exhibit 1.
 2              THE COURT:  Sure.
 3    Q   (By Mr. Cerame) I honestly don't know whether you've seen
 4    this before.  Have you seen this before today?
 5    A   Only in my conversations with Mr. Urban.
 6    Q   Okay.  I don't want to know about your content of your
 7    conversations --
 8              MR. URBAN:  Sorry.  Which exhibit are we looking at?
 9              THE COURT:  Exhibit 1, Consent Decree, Mr. Urban.
10    Q   (By Mr. Cerame) Just for the record, this is the order in
11    Wu.
12        So I don't want to know about the content of your
13    discussions with Attorney Urban at all.  But the only time you
14    saw this was in his company.
15    A   Yes.
16    Q   You had never -- when was the first time, if you recall,
17    about, that you saw this with him?
18    A   In the last week.
19    Q   Okay.  So before 2020 began, no one had ever discussed this
20    order with you.
21    A   No.
22    Q   Do you know anything about the case that this arises from,
23    Nina Wu's case?
24    A   Yes.
25    Q   Did you not -- did you know about that before 2020 began,
```

1    anything about Nina Wu's case before 2020 began?

2    A    No.

3    Q    If we could turn to the paragraph labeled 1, and just take

4    a moment and read that paragraph, because what I'm going to ask

5    you about is whether, before 2020, anyone ever discussed this

6    issue with you before.

7    A    No.

8    Q    So no one has ever discussed the issue that's presented in

9    paragraph 1 --

10              MR. URBAN:  Asked and answered.

11              THE COURT:  Yeah, that's fine.

12              MR. CERAME:  I just was making sure.

13              THE COURT:  The answer's no; right?

14              THE WITNESS:  Correct.

15              THE COURT:  Got it.

16              MR. CERAME:  Not trying to harass.

17              If I could collect the exhibit.

18   Q    (By Mr. Cerame) Are you familiar with the phrase "hostile

19   learning environment"?

20   A    Yes.

21   Q    Aside from discussions with Attorney Urban this year, have

22   you -- in what context have you discussed that term "hostile

23   learning environment"?

24   A    In the context of Title IX gender-based misconduct.

25   Q    Gender-based misconduct, okay.

1          Have you ever discussed it in terms of racial or

2    ethnic bias?

3    A    No.

4    Q    Have you ever discussed relative Title IX compliance in --

5    as concerns hostile learning environments, have you -- has

6    anyone ever discussed with you alternatives to punishments of

7    students, such as anyone ever discussed, for compliance

8    purposes, offering education?

9    A    Yes.

10   Q    Okay.  Putting out statements in support of those students

11   who are oppressed, has that ever been discussed as an

12   alternative to punishing students?

13   A    As a conduct matter?

14   Q    As a matter for Title IX compliance.

15   A    Can you clarify your question?

16   Q    Sure.  I'm trying to find out what, generally speaking,

17   aside from punishing students, and maybe you haven't, but what

18   tools have been discussed, aside from punishing students, in

19   order to comply with Title IX requirements vis-a-vis hostile

20   learning environment.

21   A    It depends on a case-by-case situation.  If you're

22   referring to sexual misconduct cases, there's a complexity

23   there that I don't believe is parallel to this.

24   Q    Sure.  Can you give me some examples?

25          THE COURT:  Can I ask, why are we doing this?

1          MR. CERAME:  Sure, Your Honor.  So Attorney Urban has

2     a hostile learning environment claim, and I'm --

3          THE COURT:  I didn't realize he filed a counterclaim

4     in this case.  What are you referring to?

5          MR. CERAME:  So he has discussed with me, and he has

6     presented, and he discussed it on the telephone call at the

7     TRO, that he felt that the speech here could fall within the

8     ambit of creating a hostile learning environment.  And in order

9     to counter that claim, what I'm trying to elicit is whether --

10    to what degree that's actually what was going on here.

11         THE COURT:  But that -- does your question really get

12    to that?  I mean if you want to give her examples of sort of

13    generically from when she was at Quinnipiac, for example?  I

14    mean what are we talking about here?  Let's talk about the

15    case.

16         MR. CERAME:  Okay, Your Honor.  So it was about

17    whether they had discussed something -- a less speech

18    restrictive alternative.

19         THE COURT:  Why don't you ask a question.

20         MR. CERAME:  I'll move on.  I'll move on.  I think I

21    made the point.

22         I have no further questions, Your Honor.

23         THE COURT:  Okay.  Is there any redirect, Mr. Urban?

24         MR. URBAN:  Yes, very briefly, Your Honor.

25                         REDIRECT EXAMINATION

1   BY MR. URBAN:

2   Q   Attorney Cerame asked you questions about a hypothetical

3   where if someone were outside the dorm at the same time of

4   night, at 12:30 -- that was the time of night where the events

5   that get us here today took place -- if someone were screaming

6   "Go Huskies" at 12:30 at night and it woke people up and it

7   bothered people, could that be the basis for disciplinary

8   investigation and sanctions?

9   A   Yes.

10  Q   So does it matter what they say as long as they disturb

11  people in the middle of the night?

12  A   No.

13  Q   During quiet hours?

14  A   It does not matter what they say.

15  Q   What if they'd been standing outside, whacking the bumpers

16  of cars with a baseball bat and people up in the dorm heard it

17  at 12:30 at night?  Could that have been the basis of a

18  investigation and possible sanctions?

19  A   Yes.

20  Q   So was it important to understand when the conduct

21  occurred?

22  A   Yes.

23  Q   And where it occurred?

24  A   Yes.

25  Q   And who was disturbed by the conduct?

