### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RYAN MUCAJ et al. | : | |
| v. | : | 3:20-cv-66 (MPS) |
| UNIVERSITY OF CONNECTICUT et al. | : | MARCH 2, 2020 |

### PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. INTRODUCTION

This case arises out of University of Connecticut (school) disciplinary proceedings against the plaintiffs, who are two seniors at the school.  The proceedings are allegedly based on the plaintiffs' utterance of a racial slur on October 11, 2019.  The plaintiffs claim that disciplinary proceedings subsequent to the October 2019 incident constitute an impermissible violation of the First Amendment and furthermore violate the consent decree, judgment and court order in *Nina Wu v. University of Connecticut*, CV H-89-649 (PCD) (January 25, 1990). Specifically, the plaintiffs claim that the punishment is directed at the language they used, constituting content-based and viewpoint-based retaliation against protected speech. The plaintiffs have moved for a preliminary injunction barring disciplinary proceedings, and in light of the recommended sanction to terminate their on-campus housing rights, they particularly seek to enjoin the school from imposing any such discipline resulting from the October, 2019 incident.

The school claims in turn that the disciplinary proceedings concern *solely* the allegedly loud character of the students' utterance, the location outside of on-campus housing, and the late hour.  The school claims first that the utterance is not speech at all because it does not express an idea.  In the alternative, the school claims that even if the utterance is speech, the claimed violation of University of Connecticut's

*Responsibilities of Community Life:  The Student Code* (Part III B), sections 2 and 13 is a content-neutral, reasonable time, place, or manner restriction on speech. (See Ex. 6 RM1; Ex. 7 JK1.) The school furthermore claims there is no irreparable harm and that the claims are not ripe.

After hearing evidence and argument on the issue, the Court agrees with the plaintiffs and GRANTS their motion for a preliminary injunction.  Irreparable harm is presumed when the alleged First Amendment infringement is direct, like in this case. *Bronx Household of Faith v. Board of Education of City of New York*, 331 F.3d 342, 349–50 (2d Cir. 2003).  The plaintiffs have also shown a likelihood of success on the merits of their claim, that the disciplinary proceedings are directed at the content and viewpoint of their speech (and they have at least raised sufficiently serious questions going to the merits of that claim to make them fair ground for litigation, and shown that the balance of hardships tips in their favor).  The evidence at the hearing and in filings showed that the investigation was not especially concerned with how loud the students were, nor the time of day of the speech, nor the location, but rather shows a strong interest in the specific language the students uttered.

The defendants, their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with them, are HEREBY ENJOINED from conducting any disciplinary proceedings stemming from the October 11, 2019 incident, and from imposing any disciplinary sanctions against the Plaintiffs stemming from the October 11, 2019 incident including, without limitation, termination of the Plaintiffs' campus housing, until the Court renders judgment after a full trial on the merits.

## II. BACKGROUND

The plaintiffs filed this case in Connecticut District Court on January 14, 2020. (ECF No. 1.)  On January 15, 2020, the plaintiffs filed an emergency motion for temporary restraining order or preliminary injunction (motion), seeking relief as described.  (ECF No. 10.) On January 16, 2029, the Court held a telephonic status conference concerning the motion.  (ECF No. 15.)  The Court found that the plaintiffs raised sufficiently serious questions going to the merits of that claim to make them fair ground for litigation, and that they demonstrated that the balance of hardships tipped in their favor.  The Court issued a temporary restraining order pending a hearing on the preliminary injunction on January 28, 2020, and a subsequent ruling. (ECF No. 14.)

On January 24, 2020, the school filed a response to the motion.  (ECF No. 25.) On January 28, 2020, the Court held an evidentiary hearing on the motion.  The following findings of fact and conclusions of law are based on evidence adduced at that hearing.

## III.  FINDINGS OF FACT

On January 25, 1990, the school entered into a consent decree with another plaintiff—Nina Wu—in another case entirely—*Nina Wu v. University of Connecticut*, CV H-89-649 (PCD) (January 25, 1990). (See Ex. 1.) The court in that case, the Honorable Peter C. Dorsey, District Judge, entered judgment in accordance with that consent decree.  *Id.*  The text of the order states, among other things, as follows:

> After extensive and voluntary negotiation, the parties agree to . . . consent to the following terms and conditions . . . and further agree that their respective officials, agents and successors will likewise be bound.

