UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RYAN MUCAJ and<br>JARRED KARAL | : | |
| Plaintiffs | : | |
| v. | : | 3:20-cv-66 (MPS) |
| UNIVERSITY OF CONNECTICUT,<br>ELEANOR DAUGHERTY,<br>MEGAN BUDA,<br>ALEXANDRA KYTAN, and<br>KIM COLON | :<br><br>:<br><br>: | |
| Defendants | : | OCTOBER 22, 2020 |

## **AMENDED COMPLAINT**

### **INTRODUCTION**

1. This is a civil rights action concerning the freedom of speech.

2. This action has two aspects: it is an action to remedy breach of a consent decree to which the plaintiffs were intended third-party beneficiaries and to which the defendants were parties or bound by the parties; and it is a § 1983 civil rights action to remedy deprivation of First Amendment rights.

3. The underlying facts concern retaliation by the University of Connecticut (school) and its agents against the plaintiffs, Ryan Mucaj and Jarred Karal (students). The retaliation impermissibly discriminates as to speech content and viewpoint.

4. The action is brought in accordance with 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution, as well as Federal Rule of Civil Procedure 71 and the common law concerning consent decrees, seeking injunctive relief to close their disciplinary files as well as compensatory damages,

1

punitive damages, findings of civil contempt, and reasonable attorneys' fees.

5. The gist of the claim is that based on uttering an offensive word, a racial slur, not directed at any individuals and unaccompanied by violence or threat of violence, the school founds that the students violated the school policy prohibiting "Disruptive Behavior."

6. The school founds that the recommended retaliatory sanction for the protected speech was, among other things, removal of the students from student housing, thereby depriving them of their physical welfare, contractual rights with the school, and inhibiting their otherwise ready access to the school environment.

7. The defendants' actions violate the court order and consent decree in *Nina Wu v. University of Connecticut*, CV H-89-649 (PCD) (January 25, 1990)[1] (hereinafter "the consent decree"), a copy of which is attached, as well as the First Amendment. The school is a party to the consent decree and on information or belief the individuals are officers, agents or successors to a party in the agreement, likewise bound.

## JURISDICTION AND VENUE

8. Jurisdiction rests on 28 U.S.C. §§ 1331 and 1343 as a matter of federal question jurisdiction and to redress the deprivation of a federal right.

9. This Court retains continuing jurisdiction to enforce the consent decree as a judgment of this Court.

10. The students have standing to enforce the consent decree in accordance with Federal Rule of Civil Procedure 71 as intended beneficiaries of the consent decree, being "any other student" of the school, identified in ¶1 of the consent decree.

---

[1] It appears that the handwritten docket number is 16.

11. This Court is authorized to issue the requested injunctive relief and money damages pursuant to 42 U.S.C. § 1983 and Federal Rules of Civil Procedure 65 and 69.

12. This Court is authorized to issue the requested relief of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

13. Venue is proper in the United States District Court for the District of Connecticut pursuant to 28 U.S.C. § 1391(b), being that the events giving rise to the claim occurred within the district.

### PARTIES

14. At all times relevant to the adverse action taken, Plaintiff Ryan Mucaj was a senior at the University of Connecticut who lived on-campus in Storrs, Connecticut, while school was in session.

15. At all times relevant to the adverse action taken, Plaintiff Jarred Karal was a senior at the University of Connecticut who lived on-campus in Storrs, Connecticut, while school was in session.

16. At all times relevant to the adverse action taken, Defendant University of Connecticut is an agency of the State of Connecticut, with its principal campus located in Storrs, Connecticut.

17. Defendant Eleanor JB Daugherty is Associate Vice President for Student Affairs and Dean of Students of the school.

18. Defendant Megan Buda is Director of Community Standards at the school and supervisor of Defendant Kytan and Defendant Colon.

19. Defendant Alexandra Kytan is Assistant Director of Community Standards of the school as well as a Student Conduct Officer who investigated the students,

3

concluded the students violated school policy, and recommends the removal of the students from student housing, among other things.

20. Defendant Kim Colon is Assistant Director of Community Standards of the school as well as a Student Conduct Officer who investigated the students. She conducted the investigative interview of student Karal.

21. On information and belief, each of the named individuals are an official of the school or an agent or successor of one of the litigants in *Wu*.

## BACKGROUND

### January, 1990 Consent Decree

22. On information and belief, in early 1989, Nina Wu was a junior at the University of Connecticut.

23. On information and belief, at about that time, Ms. Wu hung a handmade poster on her dormitory room door. The poster listed the types of people who were "welcome," "tolerated." "unwelcome," and "shot on sight."

