### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RYAN MUCAJ, et al. | : | CIVIL ACTION NO. |
| *Plaintiffs* | : | 3:20-cv- 00066 (MPS) |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT, et al. | : | |
| *Defendants* | : | JANUARY 6, 2021 |

### MEMORANDUM OF LAW IN SUPPORT OF
### <u>THE DEFENDANTS' MOTION TO DISMISS</u>

Pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), 12(b)(5) and 12(b)(6), defendants

University of Connecticut, ("UConn"), Eleanor Daugherty, in her individual capacity,

Alexandra Kytan, in her individual capacity, Kim Colon, in her individual capacity, and Megan

Buda, in her individual capacity, respectfully move this court to dismiss the plaintiffs' amended

complaint, (Dkt. 56), in whole, for lack of subject matter jurisdiction and failure to state a claim

upon which relief can be granted, and as to defendant Buda, for lack of personal jurisdiction,

inadequate service of process, and no personal involvement.

## I.    FACTUAL BACKGROUND

The plaintiffs allege the following facts.  In January of 1990, the United States District

Court issued a Consent Decree resolving a matter brought by a student against the defendant

UConn alleging violations of her First Amendment rights.  Dkt. 56, ¶ 27; Dkt. 1, pp. 21-24/24.

The Consent Decree enjoined the defendant UConn, its officials, agents and successors, from

enforcing any policy that interferes with the exercise of First Amendment rights by …

any…student, when the exercise of such rights is unaccompanied by violence or the imminent

threat of violence."  Dkt. 56, ¶ 31; Dkt. 1, pp. 21-22/24.  On January 26, 2015, the American

1

Civil Liberties Union of Connecticut, ("ACLU-CT"), sent a letter to defendant UConn's president reminding her of the obligations of the Consent Decree.  Dkt. 56, ¶35.

On October 11, 2019, defendant Daugherty received a complaint from a student that included a link to a video.  The video was taken by a student from a window in that student's residence hall room.  The video depicted the plaintiffs, in an inebriated state, walking in a residential area of campus after midnight in the early morning hours of October 11, 2019.  Dkt. 56, ¶39. The plaintiffs were "playing a game" that involved shouting "taboo" or "offensive" words at an increasing volume.  Dkt. 56, ¶40; Dkt. 10-1, pp. 30-33/95, 59-61/95.  When the sound on the video is amplified, the listener can hear the plaintiffs using a racial epithet.  Dkt. 56, ¶¶ 41, 42.  On October 23, 2019, the defendants invoked policies, "commenced disciplinary processes," and began an investigation into the events depicted in the video, (the "Investigation").  Dkt. 56, ¶¶ 47,48.

As part of the Investigation, defendant Kytan spoke to witnesses and plaintiff Mucaj, and defendant Colon spoke to plaintiff Karal.  Dkt. 56, ¶¶ 61, 62; Dkt. 10-1, pp. 30/95, 59/95.  On November 19 and 20, 2019, defendant Kytan informed the plaintiffs of the findings and recommendations of the Investigation.  Dkt. 56, ¶¶ 68,69; Dkt. 10-1, pp. 30-33/95, 59-61/95. The Investigation concluded that the plaintiffs had violated the Disruptive Behavior Policy of the defendant UConn's Student Code.  Dkt. 56, ¶¶ 72, 73; Dkt. 10-1, pp. 33/95, 61/95.  Defendant Kytan explained to the plaintiffs that they could acquiesce to the Investigation findings or request a hearing.  Dkt. 56, ¶¶ 75, 77.  Before participating in a hearing, the plaintiffs filed this action.

## II.    PROCEDURAL HISTORY

The plaintiffs filed the original complaint in this matter on January 14, 2020.  They immediately sought and obtained a temporary restraining order prohibiting the defendants from

proceeding with a hearing until the court ruled on the plaintiffs' preliminary injunction motion. Dkt. 14.  On May 7, 2020, this court denied the plaintiffs' motion for preliminary injunction as moot based on the closure of defendant UConn's campus due to the pandemic and the plaintiffs' impending graduation.  Dkt. 39.  The plaintiffs have now graduated.  Dkt. 56, ¶ 87.

On October 22, 2020, the plaintiffs filed an amended complaint (the "Amended Complaint").  Dkt. 56.  The Amended Complaint sets forth nine counts.  Counts 1, 3, 5, 7 and 9 allege that defendant UConn and each of the individual defendants, in their individual capacities, violated the Consent Decree.  Counts 2, 4, 6, and 8 allege a Section 1983 cause of action against the individual defendants, again in their individual capacities, based on allegations that those defendants violated the plaintiffs' First Amendment rights.  The plaintiffs seek injunctive and declaratory relief, compensatory damages as to all defendants, punitive damages as to the individual defendants, pre and post judgment interest as allowed by law, findings of civil contempt against each defendant and "such other relief as the Court finds just and proper."

## III.    ARGUMENT

The Amended Complaint in its entirety must be dismissed because the court lacks jurisdiction over this matter as it is not a viable Article III case or controversy on the grounds of standing and mootness.  However, should the court find that the plaintiffs do have standing under Article III, the complaint should be dismissed on several alternative grounds.

Counts 1, 3, 5, 7 and 9, alleging violations of the Consent Decree, must be dismissed because the plaintiffs are not parties to the Consent Decree and, to the extent third party beneficiary status exists under the terms of the decree, the plaintiffs lack such standing.  Further, to the extent Count 1 seeks money damages against the State, the claim must be dismissed on the grounds of Eleventh Amendment immunity.  Additionally, Counts 3, 5, 7 and 9 must be

3

dismissed because the individual defendants, in their individual capacities, are not parties to the Consent Decree and, therefore, cannot be held individually liable for any alleged violation. Finally, Counts 1, 3, 5, 7, and 9 must all be dismissed because the facts alleged do not plausibly set forth a First Amendment violation, so there has been no violation of the Consent Decree.

Counts 2, 4, 6 and 8, the Section 1983 counts, should be dismissed on the grounds of qualified immunity. The facts alleged do not set forth a First Amendment violation, and there was no clear law informing the defendants that conducting the Investigation into the plaintiffs' loud behavior in a residential area of campus in the middle of the night, whether or not accompanied by the use of a racial epithet, violated the plaintiffs' First Amendment rights. Therefore, the individual defendants are entitled to qualified immunity.

Finally, Counts 4 and 5 against defendant Buda must be dismissed as this court lacks personal jurisdiction over her. Alternatively, Counts 4 and 5 must be dismissed because they fail to allege the personal involvement of defendant Buda.

A.      STANDARD OF REVIEW

1.      Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing FED. R. CIV. P. 12(b)(1)). "When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff. Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Raila v. United States*, 355 F.3d 118, 119 (2d Cir. 2004). Importantly, "[a] plaintiff asserting subject matter jurisdiction has the burden of

4

proving by a preponderance of the evidence that it exists." *Makarova*, 201 F.3d at

113 (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir.1996)).  A court evaluating a Rule

12(b)(1) motion "may resolve the disputed jurisdictional fact issues by reference

to evidence outside the pleadings, such as affidavits." *Zappia Middle E. Constr. Co. v. Emirate of*

*Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002).

The consideration of such evidence does not convert the motion to dismiss into one for summary

judgment. *See Hicks v. Brophy*, 839 F. Supp. 948, 950 (D. Conn. 1993).

### 2.      Rule 12(b)(2) – Lack of personal jurisdiction

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears

the burden of showing that the court has jurisdiction over the defendant. *Metro. Life Ins. Co. v.*

*Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). However, prior to discovery, the

plaintiff "need only make a *prima facie* showing of jurisdiction through its own affidavits and

supporting materials to defeat the motion." *Welinsky v. Resort of the World D.N.V.*, 839 F.2d

928, 930 (2d Cir.1988) (*quoted in Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d

Cir. 1981)). Furthermore, in considering a Rule 12(b)(2) motion, the pleadings and affidavits are

to be construed in the light most favorable to plaintiff, the non-moving party, and all doubts are

to be resolved in plaintiff's favor. *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 85 (2d Cir.

2011).

### 3.      Rule 12(b)(5) – Improper Service

With respect to a Rule 12(b)(5) motion to dismiss, "[b]efore a federal court may exercise

personal jurisdiction over a defendant, the procedural requirement of service of summons must

be satisfied." *Dynegy Midstream Servs. v. Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006) (internal

quotation marks and citation omitted).  "[T]he plaintiff bears the burden of proving adequate

service." *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 298-99 (2d Cir. 2005) (citation omitted).

The plaintiff must, "through specific factual allegations and any supporting materials, make a

*prima facie* showing that service was proper." *Kwon v. Yun*, No. 05-CV-1142 (GEL), 2006 WL

416375, at *2 (S.D.N.Y. Feb. 21, 2006) (collecting cases). "Conclusory statements are

insufficient to overcome a defendant's sworn affidavit that he was not served." *Darden v.

DaimlerChrysler N. Am. Holding Corp.*, 191 F.Supp.2d 382, 387 (S.D.N.Y. 2002) (citing

*Howard v. Klynveld Peat Marwick Goerdeler*, 977 F.Supp. 654, 658 (S.D.N.Y. 1997)). The court

may "look to matters outside the complaint to determine whether it has jurisdiction." *Id.*

### 4.     Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a pleading "does not require 'detailed

factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-

me accusation." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868

(2009) (quoting In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L.

Ed. 2d 929 (2007)). In that vein, "[a] pleading that offers 'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at

555). Rather, "a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). That

measure of plausibility requires "more than a sheer possibility that a defendant has acted

unlawfully"—the pleaded facts must permit a "reasonable inference" of liability for the alleged

misconduct. *Id.; see also Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir.

2011) (instructing that "all reasonable inferences" are to be taken in the plaintiff's favor).  When

considering a Rule 12(b)(6) motion, a court may consider material outside of the complaint when

the material is integral to the complaint and relied on by the plaintiff in framing the complaint.

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153-54 (2d Cir. 2002).

**B.      The Amended Complaint must be dismissed because it does not satisfy Article III, depriving this court of subject matter jurisdiction.**

The entire Amended Complaint must be dismissed on the grounds that it fails to meet the "case or controversy" requirements of Article III.  The plaintiffs have failed to establish that they have standing for the claims for monetary relief and any claims for equitable relief are now moot.  Since these concepts bear on whether subject matter jurisdiction exists, a Rule 12(b)(1) motion is the proper vehicle to raise them.  *See SM Kids, LLC v. Google LLC,* 963 F.3d 206, 210 (2d Cir., 2020).

Article III of the Constitution limits federal-court jurisdiction to actual, ongoing "cases" and "controversies." U.S. Const., Art. III, §2.  *See Del. Riverkeeper Network v. N.Y. State Dep't of Envtl. Conservation*, 788 F. App'x 65, 66 (2d Cir. 2019) (summary order) (quoting *Deeper Life Christian Fellowship, Inc. v. Sobol*, 948 F.2d 79, 81 (2d Cir. 1991)).  Article III standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006)).