```
 1    A    Yes.

 2    Q    He showed you a newspaper article about a rally against

 3    President Trump.

 4    A    Yes.

 5    Q    I believe it's Exhibit 18.  Do you have that in front of

 6    you?

 7    A    I do not.

 8              MR. URBAN:  Okay.  If I may approach, Your Honor?

 9              THE COURT:  Sure.

10    Q    (By Mr. Urban) I know you said you weren't working at the

11    university so you didn't experience that, but looking at

12    Exhibit 18, is there a photograph with that exhibit?

13    A    Yes.

14    Q    And do you recognize the location where the photograph was

15    taken?

16    A    Yes.

17    Q    And what is that location?

18    A    In front of the Student Union.

19    Q    Is that a big open area in the center of campus?

20    A    Yes.

21    Q    Is that a residential area?

22    A    No.

23    Q    And does the photograph indicate whether it's nighttime or

24    daytime?

25    A    It appears to be in the daylight.
```

1   Q    And based on your understanding, let's just, for the

2   purpose of my question, assume that those students had gathered

3   to protest the presidency or the policies of President Trump.

4   Is there a message in that activity?

5   A    Yes.

6   Q    And what is that message?

7   A    They want to resist Trump.

8   Q    They want to resist his policies; right?

9   A    Yes.

10  Q    I want to have you look at I think it's Exhibit 6 and 7.

11          MR. URBAN:   If I may approach again?

12          THE COURT:   You may.

13  Q    (By Mr. Urban) The investigation reports that he inquired

14  of you about.

15          Now, Mr. Cerame asked you questions about the findings

16  and recommendations -- correct? -- in Exhibit 6, Ms. Kytan's

17  findings and investigations?

18  A    Yes.

19  Q    Does the findings and recommendations of Ms. Kytan, do they

20  list the backup documentation and interviews that she conducted

21  in doing her investigation?

22  A    Yes.

23  Q    And is one of the documents that she reviewed the report

24  from Ms. Helsinki (sic)?

25  A    Yes.

1    Q    And what does the report from Ms. Helsinki in Exhibit 6

2    reflect in terms of whether the conduct was loud or not?

3    A    May I read it directly?

4    Q    Yes, sure.

5              THE COURT:  Can you just tell me what page you're on?

6              THE WITNESS:  RM 6.

7              THE COURT:  RM 6.  Let me just get there.

8              All right.  Go ahead.

9              THE WITNESS:  The second paragraph of the incident

10   report states, "The video link shows three people (who look to

11   be male) in a parking lot outside Foster Hall using loud,

12   hateful, derogatory language.  Specifically the word "N" was

13   loudly utilized and was heard from inside where a student had

14   recorded and posted to social media."

15   Q    (By Mr. Urban) So students reported this from inside the

16   dorm.

17   A    Yes.

18   Q    And the words were spoken out in the parking lot.

19   A    Correct.

20   Q    And they were apparently reported to Ms. Helsinki as being

21   either yelling or loud; correct?

22   A    Correct.

23   Q    And the words were not just the N-word; right?

24   A    Correct.

25   Q    The other word was what?

1   A    Penis.

2   Q    And is it your understanding that the two students --

3        THE COURT:  Can I just interrupt?  I'm sorry, Mr.

4   Urban.

5        Where do you see the reference to "penis" on this

6   document?

7        MR. URBAN:  Bottom.

8        THE COURT:  Bottom?  Sorry.

9        THE WITNESS:  The second page, RM 7.

10       THE COURT:  Yup, I see it.  Thank you.

11       THE WITNESS:  You're welcome.

12  Q   (By Mr. Urban) Is it fair to say, based on the incident

13  report, that Ms. Kytan determined that the word "penis" had

14  been yelled loudly in the parking lot such that both the

15  student who videotaped the incident on his phone and the

16  student who closed her window could hear it; correct?

17       MR. CERAME:  Objection, Your Honor.  Lack of

18  foundation.  This is somebody else's findings, Ms. Kytan's

19  findings.

20       THE COURT:  I'll sustain it, but you can pursue this

21  if you focus us on the language of the report.

22       MR. URBAN:  Okay.

23  Q   (By Mr. Urban) The report -- take a minute to look through

24  Exhibit 6, including the findings and recommendations.

25       Now, W1, Witness 1, was the student who heard it from

1   his room and made the videotape; right?

2   A    Yes.

3   Q    And is it fair to say that her report reflects, and the

4   backup document reflects, that Witness 1 heard it in his room

5   and that's what made him start the videotaping?

6           MR. CERAME:  Just objection, Your Honor.  I don't know

7   who "her" is.

8           MR. URBAN:  Witness 1.

9           THE COURT:  Well, if she can -- I'm going to overrule

10  the objection.  Go ahead.

11          THE WITNESS:  Witness 1 is the student who took the

12  video.

13  Q    (By Mr. Urban) Okay.  And based on the documentation in

14  Exhibit 6, he heard it from his window of his dorm room.

15  A    Yes.

16  Q    And what about the other witness in the dorm?  What does

17  the report reflect and the back of document reflect about her?

18  A    On page RM 4, it states that they informed police that she

19  had heard individuals from her room and closed her window.

20  Q    Okay.  And so she heard it from her room, and they were

21  down in the parking lot.

22  A    Yes.

23  Q    And does the documentation reflect what words she heard?

24          Well, let me ask another question.  Did Mr. Karal,

25  based on your understanding of the report, admit that they were

1    yelling the word "penis"?

2    A    Yes.

3    Q    And this occurred at what time of the day or night?

4    A    Just after midnight.

5    Q    So there were two students who were disturbed?

6    A    Yes.

7    Q    And they made a report to Ms. Helsinki (sic)?

8         (Court reporter asked for clarification.)

9              THE COURT:  Wait.  So they made a report to

10   Ms. Helsinki.  Is that your understanding?

11             MR. URBAN:  She followed up with them.

12             THE COURT:  No.  I'm asking the witness, not you.

13             THE WITNESS:  So the hall director, Beth Helinski,

14   received an e-mail from another member of Residential Life

15   stating that someone had shared the video with her, and that's

16   how they began the report.

17             THE COURT:  Okay.  And your understanding that you

18   just testified to was based on the documents in front of us.

19             THE WITNESS:  Yes.

20             THE COURT:  Got it.

21   Q    (By Mr. Urban) So a fair reading of Exhibit 6 and 7, with

22   respect to the finding and recommendations, while she didn't

23   use -- while Ms. Kytan didn't use the words "loud" or "yelling"

24   in the actual section that is called "Conclusions," her

25   underlying documentation, based on her follow-up interviews,