> It is further agreed that no term or condition of this consent decree may be adjusted or otherwise modified absent future order of this Court upon application

3

of a party showing good cause for such modification and after due notice to all counsel of record.

Absent such further modification, the terms and conditions of this consent decree have the full force and effect of an order of this Court. As such, any claims of a violation of the consent decree on the part of any party hereto may be brought to this Court by any party and the Court shall make such further order and grant such additional relief as it deems necessary and appropriate. . . .

The parties agree to the entry of a Judgment, providing that the defendant University is permanently enjoined from enforcing . . . any . . . policy that interferes with the exercise of First Amendment rights by the plaintiff or any other student, when the exercise of such rights is unaccompanied by violence or the imminent threat of violence.

*Id.* at 1–2. The consent decree does not itself lay out the background of the case, but it does detail changes agreed to be made to a "Harassment and/or Intimidation" policy in the then-existing Student Conduct Code.  Specifically, the school agreed to excise a prohibition in the then-existing policy prohibiting "making personal slurs or epithets based on race . . . ." *See id. at* 5 (consent decree Ex. A.). In place of that language, the school would adopt a policy prohibiting the "face-to-face" use of "fighting words": "those personally abusive epithets which, when directly addressed to any ordinary person are, in the context used and as a matter of common knowledge, inherently likely to provoke an immediate violent reaction . . . ." *Id.*

Twenty-five years later, on January 26, 2015, the American Civil Liberties Union of Connecticut sent the school a letter reminding the school of its obligations under the *Wu* consent decree. (Ex. 3.)  The letter objects to what that organization found to be "constitutionally troubling" policies and provisions in the Student Conduct Code.  *Id.* Those particular provisions are not at issue in the this case, but the letter expresses concern that the school would, in derogation of the First Amendment, "proscrib[e] speech merely because it offends . . . ."  *Id.* at 2.

4

The plaintiffs in this case are seniors at the school and live in on-campus apartments.  (Exs. 10 & 11, verifying complaint; see also Compl., ECF No. 1, ¶¶ 13–14.) For the purposes of the motion, both plaintiffs have asked the Court to assume Mr. Karal's sworn written statement to police on October 11, 2019, is true.[1]  That statement reveals the following facts.  On the night of Thursday October 10, 2019, starting at between 9:00 P.M. and 9:30 P.M., the two plaintiffs and another student frequented several establishments near the school, purchasing beer by the pitcher and also consuming mixed drinks through various bargains and deals offered.  (See Ex. 5, Arrest Warrant Application pp. 4–5; Ex. 6 RM17–RM18; Ex. 78 JK16–JK17.)  At about midnight, the plaintiffs and the third student entered a pizza restaurant. While waiting there, they observed a fight break out between a customer and a staff member.  This prompted them to all walk home. (See Ex. 5 at 5; Ex. 6 at RM18; Ex. 7 at JK17.)

As they walked, the students talked about the night and engaged in jokes.  In particular, the two plaintiffs engaged in what is described as "The Penis Game."  In this game, participants alternate shouting the word "penis."  The first individual not to shout the word penis is a "chicken" and loses.  As the two approached their home apartments, they changed the game from the word "penis" to the word "nigger."  Mr. Karal recollected:

> "On our walk back as we had been playing the penis game saying the N-word, we did not see anyone around or see anyone looking at us from the apartment buildings.  Thinking back to that night, I don't believe that we had been shouting

---

[1]In his statements to school authorities and to police, Mr. Mucaj does not have the same recollection as Mr. Karal.  (See Ex. 5, Arrest Warrant Application p. 4.)

In their post hearing papers, however, both students ask that the Court **for the purposes of the motion, to assume** as true the rendition of facts as recounted by Mr. Karal in the arrest warrant applications.  (See Ex. 5, Arrest Warrant Application pp. 4–5; Ex. 7 RM17–RM18; Ex. 8 JK16–17.)

loud enough for other people to hear us.  I feel that we had been speaking in a
tone that was slightly louder than that of a conversation level."