24. On information and belief, the latter category listed "bimbos," "preppies," "racists," and "homos."

25. On information and belief, the school found that Ms. Wu violated the school harassment policy by way of the poster. Based on the use of the word "homos," the school expelled Ms. Wu from all residential and dining halls in April, 1989.

26. On information and belief, Ms. Wu subsequently brought an action in federal District Court, District of Connecticut, pursuant to 42 U.S.C. § 1983, alleging deprivation of her First Amendment rights. Although she denied writing the word "homos," she asked the court to assume that she did.

27. On January 25, 1990, the court, the Honorable Peter C. Dorsey, District Judge, entered judgment in accordance with the consent decree.

28. The consent decree binds not only the school, but also individual defendants and each of their "respective officials, agents and successors . . . ."

29. Pursuant to that consent decree, the school agreed to be permanently enjoined from enforcing the school harassment policy employed against Ms. Wu, as that policy existed at the time. Specifically, the school agreed to excise the prohibition in the policy concerning "making personal slurs or epithets based on race . . . ."

30. In its place, the school adopted a policy prohibiting the "face-to-face" use of "fighting words," in accordance with that legal doctrine.

31. The school furthermore agreed to be permanently enjoined from "enforcing . . . any other policy that interferes with the exercise of First Amendment rights by the plaintiff or any other student, when the exercise of such rights is unaccompanied by violence or the imminent threat of violence." (Emphasis added.)

32. The school also agreed to provide Ms. Wu with a dormitory room, to restore her dining privileges, and to pay Ms. Wu reasonable attorneys' fees.

33. On information and belief, for between five and thirty years, the school and its officials and employees have disregarded their obligations under the consent decree, and has failed to take any reasonable precautions to ensure the order is followed or even that successive officials are made aware of its existence.

34. On information and belief, notwithstanding being repeatedly reminded of its obligations under the consent decree, the school and its officials and employees continue to disregard their obligations under the consent decree, and fail to take any

reasonable precautions to ensure the order was followed.

**January, 2015 Letter**

35. On January 26, 2015, the American Civil Liberties Union of Connecticut (ACLU-CT) sent a letter to the school, by way of the Office of President. The Office of the President received, read, and evaluated the letter.

36. The letter expressed concerns over how the University's then-existing Policy Against Discrimination and Policy Statement on Harassment improperly threatened First Amendment rights.

37. Among other things, the letter specifically reminded the school, with case law cited in support, that "[i]t is well settled that expression cannot be forbidden merely because it offends."

38. The letter furthermore reminds the school of its obligations pursuant to the consent decree, with case law cited in support.

**Fall 2019, Employing University Police to Punish Offensive Speech**

39. On October 11, 2019, Defendant Daugherty viewed an October 11, 2019 video that showed the plaintiffs' walking through a parking lot, late at night. A student emailed to her an internet link to the video.

40. The video appears to be captured from an apartment window using a cell phone. It appears to depict three inebriated college students playing a word game involving various taboo or offensive words.

41. On information and belief, Defendant Daugherty believed she heard the defendants utter the word "nigger" in the video.

42. On information and belief, that utterance is inaudible or indiscernible at normal

6

volume—the utterance was only audible or discernible using a feature to highly amplify the recording.

43. On information and belief, Defendant Daugherty reported what she viewed to the University of Connecticut Police Department because she found the utterance offensive and believed others did as well.

44. On information and belief, Defendant Daugherty knew that commensurate with, and because of, her position in the school that the police would investigate and disrupt the lawful conduct of the speakers, and this caused the speakers great distress and disrupting their lawful activity.

45. On information and belief, Defendant Daugherty used the police and used her university position, acting under color of law, as an instrumentality to sanction protected speech.

46. On information and belief, Defendant Daugherty understood that such retaliatory invocation of police would chill protected speech, as to the plaintiffs and as to other students at the school.

**Fall 2019 Hearings**

47. Starting in October, 2019, the school commenced disciplinary processes against the students.

48. The processes began with a series of investigative hearings, styled as "meetings," with student Ryan Mucaj and student Karal, each independently, conducted by Conduct Officer Kytan.

49. On information and belief, each step of this process was supervised by Defendant Buda.

50. Defendant Kytan consulted with Defendant Buda on this matter frequently.

51. On information and belief, Defendant Buda approved, encouraged, and often directed the actions of Defendant Kytan as described below.