Constitutional standing requires (1) that the plaintiff have suffered an 'injury in fact'— that is, 'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical'; (2) that there is 'a causal connection between the injury and the conduct' of which the plaintiff complains; and (3) that it is 'likely . . . that the injury will be redressed by a favorable decision.'  *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 358 (2d Cir. 2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).  An "injury in fact" involves "an invasion of

a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical." *Gully v Nat'l Credit Union Admin. Bd.*, 341 F.3d 155, 160 (2d Cir. 2003). *See also Laird v. Tatum*, 408 U.S. 1, 13, 92 S. Ct. 2318, 33 L. Ed. 2d 154 (1972). A plaintiff must establish that s/he "has sustained or is immediately in danger of sustaining some direct injury . . . [that] must be both real and immediate." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02, 103 S. Ct. 1660, 1665, 75 L. Ed. 2d 675 (1983) (internal quotations and citations omitted). "To determine whether a litigant has standing to challenge governmental action as a violation of the First Amendment in particular, the litigant must demonstrate a claim of specific present objective harm or a threat of specific future harm." *Davis v. New York State Bd. of Elections*, 689 Fed. Appx. 665, 668, 2017 U.S. App. LEXIS 7824, *5-6, 2017 WL 1735253 , *citing Meese v. Keene*, 481 U.S. 465, 472, 107 S. Ct. 1862, 95 L. Ed. 2d 415 (1987) (internal quotation marks omitted). "As the party invoking federal jurisdiction, . . . [P]laintiff bears the burden of establishing that [s]he has suffered a concrete injury or is on the verge of suffering one." *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 175 (2d Cir. 2006).

Mootness can be described as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000), (*quoting Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997)). "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72, 133 S. Ct. 1523,

185 L. Ed. 2d 636 (2013) (internal quotation marks omitted); *see also United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537, 200 L. Ed. 2d 792 (2018).  Failure to satisfy the requirements of either standing or mootness places a dispute outside the reach of the federal courts. *See Already, LLC v. Nike, Inc.,* 568 U.S. 85, 91, 133 S. Ct. 721, 184 L. Ed. 2d 553 (2013)("We have repeatedly held that an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation.").

The Supreme Court has also instructed that "a plaintiff must demonstrate standing separately for each form of relief sought." *Laidlaw*, 528 U.S. at 185.  *See also Lyons*, 461 U.S. at 109.  A plaintiff's standing for retrospective relief may be based on past injuries, whereas claims for prospective relief require a continuing injury or threat of injury. *Pungitore v. Barbera,* 506 Fed. Appx. 40, 41 (2d Cir. 2012).  When the threat of future harm dissipates, a plaintiff's claims for equitable relief become moot because the plaintiff no longer needs protection from future injury.

This court lacks jurisdiction under Article III over any of the plaintiffs' claims.  First, to the extent the plaintiffs seek monetary relief for past harm, the plaintiffs have failed to allege facts sufficient to establish an injury in fact that is redressable by this court.  Second, to the extent the plaintiffs seek declaratory or injunctive relief, any claim of ongoing or future injury is now moot.

### 1.     As to the plaintiffs' claims for money damages, they lack Article III standing.

The plaintiffs' allegations fail to provide sufficient factual basis for the court to find that the plaintiffs met the criteria for Article III standing at the onset of this litigation as to their claims for money damages.  The plaintiffs do not satisfy either the first or the third prong of the Article III standing test because they pled neither a concrete and particularized injury, nor one

that the court can redress through money damages.  For these reasons, the plaintiffs lack standing

as to their claims for money damages and those claims must be dismissed.

> a)  **The plaintiffs have failed to allege facts to demonstrate a plausible injury in fact.**

The Amended Complaint alleges that the plaintiffs experienced a chilling of their rights

under the First Amendment as a result of the Investigation.  This "chilling" is the only harm[1]

alleged by the plaintiffs.  (Dkt. 56, ¶ 98.)  While allegations that a plaintiff's speech has actually

been chilled can establish an injury in fact, "allegations of a subjective 'chill' are not an adequate

substitute for a claim of specific present objective harm…." *Laird*, 408 U.S. at 13-14.  "Rather,

to establish standing in this manner, a plaintiff must proffer some objective evidence to

substantiate his claim that the challenged conduct has deterred him from engaging in protected

activity."  *Bordell v. General Electric Co.,* 922 F.2d 1057, 1061 (2d Cir., 1991)  (citing *Meese v.*

*Keene*, 481 U.S. 465, 473-74, 95 L. Ed. 2d 415, 107 S. Ct. 1862 (1987) (noting that detailed

affidavits that contained polling results and an expert's opinion were sufficient to establish

standing).  When damages are sought for a prior period of unconstitutional chill, a plaintiff must

establish that s/he was deterred from some specific, intended act of expression.  *See Abbott v.*

*Pastides*, 900 F.3d 160, 169 (9th Cir. 2018); *Spear v. Town of West Hartford,* 954 F.2d 63, 67 (2d

Cir.), *cert. denied*, 113 S. Ct. 66, 121 L. Ed. 2d 33 (1992) (dismissing First Amendment claim for

failure to allege chilling effect with sufficient particularity).

To recover damages, as plaintiffs seek here, it is not enough to establish that a reasonable

person *could* have engaged in self-censorship as a result of the defendants' actions. Instead, the

plaintiffs must show that they actually engaged in self-censorship as a result of the defendants'

---

[1] While the Second Circuit has held that "chilling" is not the exclusive type of harm a plaintiff may allege to satisfy the concrete harm requirement both of Article III and the First Amendment, *Gill v. Pidlypchak*, 389 F.3d 379, 384, (2d Cir. 2004), it is the *only harm* alleged by the plaintiffs in this case.

actions.  To prove a deprivation of free speech, a plaintiff must "come forward with evidence

showing either that (1) defendants silenced him or (2) defendants' actions had some actual, non-

speculative chilling effect on his speech" (alteration and internal quotation marks

omitted)). *Williams v. Town of Greenburgh*, 535 F.3d 71, 78 (2d Cir. 2008).  *See also* **Zherka v.**

**DiFiore**, 412 Fed. Appx. 345, 347-48 **(2d Cir. 2011)**.   The plaintiffs in this case have failed to

allege that the Investigation deterred any specific intended act of expression protected by

the First Amendment.

      The Amended Complaint offers nothing beyond a bare assertion that the Investigation

had a chilling effect on the plaintiffs' First Amendment rights.  It does not allege that the

plaintiffs wanted to or planned to engage in the same or similar speech again, but chose not to

because of fear of discipline.  Instead, the Amended Complaint simply offers the legal

conclusion that the defendants "chilled" the plaintiffs' speech.  Having failed to allege any

change in their behavior, the plaintiffs have pled only a "subjective chill[, which] cannot serve as

a substitute for a specific objective harm."  *Aretakis v. Durivage*, No. 07-CV-1273, 2009 U.S.

Dist. LEXIS 7781, at *77 (N.D.N.Y Feb. 3, 2009) (actual chilling requirement not met where

there was no change in plaintiffs behavior and plaintiff alleged only that he was temporarily

deterred from speaking).  Accordingly, the plaintiffs have not adequately pled actual chilling of

their speech.  Without any alleged facts to support the plaintiffs' claim, the alleged "chill" is

purely conjectural and not sufficient to establish standing.

      Even if this court were to find that the plaintiffs have plausibly alleged that their free

speech rights were chilled during the Investigation, any perceived chilling effect for such a brief

period would be *de minimus*, and hence not of constitutional significance. *See Ingraham v.*

*Wright*, 430 U.S. 651, 674, 51 L. Ed. 2d 711, 97 S. Ct. 1401 (1977) ("There is, of course, a *de*

11

*minimus* level of imposition with which the Constitution is not concerned."); *Arce v. Banks*, 913 F. Supp. 307, 309 (S.D.N.Y. 1996) ("At most, [plaintiff] has suffered a *de minimus* infringement of his First Amendment rights which is not actionable in a § 1983 petition.").  Participating in interviews for the purpose of providing their own version of events as the defendants undertook the Investigation does not rise to the level of constitutional harm.  In fact, participation in those interviews is essential to the protection of the plaintiffs' rights to due process.

Because the plaintiffs have failed to show that they have suffered a "distinct and palpable injury," they lack standing to bring this claim for money damages. *See Valley Forge Christian Coll.,* 454 U.S. 464, 472, 102 S. Ct. 752, 70 L. Ed. 700 (1982).  Therefore, this court need not reach a ruling on the merits of the plaintiffs' claims for money damages. *See Laird*, 408 U.S. at 14; *Bordell,* 922 F.2d at 1061.

> **b)**   **The plaintiffs have failed to allege facts to demonstrate that any alleged injury is redressable through money damages.**

Even if this court were to find that the plaintiffs had sufficiently alleged an injury, they fail to meet the redressability requirement, thus depriving them of Article III standing.  A plaintiff's injury is "redressable" by the relief sought only if it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks and citation omitted). "[T]he very essence of the redressability requirement" is that a request for "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co.*, 523 U.S. 83, 107, 118 S. Ct. 1003, 140 L. Ed. 210 (1998).  ***See also*** *Coal. of Watershed Towns v. United States Envtl. Prot. Agency*, 552 F.3d 216, 218 (2d Cir. 2008).

The plaintiffs fail to allege facts sufficient to demonstrate that the monetary relief that they seek will remedy any alleged "chilling".  The plaintiffs seek compensatory and punitive

damages, yet they do not allege a single fact to demonstrate any compensable injury that could

be redressed by money damages.  Compensatory damages cannot be awarded in a Section 1983

action absent proof of actual injury.  *Farrar v. Hobby*, 506 U.S. 103, 112, 113 S. Ct. 566, 121 L.

Ed. 2d 494 (1992).

There is no mention in the Amended Complaint of a request for nominal damages nor can

any such request be inferred.  The Second Circuit has declined reading a nominal damages claim

into a complaint's boilerplate prayer for relief.  *Fox v. Board of Trustees of the State Univ.*, 42

F.3d 135, 141 (2d Cir. 1994).  As to punitive damages, because the Amended Complaint is

devoid of allegations of willful or malicious conduct, the plaintiffs have failed to set forth a

plausible claim for punitive damages against the individual defendants under Section 1983.

Without such allegations, the court has no authority to award the punitive damages sought by the

plaintiffs.  *See McCardel v. Haddad*, 131 F.3d 43, 52-53 (2d Cir. 1997).

To the extent the plaintiffs' claims for money damages are based on the alleged violation

of the Consent Decree, the court is not able to grant that relief either.  The Eleventh Amendment

provides defendant UConn immunity from any money damages, either compensatory or

punitive.  The Eleventh Amendment bars federal claims against states, absent their consent to

such suits or an express statutory waiver of immunity. *See Will v. Mich. Dep't of State Police*,

491 U.S. 58, 66, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989); *Kentucky v. Graham*, 473 U.S. 159,

169, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985).  There is no allegation, nor anything on the face

of the Consent Decree, to support a claim that defendant UConn waived its Eleventh

Amendment immunity and consented to any claims for money damages when it agreed to the

injunctive terms of the Consent Decree.  As to the individual defendants sued in their individual

capacities for violations of the Consent Decree, those claims fail because the individual

defendants were not parties to the decree and, therefore, cannot be found personally liable for any violations.