```
 1    was that people reported that they were yelling the word
 2    "penis," that it was loud?
 3              MR. CERAME:  Objection, Your Honor.
 4              THE COURT:  I'll sustain that.
 5    Q   (By Mr. Urban) Did -- based on a complete reading of
 6    Exhibit 6, is it your understanding that Ms. Kytan determined
 7    that it was loud enough to be heard by the witnesses in the
 8    dormitory?
 9              MR. CERAME:  Objection, Your Honor.
10              THE COURT:  Why don't you focus me on the language, or
11    the witness on the language, Mr. Urban, rather than asking her
12    to draw conclusions about the document as a whole because
13    that's my job.
14    Q   (By Mr. Urban) All right.  So let's look at the findings
15    and recommendation, Exhibit 6 and Exhibit 7.  You said you
16    consulted with Ms. Kytan about this situation; right?
17    A   Yes.
18    Q   And she made a conclusion that these two young men, quote,
19    engaged in a verbal game that disrupted the living environments
20    of students residing in Charter Oak Apartments with respect --
21              THE COURT:  Where are you reading from?
22              MR. URBAN:  From the ultimate findings of both 6 and 7
23    in the Findings and Recommendations Report.
24              THE COURT:  Can you give me a page number, please?
25              MR. URBAN:  Yes.  RM 5.
```

1            THE WITNESS:  JK 4.

2            THE COURT:  S1 engaged in a verbal game, etc.  Is that

3   what you mean?

4            MR. URBAN:  Yes.

5   Q   (By Mr. Urban) Do you have an understanding, as you sit

6   here, of what Ms. Kytan was referring to when she found there

7   was disturbance?  What created the disturbance?

8            MR. CERAME:  Objection, Your Honor.

9            MR. URBAN:  She --

10           THE COURT:  Wait one second.  So you asked two

11  questions.  The first question was:  Do you have an

12  understanding as to what she was referring to?  That question

13  she can answer.

14           And just be clear, my understanding of the question is

15  you have an understanding of what Ms. Kytan was referring to.

16  If you want to ask another question, you can, when she wrote,

17  for example, "S1 engaged in a verbal game that disrupted the

18  living environment of students residing in Charter Oak

19  Apartments."

20           So the question is:  Do you have an understanding?

21           THE WITNESS:  Yes.

22  Q   (By Mr. Urban) And what was it is your understanding of

23  what caused this disturbance?

24  A   They were yelling loudly in a residential area.

25  Q   At what time of day?

1   A    After midnight.

2   Q    Mr. Cerame asked you some questions about the Wu consent

3   decree.  Do you remember those questions?

4   A    Yes.

5   Q    And he asked you if you had an understanding of what Ms. Wu

6   had reportedly done.  Do you remember that?

7   A    Yes.

8   Q    Can you tell the Court what your understanding of what

9   Ms. Wu had reportedly done is?

10  A    She had reportedly written item -- different words on her

11  white board residence.

12  Q    And was there a message connected with those words with

13  respect to who was permitted in her room?

14  A    I believe so.

15  Q    And what was that message?

16       MR. CERAME:  Your Honor, I'm going to object since the

17  witness doesn't have personal knowledge.  Seems to be referring

18  to the document to read off it.

19       THE COURT:  She can -- just one second.  She can read

20  the document.  I mean I have the document too.  So you can

21  certainly read from the document.

22  Q    (By Mr. Urban) Let me ask you this question.  I'll withdraw

23  the last question.

24       The words that Ms. Wu used, the offensive words that

25  she wrote on her white board, were those connected to a

1   message?

2   A   Yes.

3   Q   And what was the message?

4   A   That they weren't permitted.

5   Q   That people who fell into those categories were not

6   permitted into her room; correct?

7   A   Correct.

8   Q   When these two young men yelled "penis" at 12:30 in the

9   morning on a Friday morning, was there a message?

10          MR. CERAME:  Objection, Your Honor.

11          THE COURT:  You want her to speculate about their

12   intent?

13          MR. URBAN:  No.

14   Q   (By Mr. Urban) Were there any other words used?  Were they

15   part of a sentence?

16   A   No.

17          MR. CERAME:  Compound question.

18          MR. URBAN:  Well, I'll ask it again.

19   Q   (By Mr. Urban) When the word "penis" was used, as you

20   understand it, was it in a sentence?

21   A   No.

22   Q   Did you and Ms. Kytan determine that there was any message

23   in their yelling the word "penis"?

24   A   No.

25   Q   In your experience, would it have been enough to look into

1    a possible disciplinary violation if they had only yelled the

2    word "penis," leaving aside their use of the N-word?

3    A    Yes.

4         MR. CERAME:  Objection, Your Honor.  I actually didn't

5    understand the question.

6         THE COURT:  He asked:  "In your experience, would it

7    have been enough to look into a possible disciplinary violation

8    if they had only yelled the word 'penis' leaving aside their

9    use of the N-word?"

10        MR. CERAME:  All right, Your Honor.

11        THE COURT:  She said yes.

12        MR. URBAN:  May I have a moment, Your Honor?

13        THE COURT:  Yes.

14     (Pause.)

15   Q    (By Mr. Urban) If someone had written a sentence on a

16   white board on their dorm today, such as Ms. Wu did apparently,

17   would that have been a disciplinary matter for the university?

18        MR. CERAME:  Objection, Your Honor.

19        THE COURT:  Grounds?