*Id.* The game using the racial slur lasted about two minutes. *Id.* There is no evidence
the utterances were directed at any particular person. *Id.*; (see also Ex. 5 at 6; Ex. 6 at
RM19; Ex. 7 at JK18 [statement of third student]; see also transcript at 54 [not enough
evidence to suggest remarks were directed into someone's room]).

 After that verbal game, the students continued to joke and talk about the evening.
They ordered pizza delivery, played video games, and went to bed.  (See Ex. 5 at 5; Ex.
6 at RM18; Ex. 7 at JK17.)

 Unbeknownst to the plaintiffs, there was an observer who captured some of this
incident on video. (Ex. 7 at RM15; Ex. 8 at JK13.)  The observer, a resident at the
apartment complex, heard the plaintiffs shouting the word "penis," and he took video of
them "hoping to get the group of males saying or doing something funny . . . ." *Id.*  This
observer could not understand what the plaintiffs were saying when they uttered the
racial slur. *Id.* Rather, the observing student's mother indicated to him that the plaintiffs
uttered a racial slur.  (Ex. 6 at RM 21.)  There is no evidence that the student who
captured the incident on video himself initiated a complaint concerning excessive noise
or the like.

 Instead, this student posted the video on Twitter[2], which posting came to the
attention of Defendant Dean Daugherty on October 11, 2019 by way of another
individual. (Ex. 4. ["David took the time to share your tweet with me"]; transcript at 83.)
Defendant Daugherty in turn reported the incident to the University of Connecticut
Police Department.  Ex. 4.  A parallel investigation by the school began about the same

---

[2]See generally https://twitter.com/naacpuconn/status/1182821535670648833?s=21.

time.  (Ex. 6 at RM20–RM27; Ex. 7 at JK21–JK27.)

In correspondence between the school and the school police, the October, 2019 incident is repeatedly described, on separate occasions, as a "bias" incident.  (Ex. 6 at RM20 ["Suspicious Occurrence / Bias Incident"] RM22 ["Update/Arrests: Suspicious Occurrence / Bias Incident"];  RM 25 ["redacted arrest warrants for bias incidents"] RM 26 ["Thanks for meeting with me to discuss the community impact of the bias related incident."]).  At no time in this correspondence between the school and the school police is the incident called the loud incident, or the excessive noise incident, or somesuch similar.

Conduct Officer Alexandra Kytan[3], who led the school investigation, also describes the incident in official correspondence with the plaintiffs as "remarks directed towards race/ethnicity," from the beginning of the investigation in October, 2019 until issuing an administrative hearing notice on January 8, 2020 (Ex. 6 at RM1; Ex. 7 at JK1; Ex. 8).  She also does not describe the incident in correspondence as one involving excessive noise or being overly loud.

Of particular note is a hotly contested statement allegedly made by Conduct Officer Kytan to Mr. Mucaj at her first meeting with him on October 25, 2019. See Exs. 12, 13; see also Ex. 500.  Plaintiff Ryan Mucaj and his father state in their sworn affidavits that Ryan Mucaj asked Kytan, "Am I being investigated because of something I said?" Her response, according to the plaintiff and his father, was, "Yes." Plaintiff Ryan Mucaj and his father state in their sworn affidavits that Ryan Mucaj asked Kytan, "Am I being investigated for something else that I have done?"  Her response, according to

_____

[3]Defendant Kytan has several job titles.  She is described in Ex. 7 at RM2, RM8, and RM9, as the "Investigating Student Conduct Officer . . . ."

the plaintiff and his father, was, "To my knowledge, no."

For her part, Kytan states in her affidavit that she only recalls Ryan Mucaj asking "about what he was being investigated for, and I responded that I was investigating what allegedly happened in the parking lot." Ex. 500 ¶7. Notably, she does not refute the statements by Ryan Mucaj and his father: She does not claim the questions were never asked. She only does not recall them. Her recollection is not necessarily exclusive or incompatible with that of Ryan Mucaj and his father. All three individuals can be describing the same incident accurately.