52. On information and belief, the purpose of these hearings and the process of which they were a part was to investigate and sanction the students for their speech on October 11, 2019, offensive but protected.

53. In addition, at about this time, Karal was subject to an investigation by the Nursing School at University of Connecticut, alleging that his speech violated professional standards for him as a nursing student, because of the content of his speech on October 11, 2019.

54. These investigations, distinct from any possible sanctions, alone violate the consent decree and burden the plaintiffs' speech, as "enforcing . . . [a] policy that interferes with the exercise of First Amendment rights by . . . [a] student, when the exercise of such rights is unaccompanied by violence or the imminent threat of violence."

55. On October 23, 2019, Conduct Officer Kytan had the first such hearing with Karal.

56. On October 25, 2019, Conduct Officer Kytan had the first such hearing with Mucaj.

57. These first hearings informed the students of the process and general nature of the accusations against them.

58. In the October 25, 2019 hearing, Mucaj asked conduct officer Kytan if Mucaj was being investigated "because of something I said," and Kytan responded, "**Yes**."

59. At the conclusion of this meeting, Conduct Officer Kytan was apprised by the student and through counsel that the schools conduct was violative of Mucaj's rights and should be immediately enjoined.

60. During the meetings, it was made clear to both students that they were being investigated because of a claim that they uttered offensive language on October 11, 2019.

61. On November 1, 2019, Conduct Officer Kytan conducted a factfinding hearing of Mucaj, with Mucaj present.

62. On November 4, 2019, Conduct Officer Colon conducted a factfinding hearing of Karal, with Karal present.

63. Among other things, Conduct Officer Colon asked Karal whether which word he used, to clarify whether the utterance was a word that is spelled "n-i-g-g-a'" or whether the utterance was a word that is spelled "n-i-g-g-e-r."

64. It was otherwise made clear to the students in these meetings that the school's interest and concern was in the content or viewpoint of the students' speech.

65. On November 13, 2019, Karal was subjected to an investigative hearing by the nursing school.

66. During this meeting, Nursing School Officials made it explicitly clear to Karal that he was being investigated for the content of his speech on October 11, 2019, and that he was accused of violating professional standards based on the content of his speech, although ultimately the Nursing School declined to substantively continue the investigation past that initial investigative interview.

67. In correspondence and in internal records, Conduct Officer Kytan describes the investigation as concerning "remarks directed towards race/ethnicity."

68. On November 19, 2019, Conduct Officer Kytan detailed her findings to Mucaj.

69. On November 20, 2019, Conduct Officer Kytan detailed her findings to Karal.

70. The findings in both instances were essentially identical.

71. Conduct Officer Kytan, in combination with Conduct Officer Colon and the direct involvement of their supervisor Defendant Armstrong, concluded that based on their investigation, the students violated school policy.

72. These individuals and officials found that the students violated University of Connecticut's Responsibilities of Community Life: The Student Code (Part III B.), because of the content of what the students said on October 11, 2019.

73. Specifically, these individuals "found" that the students violated a policy worded as follows:

> Disruptive behavior, which is defined as participating in or inciting others to participate in the disruption or obstruction of any University activity, including, but not limited to: teaching, research, events, administration, student conduct proceedings, the living/learning environment, or other University activities, on or off-campus; or of other non-University activities when the conduct occurs on University premises; or of the living environment, on or off-campus.

74. Conduct Officer Kytan found and explained, that among other things, her recommended sanction was to terminate the students' housing agreement with the school.

75. Conduct Officer Kytan explained that the students could acquiesce and accept her finding or challenge her finding by way of another hearing.

76. Conduct Officer Kytan explained that at the end of *that* hearing, any discipline would go into effect immediately.

77. Conduct Officer Kytan further explained that if the panel upheld her finding, the students would have to vacate their on-campus homes within 24 hours.

78. At no point in any of the proceedings was either student accused of acting with

violence or the imminent threat of violence, or any misconduct even remotely approaching such. The school has only ever accused the students of acting orally and verbally.

79. At the conclusion of the November 20, 2019, Conduct Officer Kytan indicated that she had not consulted with counsel prior to making her findings.

80. At the conclusion of the November 20, 2019, the undersigned presented Conduct Officer Kytan with a November 20, 2019 letter demanding the proceedings immediately stop. She was directed in writing and orally to consult with counsel.

81. Among other things, the letter explicitly reminded Conduct Officer Kytan of her personal and official obligations to honor the order of this Court in *Nina Wu v. University of Connecticut*.