Without sufficient facts to demonstrate an injury in fact that is redressable through money damages, the Amended Complaint fails to satisfy Article III's requirements for standing as to any claim for money damages.

### 2. The plaintiffs' claims for equitable relief are moot, depriving this court of Article III subject matter jurisdiction over them.

As to the plaintiffs' claims for equitable relief, even if the plaintiffs could have demonstrated standing at the onset of this litigation, those claims are now moot because there is no longer any immediate and real threat that the plaintiffs will be harmed again. The Amended Complaint alleges that the plaintiffs have graduated and there are no allegations that suggest that they plaintiffs ever plan to return to the university. Because the plaintiffs have failed to allege facts to establish a substantial likelihood of future harm, their claims for equitable relief are moot and this court lacks jurisdiction over those claims.

When seeking injunctive relief, "a plaintiff must show the three familiar elements of standing: injury in fact, causation, and redressability." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L. Ed. 2d 1 (2009)). A plaintiff's standing to seek equitable relief depends on the substantial likelihood of future harm. *See Lyons,* 461 U.S. at 105. "Absent a sufficient likelihood that he will again be wronged in a similar way," a plaintiff is not entitled to injunctive relief. *Id.* at 111. *See Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012). The mere subjective fear that a plaintiff will be subjected again to an allegedly illegal action is not sufficient to confer standing. *Id.* at 107 n.8 ("It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions. The emotional consequences of a

14

prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant.").  *See also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury."); *Pungitore v. Barbera*, 506 F. App'x 40, 41 (2d Cir. 2012) ("[W]hen seeking prospective injunctive relief, the plaintiff must prove the likelihood of *future* or *continuing* harm.").

"The Supreme Court has 'repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are not sufficient.'" *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015)(alteration in original) *(quoting Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013)).  "In establishing a certainly impending future injury, . . . the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought." *Marcavage*, 689 F.3d at 103.

Furthermore, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton,* 414 U.S. 488, 495-96, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974).  The Second Circuit has reiterated that past injuries may provide a basis for establishing standing for injunctive relief only if "the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." *Nicosia*, 834 F.3d at 239.  *See Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *Deshawn E. by Charlotte E. v Safir*, 156 F.3d 340, 344 (2d Cir. 1998)) (A plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that [it]...will be injured in the future.").

Because "an actual controversy . . . must be extant at all stages of review, not merely at the time the complaint is filed", *Arizonans for Official English* v. *Arizona*, 520 U.S. 43, 67, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997) (quoting *Preiser* v. *Newkirk*, 422 U.S. 395, 401, 95 S. Ct. 2330, 45 L. Ed. 2d 272 (1975)), the mootness doctrine requires dismissal of an action when the litigants' interest in its judicial resolution ceases to exist. *Fox v. Board of Trustees of the State University of New York*, 42 F.3d 135, 140 (2d Cir. 1994). "[T]he condition of mootness is not a defense that could be waived by the defendants, but rather is a condition that deprives the court of subject matter jurisdiction." *Id. See Genesis HealthCare Corp.*, 569 U.S. at 72; *Lewis* v. *Continental Bank Corp.*, 494 U.S. 472, 477-78, 110 S. Ct. 1249, 108 L. Ed. 2d 400 (1990).

The plaintiffs' claims for equitable relief are moot because the plaintiffs have graduated and, therefore, are not subject to the University's discipline as students at this time or any foreseeable time in the future. They no longer live on campus nor are they bound by the Student Code. The Amended Complaint does not allege that the plaintiffs plan to return to the university at any time for any reason. The plaintiffs' allegation that they "believe" that they could be sanctioned for their speech at some unknown date in the future is unsupported by any facts and far too conjectural.

Although "imminence is concededly a somewhat elastic concept," a plaintiff's mere declaration of "some day intentions — without any description of concrete plans, or indeed even any specification of *when* the some day will be — do not support a finding of the 'actual or imminent' injury." *Lujan*, 504 U.S. at 564 & n.2 (1992) (internal quotation marks omitted); *see also Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004) (denying claim for prospective relief predicated on "an accumulation of inferences" that were "simply too speculative and conjectural"

to show "sufficient likelihood of future [injury]").  The plaintiffs have failed to allege a single fact to support a conclusion that it is substantially likely that the plaintiffs will be subject to the defendant UConn's rules again.  Without any facts alleged to demonstrate such likelihood, the plaintiffs' claims for equitable relief are moot.

Further, the Second Circuit has consistently held that a student's declaratory and injunctive relief claims against a university s/he attends are mooted by the graduation of the student, because after graduation and absent a claim for damages, "'it becomes impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury.'" *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993)(*quoting Alexander v. Yale Univ.*, 631 F.2d 178, 183 (2d Cir. 1980)).  *See also* **B.C. v. Mount Vernon Sch. Dist**., 660 Fed. Appx. 93, 96, (2d Cir. 2016); **Brief v. Albert Einstein College of Med.,** 423 Fed. Appx. 88, 90, (2d Cir. 2011); *Hayut v. State Univ. of New York*, 127 F. Supp. 2d 333, 336 n.4 (2d Cir. 2000); *Mennone v. Gordon*, 889 F.Supp. 53, 60 (D. Conn. 1995); **Wyler v. Conn. State Univ. Sys.**, 100 F. Supp. 3d 182, 188, 2015 U.S. Dist. LEXIS 39847, *9.  Therefore, because the declaratory and injunctive relief sought in the Amended Complaint could provide no legally cognizable benefits to the plaintiffs since they have graduated, those claims are moot.

It should be noted that, even if a declaratory judgment might be useful to other students, it cannot defeat the mootness doctrine.  Such an order would be tantamount to an advisory opinion.  *See generally Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. at 212-13 ("A court may not proceed to hear an action if, subsequent to its initiation, the dispute loses 'its character as a present, live controversy of the kind that must exist if [the court is] to avoid advisory opinions on abstract propositions of law." (*quoting Hall v. Beals*, 396 U.S. 45, 48, 90 S. Ct. 200, 24 L. Ed. 2d 214 (1969))).  To constitute a live case or controversy under Article

III, the remedy must have some bearing on the parties to the case. Declaratory relief is inappropriate where "the remedy sought is a mere declaration of law without implications for practical enforcement upon the parties." *Browning Debenture Holders' Committee v. DASA Corp.*, 524 F.2d 811, 817 (2d Cir. 1975). Because the declaratory remedy sought would be a mere declaration of law without implications for practical enforcement upon the parties, the case is moot and should be dismissed.

The plaintiffs' claims for injunctive and declaratory relief also fail to meet the very limited "capable of repetition, yet evading review" exception to mootness. The exception "'applies only in exceptional situations,' where two circumstances are 'simultaneously present[.]'" *Lillback ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 85 (2d Cir. 2005) (*quoting Spencer v. Kemna*, 523 U.S. 1, 17, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998)). In the absence of a class action, the "capable of repetition, yet evading review" exception will not be applied unless "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [i]s a reasonable expectation that the same complaining party would be subjected to the same action again." *Muhammad v. City of N.Y. Dep't of Corr.*, 126 F.3d 119, 123 (2d Cir. 1997) (quoting *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S. Ct. 1181, 71 L. Ed. 2d 353 (1982)).

Even if the plaintiffs could meet the first prong, they have pled no facts to support a claim that they might be subjected to disciplinary action at defendant UConn again. Therefore, because the plaintiffs no longer hold legally cognizable interests in the outcome of their requests for equitable relief, they must be dismissed as moot.

To the extent the plaintiffs' claims for equitable relief arose from allegations that the defendants violated the Consent Decree, those claims are also moot given that the plaintiffs are

18

no longer students.  Even if the plaintiffs could have claimed that they had standing as third party beneficiaries under the Consent Decree in January of 2020, those claims are now moot because the plaintiffs have graduated.

Given that the plaintiffs have failed to establish standing for any money damages claims, and given that any claims for equitable relief are now moot, this court lacks Article III jurisdiction over the Amended Complaint.  Therefore, the entire complaint must be dismissed.

### C.    ALTERNATIVE GROUNDS FOR DISMISSAL

Should the court find that the plaintiffs have established Article III standing, the court should dismiss each of the counts for the alternative reasons set forth below.

#### 1.    The court should dismiss all counts alleging a violation of the Consent Decree as it lacks jurisdiction over those claims.

Counts 1, 3, 5, 7 and 9 each assert that the defendants have violated the Consent Decree. Each of those claims fail for the following reasons.  First, the explicit language of the Consent Decree states that claims for violations "on the part of any *party* hereto may be brought to this Court by any *party*".  Doc. 1, p. 21/24.  Given that the plaintiffs were not parties to the Consent Decree, they lacked standing at the time they filed the original complaint to bring an action under the Consent Decree.  However, solely for this motion to dismiss, even if the court assumes the plaintiffs had standing as third party beneficiaries because they were students when they commenced this action, those claims are now moot given that the plaintiffs are no longer students and allege no facts to suggest that they ever will be again.  As such, all claims alleging violation of the Consent Decree are moot and must be dismissed.[2]

---

[2] This motion seeks to dismiss each of these counts against all defendants based on a lack of standing to enforce that order.  Such claims are jurisdictional and, therefore, are properly analyzed under Rule 12(b)(1).

Second, to the extent the plaintiffs are seeking money damages from the defendant UConn, those claims are barred by Eleventh Amendment immunity.[3]  The Consent Decree does not waive that immunity and, therefore, this court lacks jurisdiction over money claims against the defendant UConn.

Third, defendants Daugherty, Buda, Colon and Kytan, in their individual capacities, were not parties or signatories to the Consent Decree, and, therefore, cannot be held personally liable. To the extent the Consent Decree enjoins defendant UConn employees from violating its terms, such terms apply to employees in their official capacities as UConn employees.  Naming the defendants in their official capacities for Consent Decree violations, however, would be futile given that the plaintiffs have named defendant UConn.  Therefore, all claims against the individual defendants in their individual capacities alleging violations of the Consent Decree must be dismissed.

Finally, as set forth below, the plaintiffs have failed to set forth facts to demonstrate that the defendants violated their First Amendment rights.  The Consent Order does not prohibit the University from investigating possible violations of the Student Code.  As explained below, the Investigation did *not* interfere with the plaintiffs' exercise of their First Amendment rights because, to the extent it had any impact on the plaintiffs' speech, it was constitutionally permissible.  Therefore, there is no violation of the First Amendment and, consequently, no

---

[3] Eleventh Amendment immunity is properly understood as either an affirmative defense or a matter of subject-matter jurisdiction. *See Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013) ("[W]hether the claim of sovereign immunity constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense is an open question in the Supreme Court and the Second Circuit."). If understood as an affirmative defense, Eleventh Amendment immunity would be properly asserted in a Rule 12(b)(6) motion. If considered in terms of subject-matter jurisdiction, it would be raised in a Rule 12(b)(1) motion, but it is not waived if it is joined with "other defenses or objections in a responsive pleading or motion." *See* Fed. R. Civ. P. 12(b).

violation of the Consent Decree.  Counts 1, 3, 5, 7 and 9 must be dismissed on that ground as well.