20        MR. CERAME:  He's asking her to speculate about what

21   happened in Wu, and I don't think she has -- knows exactly what

22   happened in Wu.

23        THE COURT:  He's asking her sort of a hypothetical.  I

24   allowed you to do some of that; so I'll let her answer.

25        MR. CERAME:  Very well, Your Honor.

1    Q    (By Mr. Urban) Do you understand the question?

2    A    Can you repeat the question?

3    Q    Yes.  If someone had written words on a white board with a

4    message like Ms. Wu's on their door, as she did, today, based

5    on your understanding of the patterns of discipline at the

6    university, would that have resulted in a disciplinary

7    investigation and sanctions?

8    A    No.

9              MR. URBAN:  I have nothing further right now, Your

10   Honor.

11             THE COURT:  All right.

12             MR. CERAME:  I'm sorry, Your Honor.

13             THE COURT:  Did you want to say something to me?  Go

14   ahead.  What did you want to say?

15             MR. CERAME:  No.  I was just getting ready to do

16   recross.

17             THE COURT:  Well, the Court doesn't ordinarily allow

18   recross unless something brand new comes up on redirect.  Was

19   there something?

20             MR. CERAME:  Yes.  There was quite a bit of new that

21   came up.  There were questions about, for example, whether or

22   not a deal was expressed.

23             THE COURT:  Some of that came up during the cross.

24             MR. CERAME:  There was.  However, here it was

25   highlighted in a way certainly it was not on direct.  I was

1    going to just forego that.

2              There was also questions about the specific facts in

3    the case in a way that there was not --

4              THE COURT:  I'll allow you some limited recross.

5    Before you do that, there was a question -- I have one

6    question.

7              There was a question Mr. Urban asked you.  It was

8    along the lines of:  Did you and Mrs. Kytan, or Ms. Kytan --

9    sorry -- determine that there was a message conveyed by the

10   word "penis"?  And you said yes.  I just want to understand

11   your role.  Did --

12             MR. CERAME:  I believe --

13             THE COURT:  Can I ask the witness questions without

14   being interrupted, please?

15             MR. CERAME:  Sure, Your Honor.

16             THE COURT:  Thank you.

17             You had mentioned that you were sort of an indirect,

18   two levels above Ms. Kytan; is that right?

19             THE WITNESS:  That's correct.

20             THE COURT:  And did she consult with you during the

21   investigation?

22             THE WITNESS:  Yes.

23             THE COURT:  Okay.  And did you -- did she discuss with

24   you about what conclusions she should reach, if any?

25             THE WITNESS:  She was not looking for advice but

1    merely a review of the case.

2           THE COURT:  Okay.  And so you reviewed some paper work

3    with her?

4           THE WITNESS:  Yes.

5           THE COURT:  Is that some of the paper work we've been

6    looking at?

7           THE WITNESS:  Yes.

8           THE COURT:  Did you review a draft of her report?

9           THE WITNESS:  Yes.

10          THE COURT:  And did you make changes or suggest

11   changes to it?

12          THE WITNESS:  I don't remember making changes.

13          THE COURT:  Okay.  Did she submit it to you for your

14   approval?

15          THE WITNESS:  No.

16          THE COURT:  Okay.  If -- was it -- is it the ordinary

17   practice for the investigator to submit their draft report to

18   you or to someone in your position?

19          THE WITNESS:  Yes.

20          THE COURT:  And what's the purpose of that review?

21          THE WITNESS:  To make sure that we're consistent with

22   previous policies and procedures.

23          THE COURT:  All right.  So it's true that, in fact,

24   it's accurate for you to respond to Mr. Urban to say that you

25   and Ms. Kytan made certain determinations in this case that are

1    reflected in the report.  Is that accurate?

2              THE WITNESS:  Yes.

3              THE COURT:  Go ahead, Mr. Cerame.

4              MR. CERAME:  Just briefly, Your Honor, I thought she

5    said no.

6              THE COURT:  No, she said yes to the question.

7              MR. CERAME:  She said yes, they had determined that

8    there was a message?

9              THE COURT:  She said yes to that question.

10             MR. URBAN:  I don't believe so, Your Honor.

11             THE COURT:  Well, I could be wrong.  If both of you

12   remember otherwise, I'll check with the court reporter.  But

13   that's what -- I wasn't so interested in whether the answer was

14   yes or no as I was about the part, Did you and she determine?

15             That's why I pursued it, to be clear.  I didn't fully

16   understand Ms. Buda's role, and she's clarified that for me.

17   And I thank her for that.

18             MR. CERAME:  I apologize, Your Honor.  I only heard

19   that.

20             THE COURT:  You apparently were correct.  If the two

21   of you think that that's the case, I'm probably wrong.  I'll

22   check with the court reporter later.

23             MR. CERAME:  I just want to ask her some clarification

24   on that question as well, Your Honor.

25             THE COURT:  Sure.

RECROSS EXAMINATION

BY MR. CERAME:

Q   When Attorney Urban asked you whether you had determined if
a message -- there was a question about whether a message
had -- was part of what was going on that evening.  Let me just
ask you a follow-up question on that.

       Is your testimony here today that you declined to make
a determination as to whether there was a message?