At the hearing, the Court heard testimony from Megan Buda, the Director of Community Standards at the school. Transcript 6. Ms. Buda testified that her duties entail overview of behavioral issues related to students and oversight of the student code of conduct, and furthermore that she had worked in the field for some fourteen years. *Id.* at 7. She also testified that she is the indirect supervisor of Conduct Officer Kytan, and that she was familiar with this case. *Id.* at 39–40.

The school presented copious documentary evidence through Ms. Buda that the school does discipline students with some regularity for being disruptive. Transcript at 7–8, 10; Ex. 501. This discipline can include termination of student housing. Transcript at 10, 23. The school also presented evidence, through Ms. Buda and documentary evidence, of specific incidents that the school posits are in some way analogous to the present case. Exs. 502–507, 509–512; Transcript 13–32. Ms. Buda also testified as to the school's policy of "quiet hours," periods of time late at night through to the early morning where students are required to not be excessively loud. Transcript 42.

On cross, Ms. Buda conceded that the exhibits of data compilations would not

track incidents where students shouted "Go Huskies" loudly outside of a residence hall in violation of quiet hours. Transcript 44. Ms. Buda also conceded that the data compilations would not track incidents where school staff had to intervene to quiet an overly loud party, and that this does happen with some frequency. *Id.* 44–45.

Ms. Buda furthermore conceded that each of the specific incidents the school cited as analogous had some distinguishing feature. Incidents cited by the school implicated personal safety concerns or aggressive conduct; implicated public safety like sanitation or a fire; or involved conduct directed at individuals into their own room, as with a captive audience[4]. (Personal safety: transcript at 40 [Ex. 502], 40–41 [Ex. 503], 41–42 [Ex. 504], 53 [Ex. 510] ; public safety: transcript at 43 [Exs. 506, 507]; directed at individual in own room: 53–54 [Exs. 510, 511, 512].) Ms. Buda agreed that the present case did not implicate personal safety or concern aggressive behavior, did not implicate public safety like sanitation or a fire, and did not concern communications directed at individuals into their own room. *Id.* Another case involved an individual interrupting a meeting to which he was not invited, and Ms. Buda conceded that in the present case the plaintiffs had the right to be in the parking lot. Transcript at 53 (Ex. 509.). Another incident lacked particular facts such that Ms. Buda conceded there wasn't enough information in the record to determine what particular behavior the incident concerned. Transcript at 43 (Ex. 505).

Ms. Buda also testified that she could not say for certain whether the plaintiffs would have been disciplined in the same way had they instead shouted the cheer, "Go

---

[4] The captive audience doctrine is a narrow exception that protects unwilling listeners from protected speech. It is most commonly applied to speech directed into the home or where an individual cannot retreat, such as while in a car. *See Snyder v. Phelps*, 562 U.S. 443, 459–60, 131 S. Ct. 1207 (2011).

Huskies!" in violation of quiet hours. Transcript 51.   She testified that review of cases

was a case-by-case process.   Transcript 51.   The necessary implication of her

testimony is that not every loud violation of quiet hours is pursued—school officials hold

and exercise discretion.

## IV.  CONCLUSIONS OF LAW

### A.  Legal Standard for a Preliminary Injunction Generally

"To obtain a preliminary injunction, the plaintiffs must demonstrate: "(1)

irreparable harm; (2) either (a) a likelihood of success on the merits, or (b)

sufficiently serious questions going to the merits of its claims to make them fair

ground for litigation, plus a balance of the hardships tipping decidedly in favor of

the moving party; and (3) that a preliminary injunction is in the public interest."

*Fairy-Mart v. Marathon Petroleum Co., LP*, No. 3:17-CV-1195 (MPS) at 5 (D.

Conn. Nov. 6, 2017)(2017 WL 5140514) (*citing New York ex rel. Schneiderman

v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir.), *cert. dismissed sub nom. Allergan

PLC v. New York ex rel. Schneiderman*, 136 S. Ct. 581 (2015) (internal quotation

marks and citation omitted).