82. At about that time, a copy of the letter was sent to **all** named defendants, among others.

83. Nonetheless, the school continues to the present day with "enforcing . . . [a] policy that interferes with the exercise of First Amendment rights by . . . [a] student, when the exercise of such rights is unaccompanied by violence or imminent threat of violence," in direct derogation of paragraph 1 of the consent decree.

84. On information and belief, in making the finding and sanction, neither Conduct Officer Kytan, nor Conduct Officer Colon, nor Defendant Armstrong, accounted for the plaintiffs' First Amendment interests.

85. This threat to the students' housing, however temporary, caused them to be afraid for their well-being because of their speech.

**Disciplinary File**

86. In opening an investigation, the school opened a disciplinary file concerning each student.

87. Notwithstanding the temporary restraining order entered into in this case and notwithstanding the students' graduation, on information and belief, these files remain open.

88. The students reasonably believe that as long as these files remain open, the school could sanction them for their speech.

89. The school has not promised that no action would be taken nor notified the students that the disciplinary files are closed.

90. The students seek to have their disciplinary files formally closed.

**COUNT ONE – BREACH OF CONTRACT AND ENFORCEMENT OF CONSENT DECREE AGAINST UNIVERSITY OF CONNECTICUT**

91. All preceding paragraphs are incorporated by reference.

92. On information and belief, policies invoked by the school are an unconstitutional abridgement on their face, and as-applied or threatened to be applied, of the plaintiffs' rights to the freedom of speech under the United States Constitution, First and Fourteenth Amendments.

93. On information and belief, policies invoked by the school effect a de facto prior restraint, affording university officials essentially freewheeling and standardless discretion over speech as to content and viewpoint, as officials deem what speech falls within the policy and is impermissible. Such a prior restraint violates the freedom of speech.

94. On information and belief, policies invoked by the school are unconstitutionally overbroad, unlawfully restricting speech.

95. On information and belief, policies invoked by the school as-applied or threatened to be applied, are a content-based and viewpoint-based restriction on speech.

96. On information and belief, policies invoked by the school as-applied or threatened to be applied, are neither narrowly tailored nor the least speech restrictive means to accomplish any permissible government purpose sought.

97. On information and belief, policies invoked by the school fail to adequately advise, notify, or inform persons threated with prosecution for violating it. Accordingly, such policy is unconstitutionally vague, on its face and as-applied or threatened to be applied, under the United States Constitution, First and Fourteenth Amendments.

98. On information and belief, policies invoked by the school constitute express policy that cause a constitutional deprivation by its mere existence, chilling speech, and also when enforced.

99. The school's conduct clearly violates the order and consent decree, which is clear and unambiguous, and the school does so without fair ground as to doubt the wrongfulness of the conduct of its officials or employees.

100. On information and belief, the school has not made any diligent attempt to comply in a reasonable manner with the consent decree in at least the past five years.

101. The school's conduct constitutes a breach of the agreement in the consent decree that caused the plaintiffs harm.

**COUNT TWO – DEPRIVATION OF FIRST AMENDMENT RIGHTS**
**DEFENDANT DAUGHERTY AS AN INDIVIDUAL**

102. Paragraphs 1–99 are incorporated by reference.

103. By way of her personal conduct as described above, in employing police to sanction and punish protected speech and to harass the plaintiffs, and by way of her authority as a government official, and by failing to correct the policies of the school that infringe on the freedom of speech, Dean of Students to the University of Connecticut, Defendant Daugherty acted under color of state law to deprive the plaintiffs of their rights to the freedom of speech under the United States Constitution, First and Fourteenth Amendments.

104. By way of her personal conduct as described above, in employing police in this way, Defendant Daugherty effected an informal prior restraint scheme, chilling and deterring protected speech, and thereby acted under color of state law to deprive the plaintiffs of their rights to the freedom of speech under the United States Constitution, First and Fourteenth Amendments.

**COUNT THREE – BREACH OF CONSENT DECREE AND ENFORCEMENT OF CONSENT DECREE AGAINST DEFENDANT DAUGHERTY**

105. Paragraphs 1–99 are incorporated by reference.

106. Defendant Daugherty's conduct clearly violates the order and consent decree, which is clear and unambiguous, and does so without fair ground as to doubt the wrongfulness of the conduct.

107. On information and belief, defendant Daugherty has not made any diligent attempt to comply in a reasonable manner.

108. Defendant Daugherty's conduct constitutes a breach of the agreement in the consent decree that caused the plaintiffs harm.