> **2.      Each of the Section 1983 counts must be dismissed on the grounds of qualified immunity.**

As to the plaintiff's Section 1983 claims against the defendants Daugherty, Kytan, Colon and Buda, in their individual capacities, the doctrine of qualified immunity shields them from suit.[4]  The plaintiffs have failed to plead sufficient facts to demonstrate a violation of their rights under the First Amendment or to demonstrate that such rights were clearly established at the time of the alleged violations.

Qualified immunity is an immunity from suit, not simply from liability.  *Ganek v. Leibowitz*, 874 F.3d 73, 80 (2d Cir. 2017), citing *White v. Pauly*, ⸻ U.S. ⸻, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017).  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  In determining whether a defendant is entitled to qualified immunity, the Court engages in a two-step analysis.  The shield applies "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ganek*, 874 F.3d at 80–81, citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).  "The two-step inquiry need not always be conducted sequentially; in short, a court may assume,

---

[4] A qualified immunity defense may be asserted on a Rule 12(b)(6) motion.  *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004).

without deciding, that the facts state a constitutional violation and, yet, grant qualified immunity on the ground that the right was not then clearly established." *Ganek*, 874 F.3d at 81. *See also Pearson v. Callahan*, 555 U.S. 223, 227, 129 S. Ct. 808, 172 L.Ed.2d 565 (2009); *Zalaski v. City of Hartford*, 723 F.3d 382, 388–89 (2d Cir. 2013).

The first prong asks whether the plaintiff's allegations, if true, establish a constitutional violation. *See Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002); *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "If a plaintiff cannot make the first showing, *i.e.*, a violation of constitutional rights, no further inquiry is necessary 'because where there is no viable constitutional claim, defendants have no need of an immunity shield.'" *Ganek,* 874 F.3d at 81, *citing Zalaski*, 723 F.3d at 388*. See also Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

In this case, the plaintiffs have failed to allege sufficient facts to establish a constitutional violation of the plaintiffs' rights under the First Amendment under any theory. Therefore, any claim against the individual defendants in their individual capacities should be dismissed. However, should the court disagree, the plaintiffs also fail to allege facts sufficient to establish the second prong, that the First Amendment rights allegedly violated were clearly established. *Ganek,* 874 F.3d at 81. The plaintiffs' failure to meet the second prong is also grounds for dismissal of these claims on the grounds of qualified immunity.

> **a)  The Amended Complaint fails to allege sufficient facts to demonstrate a violation of the First Amendment on any grounds.**

The Amended Complaint alleges both "as-applied" and "facial" First Amendment challenges to "policies invoked by the school." Dkt. 56, ¶¶ 92-98. Although the plaintiffs do not identify any specific policies, except the Disruptive Behavior Policy, it appears that the plaintiffs are referring to the policies that governed the Investigation.

The policies and procedures that guided the defendants' steps upon receipt of a complaint are set forth in The Responsibilities of Community Life:  The Student Code, (the "Student Code").[5]  Part IV of the Student Code, entitled Student Conduct Process, (the "Student Conduct Process Policies"), sets forth the procedures the university will follow when it becomes aware of possible violations.  Part III, Proscribed Conduct, lists those behaviors that are prohibited on campus.

According to the Student Code, when the university receives a complaint that appears to allege a possible violation of that code, a Student Conduct officer is assigned to conduct an investigation into the allegations to determine if any violations of the Student Code occurred. Student Code, Part IV.A.2, A.3 and B.2.[6]  At the conclusion of such an investigation, the Student Conduct officer's findings and recommendations are shared with the students involved, the complainant and the responding student.  Student Code, Part IV.B.3.  Those students have the right to resolve the matter through an administrative agreement or request an administrative hearing.  Student Code, Part IV.B.4.[7]  Should any of the students elect to pursue an administrative hearing, the hearing body hears the evidence directly from witnesses, including

---

[5] In considering a motion to dismiss, the court may consider … See standard of review.

[6] "A fair and impartial investigation will be conducted by the Student Conduct officer. The respondent and complainant, if applicable, may provide information in person and/or submit a written account, provide the names of incident witnesses for possible interviews with the Student Conduct officer, provide witness statements and any documentation that may be relevant to the facts of the incident. The Student Conduct officer will make a reasonable effort to obtain supporting documentation regarding the incident from other University entities or other resources. Upon completion of the investigation process, the Student Conduct officer, applying a preponderance of the evidence standard, will determine if any violations of The Student Code occurred."

[7] "Following the notification and review of the Student Conduct officer's findings and recommendations of the investigation with the respondent and complainant (if any), the respondent and complainant (if any) may determine whether the case may be resolved by way of administrative agreement or an administrative hearing. Should the respondent or complainant (if any) not select a resolution option, the Student Conduct officer will determine a resolution option. A student who agrees to resolve any violation(s) without an administrative hearing shall have no right to appeal."

the complainant(s) and responding student(s), and "will review the final investigation report to

determine whether the investigation was conducted in a fair, impartial, and reliable manner; the

information is sufficient to support the factual findings; and there is a rational basis, applying a

preponderance of the evidence standard for the recommended findings regarding a potential

violation of *The Student Code*. In conducting this hearing, the hearing body may accept or reject

the investigating Student Conduct officer's findings in whole or in part."  Student Code, Part

IV.D.3.h and j.

The plaintiffs also refer to a provision in Part III of the Student Code, Proscribed

Conduct.  This section sets forth a list of prohibited behaviors, including "disruptive behavior" as

defined in Student Code, Part III, B.2, (the "Disruptive Behavior Policy").   Disruptive behavior

is defined as "participating in or inciting others to participate in the disruption or obstruction of

any University activity, including, but not limited to: teaching, research, events, administration,

Student Conduct proceedings, the living/learning environment, or other University activities, on

or off-campus; or of other non-University activities when the conduct occurs on University

premises; or of the living environment, on or off-campus."  *Id.*

The Amended Complaint alleges that the policies and the Investigation violated the

plaintiffs' First Amendment rights in a number of ways.  However, under any analysis, the

plaintiffs' allegations do not establish a First Amendment violation.  As such, the defendants are

entitled to qualified immunity as to the Section 1983 claims.

> **(1) Under a forum analysis, even if this court finds that the**
> **residential area of campus is a public forum, the policies, both on**
> **their face and as applied, do not violate the First Amendment.**

In relevant part, the First Amendment, applicable to states through the Fourteenth

Amendment, provides that state actors "shall make no law . . . abridging the freedom of

speech." U.S. Const. amend. I; amend. XIV. Virtually all non-violent speech is protected by

the First Amendment, even when "hurtful," "offensive," or "disagreeable." *Snyder v. Phelps*, 562

U.S. 443, 458, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011) (citing *Texas v. Johnson*, 491 U.S. 397,

414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989). Because public universities are creatures of

state government, the First Amendment's dictates unquestionably apply on their

campuses. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 822, 115 S.

Ct. 2510, 132 L. Ed. 2d 700 (1995). Indeed, the Supreme Court has noted, the "danger" of

"chilling individual thought and expression" is "especially real in the University setting, where

the State acts against a background and tradition of thought and experiment that is at the center

of our intellectual and philosophic tradition." *Rosenberger*, 515 U.S. at 835.

However, "'even protected speech is not equally permissible in all places and at all

times.'" *Calash v. City of Bridgeport*, 788 F.2d 80, 82 (2d Cir. 1986) quoting *Cornelius v.

NAACP Legal Defense and Education Fund*, 473 U.S. 788, 105 S. Ct. 3439, 3448, 87 L. Ed. 2d

567 (1985). Public universities, just like any governmental entity, "may legally preserve the

property under its control for the use to which it is dedicated." *Rosenberger*, 515 U.S. at

829 (quoting *Lamb's Chapel v. Center Moriches Sch. Dist.*, 508 U.S. 384, 390, 113 S. Ct. 2141,

124 L. Ed. 2d 352 (1993)). Because "[a] university's mission is education," federal courts have

"never denied a university's authority to impose reasonable regulations compatible with that

mission upon the use of its campus and facilities," nor required that a university either "make all

of its facilities equally available to students and nonstudents alike," or "grant free access to all of

its grounds or buildings." *Widmar v. Vincent*, 454 U.S. 263, 267 n.5, 102 S. Ct. 269, 70 L. Ed. 2d

440 (1981). This law is consistent with the established law that states may regulate the "time,

place and manner of expression", subject to certain restrictions, without violating the First

Amendment.  *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.

Ct. 948, 74 L. Ed. 2d 794 (1983).

In determining the extent to which a government defendant can restrict speech on its

property, the Supreme Court has adopted an analysis based upon the nature of the forum

involved.  *See Children First Found., Inc. v. Fiala*, 790 F.3d 328, 339 (2d Cir. 2015).   The

forum analysis "divides government property into three [principal] categories—the traditional

public forum, the designated public forum, and the nonpublic forum, along with 'a subset of the

designated public forum,' referred to as the limited public forum….  [T]he level of judicial

scrutiny that must be applied to state actions inhibiting speech varies with the nature of the forum

in which the speech occurs…." *Johnson v. Perry*, 859 F.3d 156, 171–72 (2d Cir. 2017) (Internal

citations and quotations omitted.)

Traditional public fora include "streets [and] parks ... 'which have immemorially been

held in trust for the use of the public and, time out of mind, have been used for purposes of

assembly….'" *Johnson*, 859 F.3d at 172, *citing Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d

617, 625-26 (2d Cir. 2005).  As to a traditional public forum, "any restriction based on the

content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored

to serve a compelling government interest." *Pleasant Grove City, Utah v. Summum*, 555 U.S.

460, 469, 129 S. Ct. 1125, 172 L. Ed. 2d 853 (2009). *See also Johnson*, 859 F.3d at 172.  Where

the restriction is content neutral, time, place and manner regulations must be narrowly tailored to

serve a significant government interest, and must leave open "ample alternative channels of

communication." *Perry Educ. Ass'n*, 460 U.S. 37 at 45 (internal quotation marks).

"A 'designated public forum' is a place not traditionally open to public assembly and

debate—a public school, for example—that the government has taken affirmative steps to open

for general public discourse." *Peck,* 426 F.3d at 626.  "Speech in a designated public forum is entitled to the same constitutional protection as that extended to expression in a traditional public forum, so long as the state continues to designate the forum for such use." *Johnson*, 859 F.3d at 172, citing *Peck*, 426 F.3d at 626.