       THE COURT:  Sorry.  In what context?  Message about
what?  What was the message?

       MR. CERAME:  Sorry.

Q   (By Mr. Cerame) As to the word "penis" and the other words
that were used that evening.  Did you and Alexandra Kytan, or
either individually or together, determine that there was no
message in those words?

A   I don't remember having a conversation directly with her.

Q   Okay.  So you don't remember having a conversation about
whether the words used indicated a message or not.

A   Correct.

Q   Okay.  That's what I wanted to make sure I understood.

       A lot of people took offense to the words -- you would
agree a lot of people took offense to the words that were used
that evening.

A   Yes.

Q   There were letters written to the university.

1   A    Yes.

2   Q    Are you familiar with George Carlin's routine about the

3   naughty words that you're not supposed to say on television?

4              MR. URBAN:  Scope.

5              THE COURT:  Sustained.

6              MR. CERAME:  It's about whether there's an idea

7   expressed, Your Honor.

8              THE COURT:  The objection's sustained.

9              MR. CERAME:  Understood, Your Honor.

10  Q    (By Mr. Cerame) Are you familiar with -- do you agree that

11  we learn things, children learn through the games that we play

12  in society?  We learn things about how to be --

13             MR. URBAN:  Same objection.

14             THE COURT:  Sustained.

15  Q    (By Mr. Cerame) Is it equally plausible then -- you said

16  that there's no idea expressed -- that the game that was

17  played, the word game that was played was expressing contempt

18  for the idea that there should be words that are taboo?

19  A    No.

20  Q    You don't agree that that could be possible, that the game

21  could express the idea of contempt for taboo words?

22  A    Can you rephrase your question?

23  Q    Sure.  Some people think that the idea of taboo words are

24  silly.  Some people think it's very important.  Some people

25  think it's silly.

1           Would it be possible, just possible, that the message

2     of the game is that taboo words are silly?

3           MR. URBAN:  Objection.

4     Q   (By Mr. Cerame) And the idea of taboo words are silly.

5           MR. URBAN:  Scope, asked and answered.  She already

6     testified they found no message in the words.

7           THE COURT:  I'll have to go back and look at the

8     transcript, but I'll allow the question.

9     Q   (By Mr. Cerame) Are you all right, ma'am?  Do I need to ask

10    it again?  I see the look.

11    A   Sorry.  Yes, please repeat.

12    Q   Sure, sure.  Is it possible, not absolutely, but is it

13    possible that the game --

14          THE COURT:  Well, I tell you what:  It doesn't matter

15    if it's possible.  Anything's possible.  It has no evidentiary

16    value if something's possible.  So ask a different question.

17          MR. CERAME:  I'll move on then, Your Honor.

18          THE COURT:  You can pursue it.  I said you could.  But

19    don't ask it that way because it's not a proper question.

20          MR. CERAME:  I think it's fine for argument then.  I

21    can ask it in argument.

22          THE COURT:  You're done.  Is that right?

23          MR. CERAME:  No.  Let me make sure I got all my other

24    questions done.

25    Q   (By Mr. Cerame) Oh.  How many students reported -- how many

1   students reported this incident?  You said there were students

2   who reported this incident.  How many were there?  You said

3   plural.

4   A   May I look at the --

5   Q   Sure.

6   A   -- incident report?

7           MR. URBAN:  If I may approach, Your Honor.

8           THE WITNESS:  So it appears by RM 6 that a student

9   e-mailed an administrator in Residential Life with a copy of

10  the video and the name of the student who posted the video.

11  Q   (By Mr. Cerame) So two students?

12  A   Notwithstanding the third witness.

13  Q   Third witness being the other?

14  A   The person who closed their window.

15  Q   Mm, okay, so three students.

16          Did the person --

17          THE COURT:  Now I'm confused.

18  (Court reporter asked for clarification.)

19          THE COURT:  Why don't you ask the question.

20  Q   (By Mr. Cerame) Did the student who closed her window

21  report the incident or was she only interviewed by police?

22  A   It appears that she was spoken to by a Residential Life

23  staff after it was reported.

24          THE COURT:  Just so I'm clear, did you interview any

25  of these students?

1            THE WITNESS:  No.

2            THE COURT:  Okay.  And when I say "any of these

3    students," I mean either Mr. Mucaj, Mr. Karal, any of the

4    people who reported the incident, the gentleman who was with

5    Mr. Mucaj and Mr. Karal, you didn't interview any of them;

6    correct?

7            THE WITNESS:  Correct.

8            THE COURT:  I just want to understand the scope of

9    your knowledge.  I did see you on as a recipient on some

10   e-mails from what I understood to be UConn Police; is that

11   right?

12           THE WITNESS:  That's correct.

13           THE COURT:  Did you interview UConn Police about this?

14           THE WITNESS:  No.

15           THE COURT:  Did you speak to anyone about the incident

16   other than Ms. Kytan?

17           THE WITNESS:  My supervisor.

18           THE COURT:  And that was simply to report what was

19   going on?

20           THE WITNESS:  Yes.

21           THE COURT:  Go ahead.

22           MR. CERAME:  Your Honor, I'm done.

23           THE COURT:  You can step down, ma'am.

24           THE WITNESS:  Thank you.

25        (Witness excused.)