### B.  Ripeness and Justiciability

The school claims the case is not ripe because it involves contingent

future events.  School Response (ECF No. 25) at 12.  The school further claims

that because a hearing has not taken place, there has been no final

determination of student code violations and no imposition of sanctions as of yet.

*Id.*  The school relies on two District Court opinions from the Southern District of

Ohio concerning alleged due process violations.  *Id.*  The plaintiffs in turn direct

the Court's attention to *Bronx Household of Faith v. Board. of Education of City of New York*, 331 F.3d 342, 350 (2d Cir. 2003).

The Court agrees with the plaintiffs and concludes the case is ripe. Justiciability in First Amendment cases is broader.  In *Bronx Household*, the Second Circuit reversed a District Court that concluded a case was not ripe at the preliminary injunction stage even though one of the individuals seeking relief was only *threatened* with retaliation, like the students in the present case:

> "At the time a preliminary injunction was sought in the District Court, one of the respondents was only threatened with discharge. In addition, many of the members of the class respondents were seeking to have certified prior to the dismissal of their complaint were threatened with discharge or had agreed to provide support for the Democratic Party in order to avoid discharge. It is clear therefore that First Amendment interests were either threatened or in fact being impaired at the time relief was sought. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

Threatened First Amendment interests are therefore sufficient for ripeness, and there is no doubt that the pending administrative action by the school threatens the students with punishment for something they said.  Accordingly, the case is ripe.

Furthermore the students have claimed a violation of a standing court order.  Specifically, the plaintiffs seek to enforce the provision of the *Wu* decree enjoining the school from enforcing any policy that interferes with the exercise of First Amendment rights by the plaintiff or any other student, when the exercise of such rights is unaccompanied by violence or the imminent threat of violence. As intended beneficiaries of that order—"any other student"—the plaintiffs have standing to enforce that order under Rule 71 of the Federal Rules of Civil

Procedure. *See E.E.O.C. v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Local 580*, 139 F. Supp. 2d 512, 520–21 (S.D.N.Y. 2001).  The consent decree does not just enjoin punishments but also enforcement, which includes disciplinary proceedings like those at issue here.

At the conclusion of the evidentiary hearing, the Court sua sponte raised a distinct issue of justiciability. The plaintiffs have sued the University of Connecticut, a party over which the Court may not exercise jurisdiction under the Eleventh Amendment. See *Brown v. Western Connecticut State Univ.*, 204 F. Supp. 2d 355, 361 (D. Conn. 2002) ("Connecticut state universities are entitled to claim immunity under the Eleventh Amendment analysis.").  However, the plaintiff has also named school officials in their official capacities. Compl. ECF No. 1. The Court has jurisdiction over claims for prospective relief against state officials alleging ongoing violations of federal law, as the First Amendment claim does in this case. C.f. *Dube v. State Univ. of New York*, 900 F.2d 587, 595 (2d Cir. 1990).

## C. Standard for Retaliation Claims and Burden

The plaintiffs have framed this action in substantial part through the lens of a retaliation-type claim.  "To establish a prima facie case of First Amendment retaliation, a plaintiff must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003). The "[p]laintiff has the initial burden of showing that an improper motive played a

substantial part in defendant's action. The burden then shifts to [the] defendant to show it would have taken exactly the same action absent the improper motive." *Id.* 288.

### D. The Speech is Protected

The first prong in a retaliation claim is that the speech or conduct at issue was protected. *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003). The school claims that the utterance is not protected because it is merely conduct. Response at 2–3 (ECF 25). The school relies on *U.S. v. O'Brien*, 391 U.S. 367, 376 (1968) and related cases. The plaintiffs claim such reliance is misplaced because those cases concern non-verbal conduct. The Court agrees with the plaintiffs.

In *U.S. v. O'Brien*, 391 U.S. 367 (1968), the Supreme Court upheld a criminal prohibition against burning a draft card. The court noted in particular that the prohibition "on its face deals with conduct having no connection with speech. It prohibits the knowing destruction of certificates issued by the Selective Service System, and there is nothing necessarily expressive about such conduct. . . . A law prohibiting destruction of Selective Service certificates no more abridges free speech on its face than a motor vehicle law prohibiting the destruction of drivers' licenses, or a tax law prohibiting the destruction of books and records." *Id.* at 375. The court ultimately applies a kind of intermediate scrutiny to such expressive conduct.