**COUNT FOUR – DEPRIVATION OF FIRST AMENDMENT RIGHTS DEFENDANT BUDA**

109. Paragraphs 1–99 are incorporated by reference.

110. By way of her personal conduct as described above, in working in combination with Conduct Officer Kytan or Colon or both, both directing Kytan and Colon and advising them on how to act, and in unconstitutionally enforcing school policy, Defendant Buda acted under color of state law to deprive the plaintiffs of their rights to the freedom of speech under the United States Constitution, First and Fourteenth Amendments.

**COUNT FIVE – BREACH OF CONSENT DECREE AND ENFORCEMENT OF CONSENT DECREE AGAINST DEFENDANT BUDA**

111. Paragraphs 1–99 are incorporated by reference.

112. Defendant Buda's conduct clearly violates the order and consent decree, which is clear and unambiguous, and does so without fair ground as to doubt the wrongfulness of the conduct.

113. On information and belief, defendant Buda has not made any diligent attempt to comply in a reasonable manner.

114. Defendant Buda's conduct constitutes a breach of the agreement in the consent decree that caused the plaintiffs harm.

**COUNT SIX – DEPRIVATION OF FIRST AMENDMENT RIGHTS DEFENDANT KYTAN**

115. Paragraphs 1–99 are incorporated by reference.

116. By way of her personal conduct as described above, and in unconstitutionally enforcing school policy, Conduct Officer Kytan acted under color of state law to deprive the plaintiffs of their rights to the freedom of speech under the United States

Constitution, First and Fourteenth Amendments.

117. Conduct Officer Kytan's conduct violates the order and consent decree, which is clear, and she does so without fair ground as to doubt the wrongfulness of her conduct.

**COUNT SEVEN – BREACH OF CONSENT DECREE AND ENFORCEMENT OF CONSENT DECREE AGAINST DEFENDANT KYTAN**

118. Paragraphs 1–99 are incorporated by reference.

119. Defendant Kytan's conduct clearly violates the order and consent decree, which is clear and unambiguous, and does so without fair ground as to doubt the wrongfulness of the conduct.

120. On information and belief, defendant Kytan has not made any diligent attempt to comply in a reasonable manner.

121. Defendant Kytan's conduct constitutes a breach of the agreement in the consent decree that caused the plaintiffs harm.

**COUNT EIGHT – DEPRIVATION OF FIRST AMENDMENT RIGHTS DEFENDANT COLON**

122. Paragraphs 1–99 are incorporated by reference.

123. By way of her personal conduct as described above, in working in combination with Conduct Officer Kytan or Defendant Armstrong or both, and in unconstitutionally enforcing school policy, Conduct Officer Colon acted under color of state law to deprive the plaintiffs of their rights to the freedom of speech under the United States Constitution, First and Fourteenth Amendments.

## COUNT NINE – BREACH OF CONSENT DECREE AND ENFORCEMENT OF CONSENT DECREE AGAINST DEFENDANT COLON

124. Paragraphs 1–99 are incorporated by reference.

125. Defendant Colon's conduct clearly violates the order and consent decree, which is clear and unambiguous, and does so without fair ground as to doubt the wrongfulness of the conduct.

126. On information and belief, defendant Colon has not made any diligent attempt to comply in a reasonable manner.

127. Defendant Colon's conduct constitutes a breach of the agreement in the consent decree that caused the plaintiffs harm.

## PRAYER FOR RELIEF

128. The plaintiffs request that the court grant injunctive and declaratory relief, compensatory damages as to all defendants, punitive damages as to individual defendants, pre and post judgment interest as allowed by law, reasonable attorneys' fees, findings of civil contempt as to each defendant, and such other relief as the Court deems just and proper.

THE PLAINTIFFS

BY: */s/ Mario Cerame ct30125*
Mario Cerame
Brignole, Bush & Lewis LLC
73 Wadsworth Street
Hartford, Connecticut 06106
T: 860.527.9973
F: 860.527.5929
E: mario@brignole.com
  attorneys@brignole.com

**CERTIFICATION**

A true and exact copy of the foregoing was sent by electronic mail, via the CM/ECF system, on OCTOBER 22, 2020, to:

>AAG Mary Lenehan, Esq.
>Office of the Attorney General
>Health and Education Unit
>165 Capitol Avenue
>Hartford, Connecticut 06106


>Nicole Fournier Gelston, Esq.
>General Counsel to the University of Connecticut
>Office of the General Counsel
>343 Mansfield Road, Unit 1177
>Storrs, CT 06269-1177

>>*Mario Cerame*
>>Mario Cerame