A limited public forum, a subset of the designated public forum, is created when the state "opens a non-public forum but limits the expressive activity of certain kinds of speakers or to the discussion of certain subjects."  *Peck*, 426 F.3d at 626.  "In [a] limited public forum, strict scrutiny is accorded only to restrictions on speech that fall within the designated category for which the forum has been opened."  *Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.,* 311 F.3d 534, 545 (2d Cir. 2002). Thus, the government may impose content-neutral time, place, and manner restrictions on speech within the designated category for which the forum has been opened so long as those restrictions are "narrowly tailored to serve a significant government interest and leave open ample alternative channels of communications." *Make the Rd. by Walking v. Turner*, 378 F.3d 133, 142 (2d Cir. 2003).  For speech falling outside the designated categories in a limited public forum, "restrictions need only be viewpoint neutral and reasonable." *Hotel Emps. & Rest. Emps. Union, Local 100,* 311 F.3d at 546.

Finally, "[a] nonpublic forum is one that is neither traditionally open to public expression nor designated for such expression by the State…." *Johnson*, 859 F.3d at 172, citing *Peck*, 426 F.3d at 626.  "[T]he government enjoys greater latitude in restricting speech in a nonpublic forum and may limit access or content based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Johnson*, 859 F.3d at 165, *citing Byrne v. Rutledge*, 623 F.3d 46, 54 (2d Cir.

2010).  In any nonpublic forum, speech can be regulated in a reasonable and viewpoint neutral

manner. *See, e.g., Peck,* 426 F.3d at 626–27 (holding that school was a non-public forum).  *See*

*also Make the Rd. by Walking, Inc.,* 378 F.3d at 143(To the extent that a school is in most

instances a non-public forum, the school's limitations on student speech need only be

"reasonable and viewpoint neutral.").  In fact, a limitation on speech in a

nonpublic forum *may* be content-based, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 n.6, 120

L. Ed. 2d 305, 112 S. Ct. 2538 (1992), and "need only be reasonable, as long as the regulation is

not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Lee*,

505 U.S. at 679; *see also Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991) (in

nonpublic forum, "the state has maximum control over communicative behavior since its actions

are most analogous to that of a private owner").

The first step in this analysis, then, is to determine what type of forum defendant UConn

has created in and around the residential areas of campus.  The Second Circuit has identified

several factors to be considered in making this determination. The "'primary factor'" is "'how the

locale is used.'" *Hotel Employees & Rest. Employees Union, Local 100,* 311 F.3d at 547.

Additional considerations are "the forum's physical characteristics and the context of the

property's use, including its location and purpose." *Id.* at 547.  Courts also look at the

government's intent in creating the forum and its need to control expressive activity taking place

there, as shown by its policies and regulations. *Id.* Also relevant is "whether the property in

question 'is part of a class of property which by history or tradition has been open and used for

expressive activity.'" *Id.* (*quoting Warren v. Fairfax County,* 196 F.3d 186, 190 (4th Cir. 1999)).

In the case of a state university, although it "possesses many of the characteristics of

a public forum," such as open sidewalks, "[it] differs in significant respects

28

from public forums such as streets or parks or even municipal theaters." *Widmar v. Vincent*, 454 U.S. 263, 268 n.5, 102 S. Ct. 269, 70 L. Ed. 2d 440 (1981).  While universities may choose to open limited parts of their campuses to speech, it is well established that the presence of some expressive activity in a forum does not, without more, render it a public forum. *Id.* (*citing United States Postal Service v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 130 n.6, 69 L. Ed. 2d 517, 101 S. Ct. 2676 (1981)).  "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985).

Cognizant of the balance between the First Amendment rights of individual speakers and the property rights of a state university, the Supreme Court has generally held that where the university has opened a portion of its campus to speech, i.e., lecture halls and university programming like student activity funds, they have created "limited public forums" in those areas.  *See Christian Legal Soc. v. Martinez*, 561 U.S. 661, 679, 130 S. Ct. 2971, 177 L. Ed. 2d 838 (2010); *Rosenberger*, 515 U.S. at 828-29.  In those cases, universities "open [their nonpublic] property, *limited* to use by certain groups," *e.g.*, students, faculty, employees, *or* "dedicated solely to the discussion of certain subjects," *e.g.*, student-or-university-sponsored lectures. *Christian Legal Soc.*, 561 U.S. at 679 n.11 (emphasis added).  Only when a university "intentionally opens" a portion of its campus "for expressive conduct . . . but not limited to a particular type of speech or speaker," has that portion of campus been deemed a "designated public forum." *Bowman*, 444 F.3d 976, 979 (8th Cir. 2005).

The plaintiffs in this case have not pled any facts to allow the court to conclude that the area where this incident occurred was anything other than a nonpublic forum.  There are no

allegations that the area near the residence hall has any of the characteristics of a traditional

public forum, limited forum or designated public forum.  There are no allegations that the

location is used for public speech or communication or that defendant UConn opened the area

surrounding the residence halls to use and expression by the public or the students themselves at

any point in time.  Nor are there any facts alleged showing how the nature of the residence hall

area is compatible with expressive activities and public discourse.

However, solely for the purposes of this motion to dismiss, even if the plaintiffs' speech

occurred in a public forum, the policies, both on their face and as applied, satisfy the strict

scrutiny test applicable in that forum.  Given that they withstand review under the highest test, it

is a given that they would survive review under the less stringent test applied in both limited and

nonpublic forums.

> **(a)     Even under the highest scrutiny applied to content-based regulations, the policies do not violate the First Amendment.**

First amendment analysis in a traditional public forum context requires the court to first

determine whether the regulations or restrictions at issue are content-based or content-neutral.  In

making this determination, the government's purpose is the controlling

consideration. "Government regulation of speech is content based if a law applies to particular

speech because of the topic discussed or the idea or message expressed." *Reed v. Town of*

*Gilbert, Ariz.*, 576 U.S. 155, 163, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015) (citation omitted).

That is, a law "content based if it require[s] enforcement authorities to examine the content of

the message that is conveyed to determine whether a violation has occurred." *McCullen v.*

*Coakley*, 573 U.S. 464, 479, 134 S. Ct. 2518, 189 L. Ed. 2d 502 (2014) (citation omitted).  A

regulation is content neutral if it serves purposes unrelated to the content of expression even if it

has an incidental effect on some speakers or messages but not others. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 2754, 105 L. Ed. 2d 661, 675, (1989).

Neither the Student Conduct Process Policies nor the Disruptive Behavior Policy, on their face, regulate speech or any type of conduct necessarily associated with speech, such as picketing. The Student Conduct Process Policies set forth the procedural processes the university will follow upon receipt of a complaint. The same procedures govern all investigations no matter the subject matter of the complaint or the content of the speech, if any, that allegedly was used during the alleged incident. Likewise, the Disruptive Behavior Policy is content neutral as it includes no verbiage concerning speech at all. Its focus is on behavior, not speech. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791.

Content-neutral regulations in a public forum are subject to a slightly less strict test as compared to content-based restrictions. Content-neutral restrictions may limit the time, place, or manner of expression so long as the regulations are "narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information." *Perry Educ. Ass'n,* 460 U.S. at 45. "The narrow tailoring requirement is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *Id.* (citation omitted). Thus, a content-neutral restriction "need not be the least restrictive or least intrusive means of" serving the governmental interest. *Id.* (citation omitted). "The validity of regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting

significant government interests or the degree to which those interests should be promoted."
*United States v. Albertini*, 472 U.S. 675, 689, 105 S. Ct. 2897, 86 L. Ed. 2d 536 (1985).

Thus, the plaintiffs' facial challenges[8] to the policies are subject to the slightly less
stringent test than the test applicable to content-based restrictions in a public forum.  However,
the plaintiffs also set forth as-applied challenges.  These allegations assert that, when the
defendants invoked the policies to conduct the Investigation, their actions were based on the
content of their speech, and, therefore were content-based restrictions.

Any content-based restriction in a public forum 'must satisfy strict scrutiny, that is, the
restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove
City, Utah v. Summum*, 555 U.S. 460, 469, 129 S. Ct. 1125, 172 L. Ed. 2d 853 (2009).  Even if
serving a compelling state interest, a content-based restriction on speech must be
"the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S.
656, 666, 124 S. Ct. 2783, 159 L. Ed. 2d 690 (2004). "When a plausible,
less restrictive alternative is offered to a content-based speech restriction, it is the Government's
obligation to prove that the alternative will be ineffective to achieve its goals." *United States v.
Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000). A
narrowly tailored restriction must be neither under-nor overinclusive. *Republican Party of
Minnesota v. White*, 536 U.S. 765, 775, 122 S. Ct. 2528, 153 L. Ed. 2d 694 (2002).

Again, solely for the purposes of this motion to dismiss, even if this court were to find
that the Investigation amounted to a content based restriction because it focused on the plaintiffs'
speech, the defendants' conduct satisfies the strict scrutiny applicable to such restrictions in a

---

[8] It is well-established that, in the First Amendment context, facial challenges are disfavored.  *Nat'l
Endowment for the Arts v. Finley*, 524 U.S. 569, 580, 118 S. Ct. 2168, 141 L. Ed. 2d 500 (1998) (describing
"facial invalidation" of a statute or regulation as "strong medicine," best employed "sparingly and only as a last
resort").

public forum and, therefore, does not violate the First Amendment.  Further, because the policies survive the stricter test, they also survive the less stringent test applicable to content-neutral restrictions.

**(i)     The policies and the Investigation serve compelling state interests.**

Both the policies and the Investigation itself serve the university's compelling interests in protecting the fundamental fairness and due process rights of all students involved in the processing of a student conduct complaint, maintaining a campus free from harassment and discrimination as required under federal law, and maintaining a campus that ensures the safety and security of all students so that no student is deprived of the opportunity to reap the benefits of their education.  These compelling interests more than satisfy the strict scrutiny applicable to content-based restrictions on speech in a public forum.

The Student Conduct Process Policies set forth the procedural steps the university is required to follow upon receipt of a complaint.  These processes protect the due process rights of all students, both those who file a complaint and those who are the subject of an investigation following a complaint.  By establishing these procedural guarantees, the university ensures that investigations are conducted to ascertain the facts surrounding an incident prior to the issuance of any charges or sanctions.  When the university has completed an investigation and has sufficient facts, it then decides if charges should be issued.  At that point, any accused students are given notice of the charges and possible sanctions and the right to a hearing.

In this case, the Investigation ensured the plaintiffs that they would not face the possibility of sanctions for any behavior without a full and fair examination of the facts surrounding the event and a full opportunity to be heard as to their versions of the facts giving rise to the complaint.  The Investigation also ensured the complainant student that his rights to be

free to live and learn in an environment free from disruptive behaviors, harassment and discrimination, were protected by a full inquiry into the incident.