```
1            THE COURT:  Any other evidence, Mr. Urban?

2            MR. URBAN:  Not at this time, Your Honor.

3            THE COURT:  So defense rests; is that right?

4            MR. URBAN:  Yes, Your Honor.

5                         DEFENDANTS REST

6            THE COURT:  Okay.  So and you're not proposing to call

7    anybody in rebuttal?

8            MR. CERAME:  No, Your Honor.

9            THE COURT:  Very well.

10           So Mr. Cerame referred to argument.  I think what we

11   discussed on the phone is that we would do proposed findings

12   for the Court?

13           MR. CERAME:  Yes, Your Honor.

14           THE COURT:  I think that would be more useful than

15   having argument.  I did want to discuss a little bit about the

16   law that I'll ask the lawyers to consider in preparing their

17   proposed findings.

18           So I know that I've read Mr. Urban's brief.  I know

19   he's raised an argument about whether the speech is protected;

20   so obviously that issue should be explored.

21           Second, the -- we started to talk on the call a little

22   bit about an issue that I can't remember whether Mr. Urban

23   raised or I raised it, which really boils down to causation.

24   And there's -- I don't mean to suggest a line of inquiry to

25   counsel, but I thought it would be useful to be on the same
```

1   page on this because, as I understand it, the big part of the

2   dispute in this case is whether the plaintiffs would have been

3   disciplined had they not used the N-word.

4        Mr. Urban suggests they would have been because there

5   was some evidence they were speaking loudly.  Mr. Cerame

6   suggests they wouldn't have been.  And so we're not writing on

7   a clean slate.

8        As I'm sure you know, there are cases that deal with

9   this issue.  Probably the leading case in this area is Mt.

10  Healthy, which you're probably familiar with.  Mt. Healthy

11  versus Doyle, Supreme Court case about causation.  It's 429

12  U.S. 274.  It was decided in 1977.  It talks about burden

13  shifting.  I think the parties should be prepared to address

14  that case.

15       There are more recent cases that deal with Mt. Healthy

16  in similar retaliation-type situations.  I note that Mr.

17  Cerame's complaint describes this claim, at least in part, as a

18  retaliation claim; so there's Scott Coughlin, 344 F.3d 282,

19  pages 287 to 288.

20       Just laying out the elements of a retaliation claim

21  you can find millions of Second Circuit cases, but one of them

22  is Holmes, H-o-l-m-e-s, versus Poskanzer, P-o-s-k-a-n-z-e-r.

23  That's 342 Fed. Appx. 651 at page 653.

24       The Supreme Court decided an interesting case last

25  year.  It actually involves the tort of retaliatory arrest, so

1    involving the police.  But it has some -- an interesting

2    discussion of First Amendment causation, causation in First

3    Amendment cases.  It discusses Mt. Healthy.  The case is Nieves

4    versus Bartlett, 139 S. Ct. Supreme Court 1715.

5                So those are some cases that I would more or less

6    expect to be discussed in the proposed findings in this case,

7    because I think they provide relevant legal standards for the

8    parties to address.

9                Let me just see if I had anything else.  I don't.

10   Bear with me.  Okay.

11               Let's set a schedule.  So today's the 29th.  Will the

12   parties be ordering transcripts?

13               MR. CERAME:  I anticipate so, Your Honor.

14               THE COURT:  Okay.  So we'll give the court reporter

15   time to do that.  I think, in light of that, I think it would

16   be useful to have the proposed findings within 30 days.  Is

17   that reasonable?

18               MR. URBAN:  Yeah.  I'm just waiting for my phone to

19   boot up, Your Honor.

20               MR. CERAME:  It being a leap year.

21               THE COURT:  You probably have a pen.

22               MR. URBAN:  No.  I'm just checking my calendar.

23   Sorry.

24               THE COURT:  It is a leap year.  But we could make

25   it -- that's a Saturday though.  We could make them due on the