The facts of the present case are far afield from such non-verbal conduct. In contrast to *O'Brien*, in the present case the school's action does affect

speech—verbal words.  Ms. Buda testified that a number of individuals took offense to the words used in the verbal game.  Transcript 80–81.

It is well settled that expression cannot be forbidden merely because it offends. *Terminiello v. Chicago*, 337 U.S. 1 (1949); *Cohen v. California*, 403 U.S. 15 (1971); *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988).  It is well established that racial epithets, without more, fall within the aegis of the First Amendment. *See Matal v. Tam*, 137 S. Ct. 1744, 198 L. Ed. 2d 366 (2017).  Prohibitions against racial epithets amount to not just impermissible content discrimination, but viewpoint discrimination.  *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 391–92, 112 S. Ct. 2538 (1992).  The school does not cite an analogous case applying the *O'Brien* standard to words of this character.

Moreover, the school's standard is irreconcilable with well established First Amendment principles.  "[A] narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message' . . . would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll.  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569, 115 S. Ct. 2338 (1995) (citation omitted).

Furthermore, the verbal game of chicken that "The Penis Game" entails itself does have an expressive character. The game here was used in context as part of socializing and joking.  (See Ex. 5 at 5; Ex. 6 at RM18; Ex. 7 at JK17.) The "danger" or "dare" at the heart of the game is a kind of one-upmanship with taboo words.  There would be nothing at stake if the words did not have

14

meaning—"The Penis Game" loses all peril if played with banal words like the names of medications.  The game requires offensive or taboo words to function.  The game interrogates the idea of taboo words by employing their offensive character to humorous end.  Regardless, the words employed are themselves protected on their face.

### E.  Adverse Action is Threatened or Imminent

The second prong in a retaliation claim is that the defendant took adverse action against the plaintiff.  *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003).  As to each plaintiff, Conduct Officer Kytan concluded the student violated the student code by way of the verbal game. (Ex. 6 at RM5; Ex. 7 at JK4.)  The recommended sanction included, among other things, termination of student housing.  (Exs. 10 & 11, verifying complaint; see also Compl., ECF No. 1, ¶¶ 70–74.)  Although that action has not yet taken place, as discussed above in part IV.B, it is sufficient that this adverse action is threatened or imminent.

### F.  Causation

The third prong to a retaliation claim is whether there is a causal connection between the protected speech and the adverse action.  *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003). The seminal case on this issue is *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S. Ct. 568 (1977).  In that case, the United States Supreme Court ultimately remanded the case to the District Court for further factual findings that the court "should" have made.  "Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this

15

conduct was a 'substantial factor' or to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct." *Id.* at 287.

As Ms. Buda conceded on cross examination, the conclusions in the Conduct Officers' reports concerned whether the plaintiffs uttered the word "nigger" and whether that utterance was directed at anyone in particular. Transcript 55–60.  None of the conclusions concerned, on their face, how loud the plaintiffs were.  In addition, on the face of the supporting investigative documents, there is nothing that describes or otherwise evinces a concern over how loud the plaintiffs' utterances were. The logical conclusion is that there is at least a reasonable likelihood that an impermissible motive to punish the plaintiffs for the offensive content or viewpoint of their speech played a substantial part in the decision to investigate and pursue discipline against the plaintiffs.  Based on these documents and the testimony of Ms. Buda, the plaintiffs have satisfied their initial burden of "showing that an improper motive played a substantial part in defendant's action." *Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003).

The burden would then shift to the school, to show that it would have taken exactly the same action absent the improper motive.  *Id.* Ms. Buda was asked directly and repeatedly on this point at the hearing: whether, if the students instead shouted "Go Huskies," all else being the same, the school would have

taken the exact same action here.  Transcript  49–51.  Ms. Buda could not answer in the affirmative.  She indicated, "It would be case-by-case basis."  *Id.* 50.  Accordingly, the school has not met its burden.