The Student Conduct Process Policies also serve the university's compelling interest, and requirement under federal law, to provide a learning environment that is non-discriminatory and non-hostile. Title VI of the Civil Rights Act of 1964 provides that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d, *et seq.* Although Title VI does not provide for individual liability, *see Hickey v. Myers*, 852 F. Supp. 2d 257, 267 (N.D.N.Y. 2012), "[i]n certain circumstances, courts view actions of a third party as intentional violations by the funding recipient itself." *Zeno v. Pine Plains Cent. Sch. Dist*., 702 F.3d 655, 664-65 (2d Cir. 2012) (citations omitted). "For example, in the educational setting, a school district is liable for intentional discrimination when it has been 'deliberately indifferent' to teacher or peer harassment of a student." *Id*. at 665 (citations omitted).

Further, "[d]iscrimination under Title VI is not limited to being excluded from, or denied the benefits of, a particular school program." *Id*. at 665-66 (citing 42 U.S.C. § 2000d; 34 C.F.R. § 100.3(a)). "Discriminatory actions '[r]estrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit' under the school system." *Id*. (quotation and other citations omitted). "Educational benefits include an academic environment free from racial hostility." *Zeno*, 702 F.3d at 666 (citation omitted); *see also Hayut*, 352 F.3d at 750  [*43] ("We also find that . . . [misconduct that] simply created a disparately hostile educational environment relative to her peers . . . could be construed as depriving [the victim] of the benefits and educational opportunities available at [the school]")**.**

34

In fact, the university risks losing federal funding if it does not adequately respond to complaints of discrimination under Title VI.  A finding of deliberate indifference depends on the "adequacy of a school district's response to the harassment." *Zeno*, 702 F.3d at 666 (citing *Hayut*, 352 F.3d at 750). "A failure to respond, . . . a response that 'only follows after a lengthy and unjustified delay,' . . . and a response that 'amount[s] to deliberate indifference to discrimination,' have all been found inadequate." *Id*. (internal quotations and citations omitted).

The Student Conduct Process Policies promote the university's compelling interest in complying with federal law and creating an environment free of discrimination because they provide a set of procedures to guide investigations while ensuring fundamental fairness for all involved.  The university is obligated under federal law to investigate student complaints, at least in part, to determine if any student has been the target of harassment.  Failure to investigate risks the safety and security of students and exposes the university to liability under federal law.  Thus, the policies that set forth the processes to be followed when the university receives a complaint are integral to furthering the compelling government interest in securing a campus that is safe for all.

The defendants' decision to conduct the Investigation fully serves this compelling interest.  The defendants had received a complaint that the plaintiffs had used a racial slur in a residential area of campus.  At least one student reported that the plaintiffs might have targeted him when they used the term. Dkt. 10-1, pp. 23/95, 32/95, 43/95, and 61/95.  The defendants were required under federal law and compelled by the university's commitment to preventing discrimination, harassment and bullying to conduct the Investigation to acquire full knowledge of the facts.  Failure to do so would have constituted a violation of federal law.

Both the Student Conduct Process Policies and the Disruptive Behavior Policy also serve the university's compelling interest in creating an atmosphere suitable to its educational goals. "A university's mission is education . . . ." *Widmar v. Vincent*, 454 U.S. at 268 n.5. It is axiomatic that a student cannot undermine her/his classmates' right to live and learn in an area free from disruption. Universities have authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities. Maintaining a living environment conducive to learning and sleep and one that is free from discrimination and harassment is a compelling and significant governmental interest. *See Bd. of Trs. v. Fox*, 492 U.S. 469, 475, 109 S. Ct. 3028, 106 L. Ed. 2d 388 (1989) (stating that student safety was a substantial interest justifying a university's restriction on commercial speech); *see also Healy*, 408 U.S. at 180 (noting the "acknowledged need for order" on campus). The Disruptive Behavior Policy within the Student Code serves the compelling government interest in maintaining an environment conducive to learning and fulfilling the mission of the university.

The Investigation, conducted pursuant to the Student Conduct Process Policies, and the finding regarding a violation of the Disruptive Behavior Policy,[9] satisfy this compelling interest as well. When the defendants received a complaint about loud behavior in the middle of the night near residence halls that disturbed students, they were obligated to investigate given the compelling interest in a learning conducive environment. The Investigation found that the

---

[9] The plaintiffs do not have standing to bring an as applied claim as to the Disruptive Behavior Policy because it was never actually applied to them. The university never made a final decision regarding the plaintiffs' potential violation of that policy. The plaintiffs had every right to participate in a hearing where all the evidence would have been considered by a hearing panel made up of persons not involved in the Investigation. They would have had the opportunity to testify and present witnesses and evidence. The hearing panel may have concluded that no violation had occurred. However, the plaintiffs obtained a TRO to stop that hearing and then circumstances mooted the case. The defendants have addressed the claim, however, in case the court disagrees.

plaintiffs' behavior was loud and disruptive in the middle of the night in a residential area of campus. Those facts establish a violation of the policy.

The policies and the Investigation serve compelling state interests so as to pass the strict scrutiny applicable to content based restrictions of speech in a public forum. Further, they are also narrowly tailored and the least restrictive means of serving those interests, the second prong of the forum analysis.

> **(ii)** **The policies and Investigation were narrowly tailored and the least restrictive means of serving the state's compelling interest.**

The policies and the Investigation were also narrowly tailored to serve the compelling governmental interests at stake. The procedures set forth in the Student Conduct Process Policies guide the university's investigation into student complaints while ensuring fundamental fairness in the process for all involved. The university needs procedures to investigate complaints to ensure that it can accomplish its mission, creating an environment that allows all students to exercise all their rights in an environment whose primary purpose is education. The university also needs to ensure that the procedures protect the due process rights of all students involved in the process. This means providing notice of the procedures that will apply and allowing opportunities for all involved to be heard.

The plaintiffs suggest that the Student Conduct Process Policies, as applied to them, are not narrowly tailored or the least restrictive measures to accomplish the government's goals because they allowed the university to focus on the plaintiffs' speech during the Investigation. The plaintiffs' claim fails to recognize the university's compelling interests described above. The Investigation examined the context and behaviors associated with the plaintiffs' speech in order to determine whether the plaintiffs had violated any policies, including those that prohibit

harassment and discrimination.  Any incidental effect on the plaintiffs' speech caused by the

Investigation conducted for that compelling government interest is not of constitutional concern.

Without the Investigation, the university could not have known what, if any, violations had

occurred.  University officials confronted with possible violations of the Student Code are not

required to resolve them in the abstract.  *Abbott v. Pastides*, 900 F.3d 160, 173 (2018).  "Nor

does the First Amendment require that they assume no actionable harassment or discrimination

without first seeking relevant information.  [U]niversities have obligations not only to protect

their students' free expression, but also to protect their students."  *Id*

The Student Conduct Process Policies are also narrowly drawn given that they are

intended to protect the due process rights of students accused of any violations.  Requiring a

thorough investigation prior to a possible hearing and decision ensures that students are not

accused of violations before the university has conducted an impartial inquiry into the

circumstances giving rise to the complaint.  The fact that the procedures provide a student

accused of a campus infraction with an early chance to respond is a positive feature of due

process, not an intolerable imposition. *See Goss v. Lopez*, 419 U.S. 565, 581, 95 S. Ct. 729, 42 L.

Ed. 2d 725 (1975) (holding that students are entitled under the Due Process Clause to an

opportunity to present their version of events before being suspended).  Obviously, a process that

provides for investigations conducted pursuant to the Student Conduct Process Policies are far

less "restrictive" or burdensome than a policy that would allow the university to impose

sanctions without an investigation.

The minimally burdensome process of the Investigation was narrowly tailored to several

compelling state interests and so survives strict scrutiny.  If the court accepts the plaintiffs'

position, the court would essentially give validity to the argument that speech can insulate students from any investigations into behaviors that allegedly violate the Student Code.

The Disruptive Behavior Policy is a content-neutral restriction on students' behavior on campus. It does not refer to speech or expressive conduct. It does not identify any message or challenge the content of any speech. It is narrowly drawn because it includes limiting terms that require that the behavior disrupts or obstructs "any University activity, including, … the living/learning environment…." The plaintiffs claim, however, that, as-applied to them, the policy is content-based because the Investigation's recommended finding, that the plaintiffs violated the Disruptive Behavior Policy, was based on the content of their speech. The plaintiffs point to absolutely no facts to support that claim. Instead, they offer their own hypothetical conclusion.

The plaintiffs' claim fails because the Disruptive Behavior Policy is narrowly tailored, as applied to the plaintiffs, because it does not burden substantially more of plaintiffs' free speech rights than is necessary to further the government's compelling interests. The policy prohibits the plaintiffs' behavior, specifically yelling outside residence hall windows in the middle of the night, because it disrupts the living/learning environment, not because of the speech used during the disturbing behavior. The application of the policy to plaintiffs' behavior serves the state's compelling interest in maintaining an environment that protects the rights of all students to a living and learning environment conducive to education. At most, it had the incidental effect of limiting the plaintiffs' speech to a more appropriate time, place or manner. Such incidental effects are consistent with First Amendment protections. The policy was not applied to the plaintiffs to prevent their speech, even their use of the terms they chose to use that night, under all circumstances. Instead the policy was applied because their loud and disruptive behavior in

the middle of the night in a residential area interfered with the university's mission as an institute of education.

Therefore, even under the strictest review applied to state regulations in a public forum, the policies and Investigation do not violate the First Amendment.  While the plaintiffs First Amendment claims fail a forum analysis, the Amended Complaint includes vague references to elements of other types of First Amendment arguments.  In an abundance of caution and solely for the purposes of this motion to dismiss, should the court choose to consider any other First Amendment challenges alluded to in the Amended Complaint, no matter how vague, those claims fail as well as set forth below.

**(2) The policies do not discriminate based on viewpoint.**

The Amended Complaint refers to an as-applied viewpoint discrimination claim as a First Amendment violation.  In order to plausibly allege viewpoint discrimination, a plaintiff allege that s/he was "prevented from speaking while someone espousing another viewpoint was permitted to do so." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 n.4, 189 L. Ed. 2d 502 (2014). "[T]he test for viewpoint discrimination is whether – within the relevant subject category – the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 137 S. Ct. 1744, 1766, 198 L. Ed. 2d 366 (2017).  *See also Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984); *accord Rosenberger,* 515 U.S. at 829 (explaining that viewpoint discrimination occurs when the idea or opinion expressed by the speaker is the reason the government chooses to restrict speech).  At base, viewpoint neutrality ensures "that minority views are treated with the same respect as are majority views." *Bd. of Regents v. Southworth*, 529 U.S. 217, 235, 120 S. Ct. 1346, 146 L. Ed. 2d 193 (2000).

The Amended Complaint fails to meet this standard.  The plaintiffs allege that the defendants engaged in viewpoint discrimination simply because the defendants investigated and issued a report recommending that the plaintiffs be found responsible for violating the Disruptive Behavior Policy.  They allege in a conclusory fashion that the recommended finding was based on the offensive nature of the words uttered by the Plaintiffs, rather than on the plaintiffs' behavior.