```
 1   28th of February, which is a Friday.  Is that bad for you, Mr.
 2   Cerame?
 3              MR. CERAME:  No.  I always like to have the weekend,
 4   Your Honor.
 5              THE COURT:  I don't mind if you want to do it on March
 6   2nd.  That's fine with me.
 7              MR. CERAME:  Thank you.  I appreciate that
 8   accommodation, Your Honor.
 9              MR. URBAN:  That's fine, Your Honor.
10              THE COURT:  March 2nd for proposed findings?  Okay.
11   So, you know, if, after I review the parties' proposed
12   findings, I have questions, I may get you on the phone.  We may
13   have like a telephonic argument.  I might not have questions,
14   in which case I'll just draft the ruling.
15              So is there anything else that we should discuss
16   today?
17              MR. URBAN:  Can I inquire, are you looking for
18   proposed findings of fact and proposed conclusions of law?
19              THE COURT:  Yeah, proposed findings of fact and
20   proposed conclusions of law.
21              MR. CERAME:  So if I could speak candidly for a
22   moment, Your Honor, just so I can express --
23              THE COURT:  I would hope you would not speak any other
24   way but candidly.  But go ahead.
25              MR. CERAME:  Well, I don't want to offend.  So it
```

1    sounds to me like essentially the Court wants a brief in the

2    form of a proposed opinion, and we should draft our arguments

3    accordingly, being mindful of the language that a Court would

4    use.  Is that essentially what we're talking about here?

5         THE COURT:  Perhaps you've never done proposed

6    findings before.

7         MR. CERAME:  I have not.

8         THE COURT:  But that's essentially what we're talking

9    about.  You're drafting a proposed opinion for me to sign.

10        Now, I have never signed a proposed opinion that was

11   sent to me.  I always draft my own.  But the idea is through

12   that opinion you will make your arguments.  You will propose

13   what you think are the facts that I should find and what you

14   think the legal conclusions are that I should reach.

15        MR. CERAME:  Yes.

16        THE COURT:  It doesn't have to be numbered, by the

17   way, numbered paragraphs.  A lot of times they are in numbered

18   paragraphs.  I don't really care whether they're in numbered

19   paragraphs or not.

20        But it should be fairly clear, from what you're

21   presenting, what facts you think you've proven and what law you

22   think is correct and you want the Court to adopt.  That's the

23   point.

24        Any other questions?

25        MR. CERAME:  Thank you.  That's what I thought, Your

1    Honor.  I just wanted to make sure.

2         THE COURT:  Sure.

3         MR. URBAN:  Your Honor, there is one other

4    housekeeping matter.  Mr. Cerame brought suit against a woman

5    named Maureen Armstrong.

6         Maureen Armstrong -- he was under a misunderstanding.

7    Ms. Armstrong's role in this was essentially to assist Mr.

8    Karal and Mr. Mucaj to ensure that their educational academics

9    were not interrupted in a bad way as a result of the incident.

10        THE COURT:  Do you want to withdraw the claim against

11   Ms. Armstrong?

12        MR. CERAME:  Yes, Your Honor, with anticipation, with

13   all due respect to the witness, of bringing suit against the

14   witness.  I had thought that the woman who is named in the suit

15   had the position of the witness.

16        THE COURT:  Well, let me ask you this.  So fine.  I'm

17   not going to tell you what to do.  I would note you've also

18   named a university.  I believe the Eleventh Amendment would bar

19   all claims against the university here, including claims for

20   prospective relief.  So you can sue individuals for prospective

21   relief for violations of federal law, but you can't sue states.

22   And UConn is part of the state.

23        MR. CERAME:  I recognize His Honor's footnote in a

24   recent opinion.

25        THE COURT:  Yes.

1          MR. CERAME:  So I would raise that as --

2          THE COURT:  Sure.  We don't need to deal with that

3     today.  I mean if you want to file an amended -- a motion to

4     amend the complaint or something like that, you can.  I think

5     it's pretty clear they're going to have to be dismissed from