The present case is distinguishable from *Holmes v. Poskanzer*, 342 F. App'x 651, 653 (2d Cir. 2009).  In that case, the plaintiffs did not allege that any of the named defendants personally took retaliatory action.  There was also evidence of a criminal conviction in that case, which served as a ready permissible motive for the discharge. In contrast, in the present case the plaintiff has shown personal involvement by at least one named defendant in the retaliation, and there is no criminal conviction here.

The present case is in many ways like *Scott v. Coughlin*, 344 F.3d 282, 285 (2d Cir. 2003).  In that case, a Second Circuit panel reversed the judgment of a District Court that concluded that the retaliatory action would have occurred regardless of the existence of a possible retaliatory motive.  *Id.*  The Circuit Court of Appeals particularly scrutinized the factual submissions before the Court, concluding, among other things, the district court failed to afford sworn affidavits due weight.  *Id.*

In the present case, as described above, Plaintiff Ryan Mucaj and his father have submitted affidavits that, if true, convincingly show the action taken has an impermissible motive.  Exs. 12, 13.  The counteraffidavit by Kytan does not necessarily refute these affidavits—all the affidavits can be taken as true. Ex. 500.  Accordingly, the only logical conclusion is that the school has not refuted the plaintiffs' claims on the merits as to causation.

17

**G. Irreparable Harm and Public Interest**

The foregoing analysis is essentially outcome determinative as to the elements of irreparable harm and public interest. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Bronx Household of Faith v. Board. of Education of City of New York*, 331 F.3d 342, 350 (2d Cir. 2003). "[S]ecuring First Amendment rights is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

**H. *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019)**

The recent Supreme Court case of *Nieves* has some language that is particularly instructive as to the present set of facts before the Court. *Nieves* announced a general rule, police enjoyed qualified immunity from retaliation claims so long as there is probable cause for an arrest. In a number of ways, the reasoning of *Nieves* should not apply here. Unlike the school officials here, "Officers frequently must make split-second judgments" in an unsafe environment. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019).

The valuable portion of the opinion, however, is in section II.D, starting on 1727: "Although probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so. In such cases, an unyielding requirement to show the absence of probable cause could pose a risk that some police officers may exploit the arrest power as

18

a means of suppressing speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019) (internal quotation marks omitted).

Ms. Muda testified that school residential hall staff would, with some frequency, quiet down an overly noisy party without further enforcement. Transcript 44.  She also testified that no students were disciplined for attending a rally in response to the October, 2019 incident, even though it ws apparent that there was gathering of some 200 students with megaphones while classes were in session.  *Id.* 45.  She also testified that it would depend on the specific circumstances as to whether a student might be disciplined under otherwise identical circumstances to the present case for cheering "Go Huskies!" loudly.

Accordingly, the present case gives rise to the same concerns as described in this portion of *Nieves*: a freewheeling discretion that poses a risk that some officials may exploit their disciplinary powers as a means of suppressing speech.  And for the same reason, the conduct of the school should be held suspect.

## V. CONCLUSION

For the foregoing reasons, it is so ordered.


RESPECTFULLY SUBMITTED,

THE PLAINTIFFS


BY:   */s/ Mario Cerame ct30125*
      Mario Cerame
      Brignole, Bush & Lewis LLC
      73 Wadsworth Street
      Hartford, Connecticut 06106

19

T: 860.527.9973
F: 860.527.5929
E: mario@brignole.com
   attorneys@brignole.com

**CERTIFICATION**

A true and exact copy of the foregoing was sent by electronic mail, via the CM/ECF system, on MARCH 3, 2020, to:

> Ralph Urban II, Esq.
> Assistant Attorney General
> Office of the Attorney General
> Health and Education Unit Head
> 165 Capitol Avenue
> Hartford, Connecticut 06106

> Nicole Fournier Gelston, Esq.
> General Counsel to the University of Connecticut
> Office of the General Counsel
> 343 Mansfield Road, Unit 1177
> Storrs, CT 06269-1177

_Mario Cerame_____

Mario Cerame