The allegations do not sufficiently allege that the defendants' decision to conduct the Investigation constitutes viewpoint discrimination.  There are no allegations that the defendants have ever treated other viewpoints differently.  For example, the plaintiffs have not alleged that the defendants have ever chosen not to investigate other student complaints involving loud behavior in a residential area of campus in the middle of the night.  They have also failed to allege that the university has ever chosen not to investigate a complaint when it includes an allegation that an individual was targeted by other students through speech or behavior.

The defendants investigated the events of that night to determine whether the plaintiffs had violated the Student Code.  The fact that the Investigation focused, even in part, on the words spoken by the plaintiffs, does not render the Investigation viewpoint discriminatory.  The university had the obligation to investigate the incident to determine whether the plaintiffs had violated any policy.

### (3)  The Amended Complaint does not allege sufficient facts to establish a First Amendment retaliation claim.

To the extent the plaintiffs are raising a retaliation claim under the First Amendment, that claim also fails.  As a private citizen suing a public official for First Amendment retaliation, a plaintiff must show: "(1) [s]he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [her] exercise of that right; and (3) the

defendant's actions caused [her] some injury." *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) *(per curiam) (citing Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)). The injury can take the form of actually chilled speech or other forms of harm. *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). The plaintiffs' allegations in this case fail to establish any of the three elements of a retaliation claim under the First Amendment.

Assuming solely for the purposes of this motion to dismiss that the plaintiffs have pled facts sufficient to establish that their speech was protected by the First Amendment, they have failed to plead facts to establish the second and third prongs of the retaliation test. The allegations do not sufficiently plead that the defendants' actions, specifically the Investigation, were motivated by the plaintiffs' exercise of a protected First Amendment right. Nor do they plead sufficient facts to demonstrate that the Investigation caused them an injury. As such, the retaliation claim, to the extent one is pled, must be dismissed.

"The ultimate question of retaliation [in the First Amendment context] involves a defendant's motive and intent . . . ." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002). To establish a First Amendment retaliation claim, the plaintiffs must show that the defendants acted "with the purpose of deterring the exercise of First Amendment freedoms." *Greenwich Citizens Comm., Inc. v. Counties of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 31 (2d Cir. 1996). "To establish a causal connection sufficient to survive a motion to dismiss, the 'allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action.'" *Kempkes v. Downey*, No. 07-CV-1298, 2008 U.S. Dist. LEXIS 25981, 2008 WL 852765, at *3 (S.D.N.Y. Mar. 31, 2008) (quoting *Davis v. Goord*, 320 F.3d 346, 354 (2d Cir. 2003)). "[A] direct showing requires plaintiff to provide tangible proof of retaliatory animus, [and] conclusory assertions of

retaliatory motive are insufficient." *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118-19 (2d Cir. 2015) (quotation marks omitted).  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

The plaintiffs' allegations as to the defendants' retaliatory motivation are no more than conclusory statements lacking sufficient factual support.  The plaintiffs rely on the allegation that defendant Kytan informed them that the Investigation was concerned with the words used to allege a retaliatory motive.  This allegation is simply insufficient to survive a motion to dismiss.

Given that the Student Code specifically prohibits conduct that may include speech that rises to level of harassment and discrimination, and given that the University has an obligation under federal law to protect all students from such harassing behavior, the allegation that defendant Kytan stated that the Investigation was examining the plaintiffs' speech is wholly insufficient to establish a retaliatory motive.  Examined in the context of the defendants' obligations under federal law, the reasonable inference is that the defendants' actions in conducting the Investigation were intended to determine whether the plaintiffs had violated any policies, rather than to retaliate against the plaintiffs solely on the basis of the words they uttered. The Investigation necessarily examined the plaintiffs' conduct and speech given that the student complaint included an allegation that the racial slurs were directed at a student.  Given that there is a perfectly legitimate and compelling reason for the defendants to investigate the facts surrounding the incident that occurred, the sole allegation that the Investigation was concerned with the words used is conclusory and legally insufficient to allege a retaliatory motive.

With respect to the third prong, the plaintiffs have failed to allege sufficient facts to establish any injury.  While allegations of any injury can satisfy this prong, when a plaintiff, as here, has alleged only "chilling" as the injury, s/he must show that her or his First Amendment rights were "actually chilled." *Curley*, 268 F.3d at 73 (citing *Davis v. Vill. Park II Realty Co.*, 578 F.2d 461, 464 (2d Cir. 1978)).  *See Agostino v. Simpson*, No. 08-CV-5760, 2008 U.S. Dist. LEXIS 93094, at *25-26 (S.D.N.Y. Nov. 14, 2008) (dismissing First Amendment retaliation claim where plaintiff did not allege actual adverse effect on speech); *Ford v. Reynolds*, 326 F. Supp. 2d 392, 403 (E.D.N.Y. 2004) (retaliation claim dismissed where plaintiffs failed to allege any actual chilling or deterrence of speech), *aff'd*, 167 F. App'x 248 (2d Cir. 2006).

In the case at bar, the plaintiffs have not alleged a single situation where they would have exercised their rights, but chose not to because of fear of retaliation.  "Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." *Curly*, 268 F.3d at 73.  *See Singer*, 63 F.3d at 120 (finding no chilling effect where, after an arrest, the plaintiff continued to publish his newspaper through which he criticized the village government); *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992) (finding no chilling effect where, after the filing of a lawsuit, the plaintiff continued to write criticizing editorials in the same manner as before the lawsuit).

In the absence of any non-speculative, non-conclusory allegations suggesting that the plaintiffs were harmed by the defendants' conduct, in the form of actual chilling, the plaintiffs' allegations fail to state a claim for First Amendment retaliation.

**(4)  The policies are not overbroad.**

The plaintiffs argue that the policies are overbroad and, therefore, violate the First

Amendment.  The claim fails because the plaintiffs have failed to plead any facts to show that the

policies are unconstitutional in a substantial number of cases.  Instead, they have only claimed

that they are overbroad in their application to their own case.  This is not sufficient to state an

overbreadth claim.

A law is unconstitutionally overbroad if it "punishes a substantial amount of protected

free speech, judged in relation to [its] plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113,

118-19, 123 S. Ct. 2191, 156 L. Ed. 2d 148 (2003) (internal quotation marks omitted). Before a

court will invalidate a law as overbroad, the challenging party must demonstrate "*substantial*"

infringement of speech. *United States v. Williams,* 553 U.S. 285, 292, 128 S. Ct. 1830, 170 L.

Ed. 2d 650 (2008).  This substantiality standard is "vigorously enforced," *United States v.*

*Thompson*, 896 F.3d 155, 163 (2d Cir. 2017), and because the overbreadth doctrine's purpose is

to prevent the chilling of protected speech, "[r]arely, if ever, will an

overbreadth challenge succeed against a law or regulation that is not specifically addressed to

speech or to conduct necessarily associated with speech (such as picketing or

demonstrating)." *Virginia v. Hicks*, 539 U.S. 113, 124, 123 S. Ct. 2191, 156 L. Ed. 2d 148

(2003).

The Amended Complaint fails to allege any facts to show how the policies

unconstitutionally interfere with the First Amendment in a "substantial" number of applications.

The plaintiffs' lone allegation, that the policies had a chilling effect on their own speech, is not

enough to state a facial challenge. "[T]he mere fact that one can conceive of some impermissible

applications of a statute is not sufficient to render it susceptible to an overbreadth challenge."

*Sibley v. Watches*, 2020 U.S. Dist. LEXIS 213611, *16, __ F.Supp.3d __, 2020 WL 6721467,

(*citing Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S. Ct. 2118,

80 L. Ed. 2d 772 (1984).  Therefore, the plaintiffs' overbreadth challenge must be dismissed.

### (5) The policies are not unconstitutionally vague.

The plaintiffs also claim that the policies are unconstitutionally vague.  The claim fails

because the policies provide adequate notice of what procedures shall apply when a complaint is

filed and what behaviors are considered disruptive.  Further, the policies are explicit enough so

as to create no risk of arbitrary enforcement.

The Due Process clause of the Fifth Amendment requires that a regulation must, at a

minimum, "provide people of ordinary intelligence a reasonable opportunity to understand what

conduct it prohibits in a manner that does not encourage arbitrary and discriminatory

enforcement." U.S. Const. amend. V; *Hill V. Colorado*, 530 U.S. 703, 732, 120 S. Ct. 2480, 147

L. Ed. 2d 597 (2000).  "A statute can be impermissibly vague for either of two independent

reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to

understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and

discriminatory enforcement." *Farrell*, 449 F.3d at 485 (quoting *Hill v. Colorado*, 530 U.S. 703,

732, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000)). "Thus, all vagueness challenges—

whether facial or as-applied—require [courts] to answer two separate questions: whether the

statute gives adequate notice, and whether it creates a threat of arbitrary enforcement." *Id.  See*

*Sibley v. Watches*, 2020 U.S. Dist. LEXIS 213611, *20, __ F.Supp.3d __, 2020 WL 6721467.

The plaintiffs' vagueness claims fail because the policies give adequate notice and do not

encourage arbitrary enforcement.  The Student Conduct Process Policies apply to all student

complaints without regard to speech.  They set forth detailed procedural rules that staff will

follow upon receipt of a complaint.  There is no question about the procedure to be followed.

Likewise, a person of ordinary intelligence would understand that loud behavior in the middle of

the night outside the windows of residence halls would cause a disturbance that might be subject

to discipline under the Disruptive Behavior provision of the Student Code.  It is completely

unreasonable to assume that because the behavior included elements of speech that the disruptive

behavior was exempt from the policy.

Further, like an overbreadth challenge, "[f]acial vagueness challenges may go forward

only if the challenged regulation 'reaches a substantial amount of constitutionally protected

conduct.'" *Farrell v. Burke*, 449 F.3d 470, 496 (2d Cir. 2006).  **The plaintiffs have not alleged**

**any facts to state a plausible claim that the policies reach a substantial amount of protected**

**conduct.  In fact, they have only alleged that it reached their own.  As such, the claim fails.**

*Sibley v. Watches*, 2020 U.S. Dist. LEXIS 213611, *29-30, __ F.Supp.3d __, 2020 WL 6721467.

Therefore, the claim must be dismissed.

### (6) The policies do not amount to a prior restraint on speech.

The plaintiffs allege that the policies amount to a prior restraint on the First Amendment,

but fail to allege any facts to demonstrate why that claim would apply to these policies.

Therefore, the claim fails.  A "prior restraint" is any statute, ordinance, or policy that vests an

administrative official with discretionary power to control in advance the use of public places

for First Amendment activities. *See Kunz v. People of the State of New York*, 340 U.S. 290, 293-

94, 71 S. Ct. 312, 314, 95 L. Ed. 280 (1951). Although prior restraints are not per se

unconstitutional, they bear a heavy presumption against constitutionality and must be carefully

scrutinized to guard against the unreasonable curtailment of free expression. *See FW/PBS, Inc. v.*

*Dallas*, 493 U.S. 215, 225, 110 S. Ct. 596, 604, 107 L. Ed. 2d 603 (1990).