6     the case one way or the other.  But if you want, you can just

7     put that in proposed findings, and I'll just deal with it in

8     the opinion.  That's fine too.

9          MR. CERAME:  I'm just looking at basically His Honor's

10    footnote.

11          MR. URBAN:  One other question, Your Honor.  I know

12    that the Court ordered that my answer and affirmative defenses

13    are due the 5th of February.

14          THE COURT:  You want some more time?

15          MR. URBAN:  Yes.

16          THE COURT:  How much time do you want?

17          MR. URBAN:  I guess we could file it at the same time?

18          THE COURT:  That's fine, unless you're going to be

19    arguing defenses.  I mean he needs to see them if you're going

20    to argue defenses.  It doesn't sound like you are.  That's a

21    standard that the Court applies typically.

22          MR. URBAN:  I certainly raise the affirmative defense

23    of qualified immunity.

24          THE COURT:  Right, but I'm not going to be deciding

25    that here.  I'm just deciding whether I should grant the motion

1   for preliminary injunction, which I believe just seeks to

2   enjoin the hearing in any further discipline.  So I don't think

3   we need this before me in connection with this motion.  Do you

4   disagree?

5          MR. CERAME:  I don't disagree because it's not seeking

6   money damages as part of the preliminary injunction.

7          MR. URBAN:  I'll try to get the answer done before

8   that time.

9          THE COURT:  The only question I have is if you're

10  going to be arguing in your proposed findings about defenses

11  that are set forth in your answer, then he needs to see them

12  before the proposed findings are due.  So what do you want -- I

13  think we should set -- probably set a date then.  I mean I'm

14  happy to give you more time.

15         MR. URBAN:  Why don't I file my answer by the middle

16  of February.

17         THE COURT:  Fine.  So you want to say February 17th?

18         MR. URBAN:  Sure.

19         THE COURT:  Okay, so 2/17 will be the date for the

20  answer.

21         All right.  Is there anything else?

22         MR. CERAME:  Your Honor, if for some reason I am

23  confused -- I know His Honor's very sensitive about calling

24  chambers, and I respect that.

25         THE COURT:  That's because I don't like to have ex

1  parte conversations.

2          MR. CERAME:  I absolutely respect that, Your Honor,

3  for a number of reasons.

4          THE COURT:  Glad to hear it.

5          MR. CERAME:  But if I need for some reason, is it fair

6  to ask for a status conference or something?

7          THE COURT:  File a motion with the Court.

8          MR. CERAME:  A motion, sure.

9          THE COURT:  That's the way to ask for things.

10          MR. CERAME:  Understood, Your Honor.

11          THE COURT:  Got it?

12          Mr. Urban, anything?

13          MR. URBAN:  I don't believe so.

14          THE COURT:  We'll be in recess.  Thank you, everyone.

15  Thank you, Ms. Buda.

16       (Proceedings concluded at 11:07 a.m.)

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3    **WITNESS NAME**                                              **Page**

4    Megan Buda

5        Direct By Mr. Urban ......................................... 6

6        Cross By Mr. Cerame ........................................ 39

7        Redirect By Mr. Urban ...................................... 64

8        Recross By Mr. Cerame ...................................... 80

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3

 4                    C E R T I F I C A T E

 5

 6

 7

 8              I, Julie L. Monette, RMR, CRR, CRC, Official

 9    Court Reporter for the United States District Court for the

10    District of Connecticut, do hereby certify that the foregoing

11    pages are a true and accurate transcription of my shorthand

12    notes taken in the aforementioned matter to the best of my

13    skill and ability.

14

15

16                    /S/ JULIE L. MONETTE
                  _____
17                  Julie L. Monette, RMR, CRR, CRC
                        Official Court Reporter
18                         450 Main Street
                     Hartford, Connecticut 06103
19                         (860) 212-6937

20

21

22

23

24

25
```