47

Neither the Student Conduct Process Policies nor the Disruptive Behavior provision within the Policies operates as an unconstitutional prior restraint because neither gives the defendants the power or discretion to deny the use of the forum in advance of the actual expression. *See Hobbs v. County of Westchester*, 397 F.3d 133, 148 (2d Cir. 2005) (defining a prior restraint as "any regulation that gives public officials the power to deny use of a forum in advance of actual expression") (citations and brackets omitted).  Given that the policies do not amount to unconstitutional prior restraints because they do not give defendants the power or discretion to deny use of any forum in advance of the actual expression, the court must dismiss the plaintiffs' unconstitutional prior restraint claim.

Having failed to establish any violation of the First Amendment under any theory, the court must dismiss each of the Section 1983 claims on the grounds of qualified immunity.  Alternatively, the court should dismiss those claims because any First Amendment rights harmed by the Investigation were not clearly established at the time the defendants initiated the Investigation.

> b)      **The plaintiffs' First Amendment rights under these factual circumstances were not clearly established at the time the defendants conducted the Investigation.**

Even if this court were to find that the plaintiffs had alleged sufficient facts to plausibly state a First Amendment violation, the individual defendants are still protected by qualified immunity because the law surrounding the First Amendment rights of students under these specific circumstances is not clearly established.  It is certainly not clear precedent that students have the right to use racial slurs that are perceived by other students as targeted toward them, and that a university has no right to investigate such behavior.  Further, it is certainly not clear precedent that students have the right to act loudly in the middle of the night close to residence

halls and insulate this behavior from any investigation or possible sanctions by uttering words that they claim may fall into a category of "protected speech" by virtue of their controversial, offensive or repulsive nature.  The defendants in this case acted as reasonable officials in conducting the Investigation under the circumstances of this case and are entitled to qualified immunity.

"To make this 'clearly established' showing, a plaintiff need not identify a case directly on point, but precedent must have spoken with sufficient clarity to have placed the constitutional question 'beyond debate.'" *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017), citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L. Ed. 2d 1149 (2011). The inquiry focuses on the "'objective legal reasonableness' of the official's acts, *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396, 'assessed in light of the legal rules that were 'clearly established' at the time [the action] was taken,' *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1850, 198 L. Ed. 2d 290 (2017).

"In determining whether a right was so clearly established, the Supreme Court has emphasized that the 'dispositive inquiry ... is whether it would be clear to a *reasonable officer* that his conduct was unlawful *in the situation he confronted.'"* *Barboza v. D'Agata*, 676 F. App'x 9, 12 (2d Cir. 2017), citing *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (emphases added).  "'Even if the right at issue was clearly established *in certain respects*, ... an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue *in its particular factual context*.'" *Barboza v. D'Agata,* 676 F. App'x 9, 12 (2d Cir. 2017).  "That determination is made not from the perspective of courts or lawyers, but from that of a reasonable [person] in the defendant's position." *Ganek,* 874 F.3d at 81, citing *Saucier,* 533 U.S. at 202.   "The standard is deliberately

'forgiving,' in order to give public officials 'breathing room to make reasonable but mistaken judgments' without fear of disabling liability.  Thus, as has often been observed, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ganek*, 874 F.3d at 81.  (Internal citations and quotations omitted.)

### (1) Defendants Buda, Kytan and Colon

In this case, given the state of the law regarding students' First Amendment, due process and Title VI rights, no reasonable college official could have known that investigating a complaint that includes allegations that the plaintiffs had engaged in loud and disruptive behavior in the middle of the night near residence halls, and that the plaintiffs had used a racial slur that another student thought was directed at him, would violate the plaintiffs' constitutional rights.  The defendants were making decisions against a backdrop of fundamental and consequential legal doctrines.  Without a specific legal precedent, determining how those doctrines intersected required these educators to use their best judgment.  No reasonable person could have known that actions taken to ensure the protection of students' due process rights, anti-discrimination rights under federal law, and First Amendment rights would be construed as violating clearly established statutory or constitutional rights.  To the contrary, the decision to conduct the Investigation was made with the reasonable belief that it was both legally permissible and necessary to fulfill the university's obligations to best protect all students' rights.

Accordingly, qualified immunity shields defendants Buda, Kytan and Colon, in their individual capacities, from the plaintiffs' Section 1983 claims and the court should dismiss those counts.

### (2) Defendant Daugherty

The plaintiffs' allegations against defendant Daugherty amount to a claim that she violated their First Amendment rights by reporting the October 11, 2019 incident to the UConn Police Department.  Dkt. 56, ¶¶ 39-46.  The plaintiffs claim that she knew the police would investigate and "disrupt the lawful conduct of the speakers."  Dkt. 56, ¶ 44.  The plaintiffs allege that she "used her position" to "sanction" protected speech by reporting the incident.  Dkt. 56, ¶ 45.

The plaintiffs' allegations are wholly insufficient to state a claim under Section 1983.  First, there are no facts pled to establish a constitutional violation.  Reporting incidents to the police, even when they involve elements of speech, does not violate the First Amendment.  Connecticut prohibits the ridicule of persons on the basis of race or color.  Section 53-37 states: "Any person who, by his advertisement, ridicules or holds up to contempt any person or class of persons, on account of the creed, religion, color, denomination, nationality or race of such person or class of persons, shall be guilty of a class D misdemeanor."  C.G.S. Section 53-37.  Reporting an incident that may involve a violation of law is not a violation of the First Amendment.

Further, the allegations do not support the claim that defendant Daugherty's actions were motivated by any "influence" she allegedly had over the UConn police.  There are no allegations that she served in any capacity that gave her any supervisory role over the police.  Likewise, there is nothing but a conclusory allegation that her actions were "retaliatory."  There are no facts pled to demonstrate any retaliatory motive on defendant Daugherty's part.  Any reasonable university official receiving the videotape and complaint alleging that a student thought he was targeted by the racial slurs uttered by the plaintiffs would have thought it completely

constitutional to make a report to the police so that the incident could be investigated to determine if any violation of law had occurred.

The plaintiffs fail to satisfy either prong of the qualified immunity test as to defendant Daugherty, and, therefore, the Section 1983 claim against her must be dismissed.

### D.    This court lacks personal jurisdiction over defendant Buda.

Counts 4 and 5 against defendant Buda must be dismissed because she was not properly served depriving this court of personal jurisdiction over her.  Lack of personal jurisdiction and insufficiency of process provide two different, but interrelated, grounds for dismissal.  *Davis v. Mara*, 587 F. Supp. 2d 422, 424 (D. Conn. 2008).  Adequate service of process is a prerequisite for a court's exercise of personal jurisdiction.  *Id.* at 425.  "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."  *Id.*, *citing Omni Capital Intern., Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).  *See also Murphy Bros. v. Michetti Pipe Stringing*, 526 U.S. 344, 350 (1999) ("In the absence of service of process [or waiver of service by the defendant], a court ordinarily may not exercise power over a party the complaint names as a defendant.")  The burden is on the plaintiff to establish that personal jurisdiction lies.  *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).

"The Federal Rules of Civil Procedure provide that an individual may be served pursuant to the law of the state for service upon a defendant in state court or by delivering the summons and complaint to the individual or his dwelling or an authorized agent.  *See* Fed.R.Civ.P. 4(e). Connecticut General Statutes § 52-57(a) requires that service of civil process on individuals be made by leaving the process and the complaint 'with the defendant, or at his usual place of abode.'"  *Kirkendall v. Univ. of Conn. Health Ctr.,* 205 F.3d 1323 (2d Cir. 2000).

In this case, defendant Buda was not named in the original complaint. Although she was added to the list of defendants in the caption of the Amended Complaint, no summons was ever issued to her. Further, she was never served properly in her individual capacity because she was not served in hand or at her abode. There is no allegation that defendant Buda authorized an agent to receive service of process on her behalf. Nor has any person been appointed by law to receive such service. Having failed to fulfill the service requirements of Fed. R. Civ. P. 4(e), this court lacks personal jurisdiction over her. For this reason, the court must grant the defendants' motion to dismiss the complaint against defendant Buda in her individual capacity.

### E. The plaintiffs have failed to allege sufficient facts to establish the personal involvement of defendant Buda.

A plaintiff must allege personal involvement in the alleged constitutional violation in order to state a valid Section 1983 claim for money damages against a state official in her individual capacity. In this case, the plaintiff has failed to allege facts to demonstrate that the defendant Buda was personally involved in actions which allegedly deprived the plaintiffs of their First Amendment rights. Therefore, the Section 1983 claim for money damages against defendant Buda in her individual capacity must be dismissed.

Section 1983 imposes liability for "conduct which 'subjects or causes to be subjected', the complainant to a deprivation of rights secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976). Thus, an allegation of the defendant's personal involvement in the alleged constitutional deprivation is a necessary prerequisite for a valid cause of action under Section 1983. *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087 (1978).

Personal involvement necessary to impose individual liability includes situations where the individual: "(1) directly participated in the violation, (2) failed to remedy the violation after

being informed of it by report or appeal, (3) created a policy or custom under which the violation

occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or

(5) was deliberately indifferent to the rights of others by failing to act on information that

constitutional rights were being violated." *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir. 2007).

Ultimately, a public official can only be liable if the official causes the harm. *Baker v.

McCollan*, 443 U.S. 137, 142, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979). Thus, the plaintiff must

establish a tangible connection between the acts of the defendant and the injuries suffered. *Bass

v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

A supervisor cannot be held liable under Section 1983 under the doctrine of respondent

superior. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 n.58, 98 S. Ct. 2018, 56 L. Ed.

2d 611 (1978); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994); personal involvement of

the supervisor is required. *Leonhard v. United States*, 633 F.2d 599, 621 n.30 (2d Cir. 1980).

"The personal involvement and liability of supervisory personnel is established when the

supervisory official has 'actual or constructive notice of unconstitutional practices and

demonstrates gross negligence or deliberate indifference by failing to act.'" *Rahman v. Fisher*,

607 F. Supp. 2d 580, 584-85 (S.D.N.Y. 2009) (Cote, D.J.), *citing Meriwether v. Coughlin*, 879

F.2d 1037, 1048 (2d Cir. 1989) (citation omitted), and *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d

Cir. 1999).

The plaintiffs allege that defendant Buda supervised the Investigation process and

"approved, encouraged, and often directed the actions of Defendant Kytan." These allegations

are insufficient to plead a claim against a supervisor under Section 1983. The plaintiff has not

alleged that defendant Buda's actions constitute gross negligence or deliberate indifference.

Given that the plaintiffs have failed to allege sufficient personal involvement by defendant Buda,

they have failed to state a valid Section 1983 claim.  Therefore, the Section 1983 claim against defendant Buda must be dismissed.

**IV.     CONCLUSION**

For all of the reasons set forth herein, the defendants respectfully as this court to grant the motion to dismiss.

## <u>CERTIFICATION</u>

I hereby certify that on January 6, 2021, a copy of the foregoing *Memorandum of Law in Support of the Defendants' Motion to Dismiss* was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


/s/ Mary K. Lenehan
Mary K. Lenehan
Assistant Attorney General